# EXHIBIT A

# EXHIBIT A

Abraham Bates (12440)
Timothy Clark Dudley (13053)
**WASATCH ADVOCATES LLC**
2825 E. Cottonwood Pkwy, Ste. 500
Salt Lake City, Utah 84121
Telephone: (801) 990-3425
Facsimile: (801) 931-2512
abe@slclawfirm.com

Attorneys for Plaintiff.

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| RICHARD W. HARRIS, an individual, | **COMPLAINT FOR DECELARATORY JUDGMENT, DAMAGES, AND QUIET TITLE** |
| Plaintiff. | |
| vs. | |
| LEHMAN BROTHERS BANK., a defunct Colorado Corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEM, a Delaware Corporation; ITS TITLE INSURANCE SERVICES LLC, a Utah Corporation; AURORA LOAN SERVICES, LLC, a Colorado Corporation; JAMES H. WOODALL, a licensed Utah attorney; KEYBANK NATIONAL ASSOCIATION an Ohio Corporation; FIRST AMERICAN TITLE INSURANCE a California Corporation; and DOEs 1-5, unknown parties in interest, | Case No. |
| | Judge: |
| Defendants. | |

Plaintiff files this Complaint and alleges the following:

## PARTIES

1.  Plaintiff Richard Harris ("Harris") is a resident of Salt Lake County, state of Utah, and

is the owner of the property located at 2029 West 11800, Riverton, Salt Lake County, Utah (the "Property"), and the obligor on the promissory note (the "Note") secured by the deed of trust in this case. The Property is more particularly described in Exhibit 1.

2. Defendant Lehman Brothers Bank ("Lehman") is a defunct Colorado corporation now in bankruptcy. Lehman is the original lender on the Note executed by Harris. Lehman is the lender named on a deed of trust ("Deed of Trust") recorded against the Property on April 3, 2007. *See* Deed of Trust, attached as Exhibit 2.

3. Defendant Mortgage Electronic Registration Systems ("MERS") is a Delaware corporation and the purported beneficiary of the Deed of Trust. MERS is not registered to do business in the state of Utah.

4. Defendant ITS Title Insurance Services is a Utah corporation and the named Trustee on the Deed of Trust.

5. Defendant Aurora Loan Services LLC ("Aurora") is a Colorado corporation which purchased the Property at a public auction on April 28, 2010. *See* Trustee's Deed, attached as Exhibit 3.

6. Defendant KeyBank National Association is an Ohio corporation and the holder of two Home Equity Line Deeds of Trust against the Property. *See* Home Equity Line Deeds of Trust, attached as Exhibit 4.

7. Defendant First American Title Insurance is a California corporation and the trustee of the two Home Equity Line Deeds of Trust. *See* Home Equity Line Deeds of Trust, attached as Exhibit 4.

8. Defendant James H. Woodall is a licensed Utah attorney and was a successor trustee under the Deed of Trust. *See* Trustee's Deed, attached as Exhibit 3.

9. Does #1 through #5 are other unknown real parties in interest.

## JURISDICTION AND VENUE

10. Jurisdiction is proper pursuant to Utah Code Ann. § 78-3-4.

11. This suit is brought in the Third Judicial District Court in and for Salt Lake County, State of Utah, and venue is proper pursuant to Utah Code Ann. § 78-13-4(1), because the property at issue is located in Salt Lake County, state of Utah.

## GENERAL ALLEGATIONS

1. Plaintiff's home is being foreclosed upon by Defendants who lack standing to prosecute the foreclosure. When the "beneficial interest" in the trust deed(s) securing the promissory note(s) executed by the lender and Plaintiff were assigned to MERS, the note(s) were split from the trust deed(s), rendering the mortgage(s) unenforceable. MERS, and its assigned foreclosure trustee, are third-party debt collectors who have violated the Fair Debt Collection Practices Act ("FDCPA") by threatening foreclosure without legal authority and by misleadingly representing that they are employees of MERS even though this employment status is fictional. MERS has destroyed the system of public records for real property in violation of Utah law, and has facilitated mortgage fraud against Plaintiff and thousands of other homeowners in Utah.

2. A Notice of Default ("NOD") was recorded against the Deed of Trust, which was allegedly secured by the Lehman Note, on April 3, 2007. *See* NOD, attached as

Exhibit 5.

## THE MORTGAGE ELECTRONIC REGISTRATION SYSTEM ("MERS")[1]

3. MERS was created by the Mortgage Bankers Association of America ("MBA") to lower transactions costs for the finance industry by avoiding the payments of fees to local governments to record mortgage assignments.

4. MERS is incorporated in the state of Delaware, but headquartered in the state of Virginia. It is not licensed to do business in the state of Utah.

5. Mortgage finance companies use MERS to interact with the land title recording system in one of two ways: (1) to record MERS' name as an assignee, or by (2) recording MERS' name as the original mortgagee.

6. Under the first scenario an originating lender makes a traditional mortgage loan by listing itself as the payee on the promissory note and as the mortgagee on the trust deed. The loan is then assigned to a seller for repackaging through securitization for investors.

7. Under the second scenario, present in this case, MERS' name is recorded as the original mortgagee, or assignee of the "beneficial interest" in the trust deed. This way all further assignments of the loan do not have to be recorded.

---

[1] The following information regarding MERS is borrowed principally, and often directly, from S.J. Quinney College of Law Associate Dean Christopher Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, available at http://ssrn.com/abstract=1469749. Dean Peterson is one of the leading experts on MERS in the United States and will provide expert testimony at trial in this case. His article is attached to this Complaint as Exhibit 8. A Notice of Expert Witness for Dean Peterson accompanies this Complaint.

8. Instead of recording the assignment to the seller or trust that will own the loan, the originator pays MERS a fee to record an assignment to MERS with the local county recorder.

9. MERS maintains this it is the "mortgagee of record," or, in this case, "the beneficiary" under the trust deed even though its ownership of the mortgage is purely fictional.

10. MERS is never entitled to receive the borrower's monthly payments, nor is it entitled to receive the proceeds of a foreclosure or deed of trust sale.

11. MERS has no actual financial interest is any mortgage loan.

12. MERS does not, and cannot, provide lien releases of the mortgages it purports to own.

13. Once a loan is assigned to MERS, public records can no longer reveal who (or what) actually owns a lien on property.

14. MERS was established, in large part, to facilitate the securitization of sub-prime loans into collateralized debt obligations ("CDOs"). In 1999, shortly after MERS was established, credit rating agency Moody's issued a report, published on the front page of *Mortgage Banking*, that declared "in transactions where the securitizer used MERS, there would be no need for new assignments of mortgages to the trustee of the mortgage-backed securities ("MBS") transactions." Shortly afterward, the use of MERS exploded in the early 2000s.

15. As subprime mortgage refinancing accelerated, MERS registered an average of 21,000 loans on its system every day.

16. The creation of MERS was meant to facilitate the burgeoning volume of mortgage loan transfers that were occurring "[a]s investors bought more and more loans in the secondary market."[2]

17. MERS has saved financiers of MBSs over one billion dollars since its creation in 1999.

18. More than half of the nation's existing residential loans are recorded under MERS' name, and MERS' CEO insists that "[o]ur mission is to capture every mortgage loan in the country."[3]

19. Because MERS does not actually advance any loan principal to the homeowner and because it does not have the right to receive any payments from the borrower, MERS is not the actual party in interest in any foreclosure proceeding.

20. In order to move foreclosures along as quickly as possible, MERS allows actual mortgagees and loan assignees or their servicers to bring foreclosure actions in MERS' name, rather than their own.

**MERS LACKS STANDING AND REAL-PARTY-IN-INTEREST STATUS AS AN ENTITY UNKNOWN TO TRADITIONAL MORTGAGE LAW THAT SERVES NO ROLE IN THE LENDING PROCESS.**

21. The roles and rights of various players in a lending transaction—such as the borrower, the lender, and the trustee of the deed of trust—have been well settled.

---

[2] R.K. Arnold, *Yes, There Is Life on MERS*, Prob. & Prop., Aug. 1997, at 34.

[3] Carson Mullen, *MERS: Tracking Loans Electronically*, MORTGAGE BANKING, May 31, 2000, 62 at note IX.

One of these settled principles is that the beneficiary of the deed of trust is the party

to whom the debt is owed.

*See Hellman v. Capurro,* 549 P.2d 750, 751 (Nev. 1976) ("A mortgagee or a

beneficiary to a

deed to trust is entitled to only one satisfaction of *his debt*." (emphasis added)); *see*

*also*

*Monterey S.P. P'ship v. W.L. Bangham, Inc.,* 777 P.2d 623, 627 (Cal. 1989) ("[A] deed

of trust

typically secures a debt owed the beneficiary . . . .").

22. MERS membership rules clearly state that members are never permitted to claim

MERS is a "note-owner" as part of foreclosure proceedings.[4]

23. MERS does not own legal title to mortgages it records, even though the language of a

trust deed reads "MERS is a separate corporation that is acting solely as nominee for

Lender and Lender's successor and assigns. **MERS is the beneficiary under this**

**Security Instrument.**" (emphasis original). *See Foreclosing Trust Deed.*

24. MERS' self-characterization is schizophrenic: a "nominee" is an agent for the

mortgagee, while the "beneficiary" is the mortgagee itself. MERS' description of

itself is false on its face, because the same entity cannot simultaneously be both

"solely" an agent *and* a principal with respect to the same property right.[5]

---

[4] MERS Rules of Membership, Rule 8, Section 2(a)(i), 2(c) (Appx. 469-70).
[5] See Restatement (Third) of Agency Law § 1.01 ("Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control. . . ."). Moreover, neither the popularity of MERS' self-characterization, nor its contractual recitation, are controlling. *Id.* § 1.02 ("An agency relationship arises only when the elements stated in §

25. When MERS is challenged in litigation related to its standing to foreclose, MERS takes the position, as its corporate counsel explains, that it "gets its authority to assign and/or discharge a mortgage because MERS is the mortgagee, and as such holds legal title to the mortgage."[6]

26. When MERS is challenged in litigation based on fraud, deceptive practices, or other statutory consumer protection claims associated with loans registered in its system, MERS argues it is merely an agent ("nominee") without any exposure to liability.[7]

27. Mortgage contracts are construed based on the economic realities of the transaction, and not upon the language the parties use to describe the bargain.[8]

---

1.01 are present. Whether a relationship is characterized as agency in an agreement between the parties or in the context of industry or popular usage is not controlling.").

[6] MERS Forum, FAQ with Sharon Horstkamp, MERS Vice President and Corporate Counsel, www.mersinc.org/forum/viewreplies.aspx?id=13&tid=73 last viewed June 9, 2004.

[7] *Compare* Landmark Nat. Bank v. Kesler, No. 98,489, 2008 WL 4180346, at *1-*2 (Kan. Ct. App., Sept. 12 ,2008) ("What is MERS's interest? MERS claims that it holds the title to the second mortgage . . . . MERS objects to its characterization as an agent...") *with In re* Escher, 369 B.R. 862 (E.D. Pa. 2007) ("MERS' role as nominee leads the Court to conclude that it cannot be liable on any of the Plaintiff's [Truth in Lending or Pennsylvania consumer protection] claims. A nominee is understood to be an agent for another. . . . Therefore MERS will be dismissed from this action and no further reference to MERS will be made." ); Hartman v. Deutsche Bank Nat. Trust Co., No. 07-5407, 2008 WL 2996515, *2 (E.D.Pa. Aug. 1, 2008) (accepting MERS' argument that it could not be liable under the Truth in Lending Act because there was no colorable allegation "that ... [the plaintiff's] mortgage loan was assigned to MERS, or that MERS was ever the owner of that obligation."); Brief in Support of Defendant's Motion to Dismiss at 3, King v. Ocwen, Civil Action No. 07-11359, 2008 WL 2063553 (E.D.Mich, April 14, 2008) (arguing that MERS could not be liable for Fair Debt Collection Practices Act violations because "*HSBC was the mortgagee* for the property. Ocwen is the servicer for the property. [And,] MERS acted solely as the nominee for the original mortgagee of the property") (emphasis added).

[8] Ja-Mo Associates, Inc. v. 56 Fulton St. Garage Corp. 30 A.D.2d 287, 290 (N.Y. A.D. 1968) ("While the court is not bound by the label which the parties applied to the payment and may examine the true nature of the transaction, the payment here bore none of the distinguishing characteristics which would render section 233 (of the Real Property Law . . . ) applicable. There was no intention that the landlord hold the money as security.") (citations omitted); Szabo Food Service, Inc. of North Carolina v. Balentines, Inc., 206 S.E.2d 242, 249 (N.C. 1974); ("It has long been the rule with us that in determining whether a contract is one of bailment for use, a lease with an option to purchase, or one of sale with an attempt to retain a lien for the purchase price, the courts 'do not consider what description the parties have given to it, but what is its essential character.") (citation omitted); Lee v. Barnes, 362 P.2d 237, 240 (Wash. 1961) ("The label affixed to a security interest by the parties does not necessarily determine its legal significance.");

28. The economic reality of a mortgage transaction clearly indicates that MERS is not a mortgagee or an assignee.

29. According to Black's Law Dictionary, a "mortgagee" is "[o]ne to whom property is mortgaged; the mortgage creditor, or lender. – Also termed *mortgage-holder.*"[9]

30. There are three fundamental economic reasons why MERS is not a mortgagee: (1) MERS does not fund any loans; (2) homeowners do not promise to pay MERS any money; and (3) MERS is never entitled to receive the proceeds of a foreclosure sale. These funds go to the *actual mortgagee* (or assignee) that is the true owner of the lien.

31. Thus, not only does MERS allow financiers to avoid county recording taxes, it also allows them to misleadingly represent to the borrower that some other evidently official institution is instigating the foreclosure.

32. MERS' claim that it owns legal title to mortgages by virtue of assignment is also false on its face because MERS does not pay the mortgage originator value in exchange for the mortgage. On the contrary, the originator or servicer pays MERS to take the "assignment." Under this "assignment," MERS is still not entitled to receive repayment of the mortgage loan, nor is it entitled to the proceeds of a foreclosure sale." The fee MERS is paid is to provide recordkeeping and foreclosure services, not to own a lien on a family residence.

33. Federal consumer protection and bankruptcy law also show that MERS does not own legal title to loans registered in its database. Under the Truth in Lending Act

---

[9] BLACK'S LAW DICTIONARY (8th ed. 2004), mortgagee.

("TILA") and the Home Ownership and Equity Protection Act ("HOEPA"), a mortgage

assignee can be liable for an original lender's violations of those statutes.  If MERS

owns legal title to the mortgages in its database, it would have taken on liability for

tens of millions of residential mortgages, liability the company has repeatedly

disclaimed.

34. MERS' claim that it owns legal title to mortgages is further undermined by the long-

standing rule that a mortgage follows a negotiated promissory note.[10]  Courts are

virtually unanimous in holding that, where a mortgage lender with a promissory

note negotiates that note to a holder, the holder of the promissory note also obtains

any mortgage securing that note.[11]

35. The venerated principle of property law that a promissory note cannot be split from

the trust deed securing it was handed down by the Supreme Court over a century

ago: "[t]he note and mortgage are inseparable; the former as essential, the latter as

---

[10] RESTATMENT (THIRD) OF PROPERTY:MORTGAGES §5.4 (a), cmt. B (1997); NELSON & WHITMAN, *supra* note X, at §5.27; GEORGE E. OSBORNE, HANDBOOK ON THE LAW OF MORTGAGES § 223 (1970).
[11] In re Ivy Properties, Inc., 109 B.R. 10, 14 (Bkrtcy.D.Mass.,1989) (under Massachusetts common law the assignment of a debt carries with it the underlying mortgage); Margiewicz v. Terco Properties of Miami Beach, Inc., 441 So.2d 1124, 1125 (Fla.Dist. Ct. App.1983) (When a note secured by a mortgage is assigned, the mortgage follows the note into the hands of the assignee); Rodney v. Arizona Bank, 836 P.2d 434, 436 (Ariz. Ct. App.1992); Brewer v. Atkeison, 25 So. 992, 993 (Ala. 1899) ("[A]n assignment by the mortgagee of one of the mortgage notes operates as an assignment pro tanto of the lien upon the lands."); Martindale v. Burch, 10 N.W. 670, 671 (Iowa 1881) ("That an assignment or transfer of a note, secured by a mortgage, operates as an assignment of the mortgage lien, is a settled rule of law."); Robinson Female Seminary v. Campbell, 55 P. 276. 277 (Kan. 1898) ("the assignment of the note operated as an assignment of the mortgage made to secure the note."); Page v. Pierce, 26 N.H. 371, 1853 WL 2428, at *4 (1853) ("It is settled in this State, that the assignment of a debt secured by a mortgage of land, is *ipso facto* an assignment of the security also.").

an incident. An assignment of the note carries the mortgage with it, while an

assignment of the latter alone is a nullity."[12]

36. The parties to mortgage securitizations and loan originators who "assign" a

mortgage to MERS do not negotiate the promissory notes to MERS. MERS does not

pay value for the notes and is not entitled to receive payment. Also, negotiating a

note to MERS would expose it to assignee liability under numerous federal

consumer protection laws.

37. In thousands of cases across the country, including the present case, MERS claims

that it owns legal title to the mortgage and therefore is entitled to foreclose.

However, an economic analysis of the claim that MERS owns the lien is

demonstrably false when MERS does not own the proceeds of the sale generated

from exercising the lien.

## FIRST CAUSE OF ACTION
### FOR DECLARATORY JUDGMENT THAT MERS LACKS STANDING TO BRING FORECLOSURE ACTIONS
#### (Against Defendants MERS and the Trustee exercising MERS' alleged lien rights)

38. Plaintiff repeats and reincorporates the preceding paragraphs by reference.

39. Standing in state courts in Utah is analyzed under the "distinct and palpable injury"

test. *Jenkins v. Swan, 675 P.2d 1145, 1150 (Utah 1983).* The petitioning party must

---

[12] Carpenter v. Longan, 83 U.S. 271, 274 (1872). *Compare* Jackson v. Mortgage Electronic Registration Systems, Inc., Slip Op., 2009 WL 2461257, *5 (Minn. Aug. 13, 2009) ("By acting as the nominal mortgagee of record for its members, MERS has essentially separated the promissory note and the security instrument, allowing the debt to be transferred without an assignment of the security instrument.") *with* MERS STATE-BY-STATE FORECLOSURE PROCEDURES, *supra* note X, at 5 ("To reflect the interrelationship of the promissory note and mortgage and to ensure these two instruments are tied together properly, the recital paragraph names MERS, solely as nominee for Lender, as beneficiary.").

allege that is has, or will suffer some "some distinct and palpable injury that gives [it] a personal stake in the outcome of the legal dispute." *Id.* at 1148. When determining whether a party has suffered a distinct and palpable injury, a court must engage in a three-step inquiry. *See id.* at 1150. First, the party must assert that it has been or will be "adversely affected by the [challenged] actions." *Id.* Second, the party must allege a causal relationship "between the injury to the party, the [challenged] actions and the relief requested." *Id.* Third, the relief requested must be "substantially likely to redress the injury claimed." *Id.* at 1149.

40. The injury in fact, causation, and redressability factors track federal justiciability requirements.

41. For an injury to be redressable, it must be likely that "the plaintiff's injury will be remedied by the relief the plaintiff seeks in bringing the suit."[13]

42. While a debtor's failure to repay a mortgage loan causes a clear injury in fact to the investors who have purchased the securities that draw revenue from the note, or to an actual individual lender who holds the note, the debtor's failure to pay does not cause an injury in fact to MERS, a company that has no factual expectation of receiving loan payments or proceeds from a foreclosure sale.

43. MERS makes the same amount of money on each mortgage upon which it serves as nominee/beneficiary, regardless of whether the borrow repays.

44. Even if this Court accepts MERS' suspect claim that it owns legal title to a mortgage, nominal ownership does not give rise to an actual injury in fact:

---

[13] *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 128 S.Ct. 2531, 2535 (2008).

"Prior to the Introduction of MERS to the mortgage markets, in the history of the Anglo-American common law, there has been no case that holds that a debt collection plaintiff that lacks any beneficial interest in the debt has standing to sue *even* where legal title to that debt is held by a trustee.  Nor has there ever been a case that holds there are *two* separate legal titles to the same property. . . .  To grant MERS standing based on legal title held by someone else [the trustee of the security, or the actual lender/mortgagee], is to treat the notion of legal title as some magical nonsense where ownership means nothing other than a willingness on the part of the courts to let financiers seize homes however is most convenient for them."[14]

45. The case against standing for MERS is even stronger when MERS claims it is the original mortgagee, or owner of the beneficial interest in the trust deed securing the original mortgage loan.  In a title-theory state like Utah, it is absurd to claim that MERS *legally owns* the tens of thousands of Utah homes it has listed in its database.

46. Currently, there is a growing split in authority on whether MERS has standing to bring foreclosure actions against homeowners.  Courts that look beyond the formal labels affixed to MERS by the parties have been reluctant to grant standing,[15] while

---

[14] Peterson, *Foreclosure, Subprime Mortgage Lending, and The Mortgage Electronic Registration System*, available at http://ssrn.com/abstract=1469749; *See also* Sprint Communications Co., L.P. v. APCC Services, Inc., 128 S.Ct. 2531, 2535 (2008).

[15] *See* LaSalle Bank NA v. Lamy, 12 Misc.3d 1191, 824 N.Y.S.2d 796, at *2 (2006) ("[T]his court and others have repeatedly held that a nominee of the owner of the note and mortgage, such as Mortgage Electronic Registration Systems, Inc. MERS), may not prosecute a mortgage foreclosure action in its own name as nominee for the original lender because it lacks ownership of the note and mortgage at the time of the prosecution of the action.")

the courts granting standing have often written conclusory opinions that refuse to

look beyond MERS' nominal claims of ownership.[16]

47. In 2009, the Arkansas Supreme Court held that "MERS is not the beneficiary, even

though it is so designated in the deed of trust. Pulaski Mortgage, as the lender on the

deed of trust, was the beneficiary. It receives the payments on the debt."[17]

48. In 2009, the Kansas Supreme Court also rejected the notion that MERS is a real party

in interest to a foreclosure action. *See Landmark v. Kesler*, 216 P.3d 158, 168 (2009),

attached as Exhibit 7.

49. In 2009, the Missouri Court of Appeals found that MERS could not foreclose when

"[t]he practical effect of splitting the deed of trust from the promissory note is to

make it impossible for the holder of the note to foreclose, unless of the holder of the

deed of trust is the agent of the holder of the note . . . . The mortgage loan becomes

ineffectual when the note holder did not also hold the deed of trust." *See Bellistri v.*

*Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 623 (Mo.App.2009), attached as Exhibit

8.

50. The Nebraska Supreme Court has "conclude[d] that MERS does not acquire

mortgage loans" because "simply stated, MERS has no independent right to collect

---

(unreported disposition) *with In re* Sheridan, No. 08-20381-TLM, 2009 WL 631355 (Bkcrtcy.D.Idaho March 12, 2009) (In homeowner's bankrtupcy, MERS lacked standing to file a motion for relief from the automatic stay that would facilitate foreclosure under state law).

[16] *See, e.g., In re Sina,* 2006 WL 2729544 (Minn.App. 2006) ("Although the record shows that ALS serviced the mortgage, the assignment of the mortgage was recorded in MERS's name. And by agreement, MERS retained the power to foreclose the mortgage in its name. Because MERS is the record assignee of the mortgage, we conclude that MERS has standing to foreclose the property by advertisement.").

[17] *Mortgage Elec. Registration Sys., Inc. v. S.W. Homes of Ark.,* __ S.W.3d __ , 2009 WL 723182 (Ark. Mar. 19, 2009) (slip op. at 4-5).

on any debt because MERS itself has not extended credit, and none of the mortgage debtors owe MERS any money." *Mortgage Elec. Registration Sys., Inc. v. Neb. Dep't of Banking & Fin.*, 704 N.W.2d 784, 788 (Neb. 2005). This conclusion relied upon MERS's arguments to that court that it "only holds legal title to members' mortgages in a nominee capacity and is *contractually prohibited from exercising any rights with respect to the mortgages (i.e., foreclosure) without the authorization of the members.* Further, MERS argues that it does not own the promissory notes secured by the mortgages and has no right to the payments made on the notes." *Id.* at 787 (emphasis added).

51. Numerous bankruptcy courts have also found that, because MERS never holds the promissory note, its assignment of the deed of trust has no force.[18]

52. The United States Court of Appeals for the Seventh Circuit has described MERS's complete lack of substantive involvement in the lending transaction:

> MERS is not the lender. It is a membership organization that records, trades, and forecloses loans on behalf of many lenders, acting for their accounts rather than its own. . . . It is a nominee only, holding title to the mortgage but not the note. Each lender appears to be entitled not only to payment as the

---

[18] *See In re Wilhelm*, 407 B.R. 392 (Bankr.D.Idaho 2009) (standard mortgage note language does not expressly or implicitly authorize MERS to transfer the note); *In re Vargas*, 396 B.R. 511, 517 (Bankr.C.D.Cal.2008) ("[I]f FHM has transferred the note, MERS is no longer an authorized agent of the holder unless it has a separate agency contract with the new undisclosed principal. MERS presents no evidence as to who owns the note, or of any authorization to act on behalf of the present owner."); *Saxon Mortgage Services, Inc. v. Hillery*, 2008 WL 5170180 (N.D.Cal.2008) (unpublished opinion) ("[F]or there to be a valid assignment, there must be more than just assignment of the deed alone; the note must also be assigned.... MERS purportedly assigned both the deed of trust and the promissory note.... However, there is no evidence of record that establishes that MERS either held the *541 promissory note or was given the authority ... to assign the note.").

note's equitable (and legal) owner but also to control any litigation and settlement.

*Mortgage Elec. Registration Sys., Inc. v. Estrella*, 390 F.3d 522, 524-25 (7th Cir. 2004).

53. "If [the original lender] has transferred the note, MERS is no longer an authorized agent of the holder unless it has a separate agency contract with the new undisclosed principal." *In re Vargas*, 396 B.R. 511, 517 (Bankr. C.D. Cal. 2008).

54. The requirement of proceeding in the name of the real party in interest is intended to prevent a disconnect between the party prosecuting a motion and the decisionmaker with authority: "The purpose of the [real-party-in-interest] requirement is to protect individuals from the harassment of suits by persons who do not have the power to make final and binding decisions concerning prosecution, compromise and settlement. . . . [A] real party in interest must be in such command of the action as to be legally entitled to give a complete acquittal or discharge to the other party upon performance." *In re Tainan*, 48 B.R. 250, 252 (Bankr. E.D. Pa. 1985), *cited with approval in Greer v. O'Dell*, 305 F.3d 1297, 1303 (11th Cir. 2002).

55. On September 25, 2009, R.K. Arnold, the President and CEO of MERSCORP, Inc. – the parent of MERS - was deposed in Alabama. In his deposition, Arnold admitted that MERS does not have a beneficial interest in any mortgage; that it does not loan

money; and that it does not suffer a default if a borrower fails to repay a mortgage loan.[19]

56. According to Utah law, the "beneficiary" of a trust deed "means the person named or otherwise designated in a trust deed as the person for whose benefit a trust deed is given, or his successor in interest." U.C.A. 57-1-19(1) (1988).

57. By MERS' own admissions, and by the persuasive authority of numerous state and federal courts across the country, MERS is not in fact the owner, by assignment or otherwise, of the beneficial interest of Plaintiff's promissory note, mortgage or trust deed.

58. According to Utah law governing transfers in trust of real property, "[t]ransfers in trust of real property may be made to secure the performance of an obligation of the trustor or any other person named in the trust deed to a beneficiary. *All right, title, interest and claim in and to the trust property acquired by the trustor, or the trustor's successor in interest . . . shall inure to the trustee . . . .*" (emphasis added) U.C.A. 57-1-20 (2001).

59. Therefore, because MERS does not have any interest in the promissory note or the mortgage/trust deed, MERS' assignment of such interest to any other party, including the foreclosing Trustee, is invalid.

60. Plaintiff therefore prays for declaratory judgment that MERS is not the mortgagee, owner or assignee of the beneficial interest in the Foreclosing Trust Deed and

---

[19] *See* Video Deposition of R.K. Arnold, *Henderson v. MERSCORP, Inc.,* Civil Action No. CV-08-900805 (Ala. Cir. Sept. 25 2009) available at http://www.stopforeclosurefraud.com/2010/05/29/full-deposition-of-mortgage-electronic-registration-systems-mers-president-ceo-r-k-arnold-merscorp/).

therefore lacks authority to foreclose on Plaintiff's Property pursuant to U.C.A. 57-1-19(1).

61. Plaintiff further asks for declaratory judgment that the transfer in the trust of the Property to the Trustee is invalid pursuant to U.C.A. 57-1-20.

## SECOND CAUSE OF ACTION
### VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (Against Defendants MERS and Any Servicer or Trustee Acting on MERS' Behalf)

62. Plaintiff repeats and reincorporates the preceding paragraphs by reference.

63. The federal Fair Debt Collection Practices Act ("FDCPA") forbids false or misleading representations and unfair collection tactics, including threats to foreclose when not legally entitled to do so. 15 U.S.C. §§ 1692d-1692f.

64. The FDCPA requires that debt collectors give consumers written validation and verification of a debt as well as the identity of the creditor in order to prevent collection of debts or fees no actually owed. 15 U.S.C. §§ 1692g(a).

65. The FDCPA grants a private right of action allowing consumers to sue for statutory punitive damages, costs and attorney's fees. 15 U.S.C. §§ 1692k(1).

66. The FDCPA must be construed broadly in favor of debtors, analyzed from the perspective of the "least sophisticated debtor."[20]

---

[20] *See, e.g.,* Brown v. Card Service Center. 464 F.3d 450, 453 ("Because the FDCPA is a remedial statute, we construe its language broadly, so as to effect its purpose. Accordingly, . . . we have held that certain communications from lenders to debtors should be analyzed from the perspective of the "least sophisticated debtor.").

67. MERS is a third-party debt collector subject to the FDCPA when it regularly collects, or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due to another.

68. By bringing foreclosure lawsuits, MERS is "attempt[ing] to collect, [either] directly or indirectly, debts" within the meaning of the statute.[21]

69. The overwhelming majority of state and federal courts have concluded that bringing a foreclosure action is a debt collection activity governed by the Act.[22]

70. Moreover, whatever the mortgage closing documents say, because MERS remits all proceeds of its collection activities to the actual owner of the loan (usually a securitization trustee), MERS is clearly collecting a debt that is owed to another business entity.

71. MERS is not a creditor exempted under the statute when it does not "offer or extend credit" on any mortgage loan. *See* 15 U.S.C. § 1692a(4).

72. The FDCPA contains an exemption specifically designed for mortgage servicers. *See* 15 U.S.C. §§ 1692a(6)(F).[23]

---

[21] 15 U.S.C. § 1692a(6). The Supreme Court has held that collection lawsuits are debt collection within the FDCPA. *Hientz v. Jenkins*, 514 U.S. 291, 294 (1995).

[22] *Wilson v. Draper & Goldberg*, 443 F.3d 373 (4th Cir. 2006); *Kaltenbach v. Richards*, 464 F.3d 524 (5th Cir. 2006); *Shapiro & Meinhold v. Zartman*, 823 P.2d 120 (Colo. 1992); *Galusk v. Blumenthal*, 1994 WL 323121 (N.D.Ill. June 26, 1994). *Cf Bergs v. Hoover, Bax, & Slovacek, LLP.*, 2003 WL 22255679 (N.D. Tex. Sept. 24, 2003).

[23] *Dawson v. Dovenmuehle Mortgage Inc.*, No. 00-6171, 2002 WL 501499, at *5 ("A loan servicer, someone who services but does not own the debt, is not a 'debt collector' if the servicer begins servicing of the loan before default...."). S. Rep. No. 95-382, at 3 (1977) (X- quote ). The Federal Trade Commission's Staff Commentary also reflects this policy by explaining that: "The exception (iii) for debts not in default when obtained applies to parties such as mortgage service companies whose business is servicing current accounts."). 53 Fed. Reg. 500097, 50103 (Dec. 13, 1988). SENATE REPORT NO. 95-382, at 3-4(1977) ("[T]he committee does not intend the definition [of debt collector] to cover the activities of . . . mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default *when taken for servicing*.") (emphasis added);

73. However, this exemption does not apply to MERS for two reasons: (1) MERS is not a mortgage loan servicer when it does not service the debt by collecting payments due; (2) the legislative history and policy rationale behind the exemption indicates MERS does not qualify. Congress exempted original creditors and loan servicers (prior to default) from the FDCPA because it felt that market forces would penalize creditors who perpetrated overbearing or harassing debt collection practices when consumers could shift their future credit purchases elsewhere; third-party debt collectors, on the other hand, are not chosen by the consumer, and therefore are not vulnerable to a market-base remedy. Likewise, homeowners never choose to interact with MERS. Most often, MERS enters into the transaction without the homeowner's knowledge. Additionally, MERS' collection activities are focused exclusively and completely on collecting loans on the eve of foreclosure. Therefore, because there is no market-based remedy to penalize MERS for unfair or deceptive debt collection practices and because MERS' collection activities are post-default, it should be considered a third-party debt collector.

74. The FDCPA will be gutted if entities like MERS are not considered debt collectors. If courts conclude MERS is entitled to exemption, third-party debt collection mills will inevitably circumvent the statute by instructing doctors, hospitals, landlords, credit card lenders, and others to list MERS, or some other "obligee of record in nominee capacity" in the loan or account origination documents.

75. It is for this reasons that the FDCPA must be construed broadly in favor of debtors.

76. Mortgage servicers who cloak themselves in MERS' name should also be considered debt collectors.

77. MERS is a relatively small company without the resources to use its own employees to bring the hundreds of thousands of foreclosures in which it is named a party.[24]

78. MERS solves this problem by telling courts, and anyone else who asks, that the servicer's employee or foreclosure attorney is an employee of MERS, even though MERS does not pay that person a salary or any other compensation.[25]

79. Under MERS company policy, thousands of employees of *other* companies and law firms have been named "certifying officers" of MERS.[26]

80. A servicer's employee or foreclosure attorney can become a "Vice-President" of MERS by simply filling out the "Corporate Resolution Request Form" on MERS' web page.[27]

---

[24] MERS' web page lists the contact information for only five attorneys and two paralegals. MERS Departments, http://www.mersinc.org/about/departments.aspx?id=2 (viewed Sept. 5, 2009).
[25] Mortgage Electronic Registration System, Inc., MERS Law Seminar for USFN Conference, 15 (April 21, 2002) (document on file with author) ("Question : *Who should be named as a certifying officer?* [Answer:] Anyone that signs 'documents for the Lender currently should be named as a certifying officer. This way, the Lender's procedures will not need to be changed and the same people will continue to execute the documents.").
[26] Question and Answer document produced by MERS for a training conference explains:
Question: *What is a Certifying Officer?*
A certifying officer is an employee of the Lender who is appointed a MERS officer by a MERS Corporate Resolution. The Resolution allows the certifying officer to execute documents as a MERS officer.
Question: *Does the title that the employee holds as an employee of the Lender correspond to the title that the employee holds as a MERS Certifying Officer?*
No. All MERS Certifying Officers are appointed assistant secretaries and vice presidents of Mortgage Electronic Registration Systems, Inc. That means that if an employee is a Senior Vice President of the Lender, that employee is not a Senior Vice President of MERS. The employee is an assistant secretary and vice president of MERS.
Mortgage Electronic Registration System, Inc., MERS Law Seminar for USFN Conference, 15 (April 21, 2002) (document on file with Dean Peterson).
[27] MERS, Corporate Resolution Request Form, www.mersinc.org/MersProducts/forms/crrf/crrf.aspx (last viewed: April 6, 2009).

81. Once a servicer's employee or foreclosure attorney attains the fictitious "Vice-President" title, he or she can order as many MERS corporate seals as he or she wishes for a fee of $25.

82. The FDCPA demands that courts look past the nominal labels debt collectors give themselves and determine who is actually engaging in what type of economic activity.

83. For example, debt collectors who pretend to send letters from an attorney, where an attorney has not actually reviewed the file in question, have committed a deceptive act under the statute. *Clomon v. Jackson*, 988 F.2d 1314 (2d. Cir. 1993).

84. Similarly, third-party debt collectors cannot exempt themselves from the statute by pretending to be the creditor. 15 U.S.C. § 1692e(11).

85. And when a creditor pretends to be a third-party debt collector, they lose their exemption under the statute.[28]

86. These thousands of MERS' "Vice-Presidents" and the foreclosure attorneys, like the Trustee in this case, who purport to act on MERS' behalf, are in-fact third party debt collectors masquerading as agents of the original creditor.

87. The FDCPA will be gutted under the MERS' rationale, whereby any original creditor can set up a "corporate resolution" form on its web site, enabling third-party debt collectors to fictitiously assign themselves officious titles with the creditor.

---

[28] 15 U.S.C. § 1692a(6) ("The term 'debt collector' . . . includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts, such term includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.").

88. From the perspective of the least-sophisticated consumer, especially in the case of a homeowner facing foreclosure, the representation that a "Vice-President" of an official-sounding organization like MERS is instituting foreclosure proceedings is misleading and deceptive. The homeowner does not know with whom he or she should attempt to negotiate a settlement, or where he or she should go to obtain information on the amount due. The homeowner has no way to distinguish between the MERS "Vice President" making foreclosure threats on her home and the myriad other mortgage-rescue schemers and charlatans who prey on the vulnerable in the present housing market downturn.

89. The representation that the servicer's employee, foreclosing attorney, or Trustee acting on MERS' behalf, is an employee of MERS is false when the economic reality of the interaction indicates otherwise: the "employee" is not selected through any hiring process and is not paid any salary or compensation.

90. At minimum, the representation that the servicer's employee, foreclosing attorney, or Trustee acting on MERS' behalf is an employee of MERS is misleading when the least-sophisticated consumer is likely to believe that some other company has intervened to prosecute the foreclosure when, in fact, no such thing has occurred.

91. Plaintiff therefore prays for declaratory judgment that (1) MERS is a debt collector under the FDCPA; that (2) the Servicers and/or Trustee acting on MERS' behalf are debt collectors under the Act; and that (3) both MERS, the Servicer(s) and/or Trustee are in the business of regularly collecting debts through foreclosure.

92. Plaintiff has suffered damages due to Defendants misleading, false and deceptive acts in violation of the FDCPA. MERS and/or its agents have violated the FDCPA by foreclosing on Plaintiff's home without the legal authority to do so. Moreover, communications like the notice of trustee sale, where the foreclosing trustee purports to be acting on behalf of MERS, are misleading, deceptive and/or false.

93. Plaintiff also demands, pursuant to the FDCPA, that Defendants produce the "blue-ink" note verifying and validating both the identity of the creditor and the amount due on the mortgage loan obligation.

## THIRD CAUSE OF ACTION
## QUIET TITLE
### (Against All Defendants and Any Other Party
### Claiming an Interest in the Property)

94. Plaintiff hereby incorporates and re-alleges all previous paragraphs in this Complaint.

95. Plaintiff brings this action against all named Defendants or any other person claiming an interest in the Property to quiet title to the Property.

96. Because MERS claims the beneficial interest in the trust deed(s), the promissory note has been split from the trust deed. "The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment

of the underlying obligation. The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust." *Bellistri, supra* at 623.[29]

97. Therefore, the Property is encumbered by trust deed(s) which are null and void, but are clouding title to the Property.

98. No named defendant has any valid interest in the trust deeds and/or the notes and/or the Property.

99. Plaintiff seeks an order from this Court releasing the trust deeds and quieting title to the property in favor of Plaintiff.

100.    A *lis pendens* will be filed against the Property.

## FOURTH CAUSE OF ACTION
### EQUITABLE RELIEF
### (Against All Defendants)

101.    Plaintiff hereby incorporates and re-alleges all previous paragraphs in this Complaint.

102.    This Court has wide discretion to fashion relief in equity if the Court concludes that Plaintiff has no adequate remedy at law. *See Willard v. Tayloe*, 75 U.S. 557 (1869) ("... relief is not a matter of absolute right to either party; it is a matter resting in the discretion of the court, to be exercised upon a consideration of all the

---

[29] *See also In re Wilhelm*, 407 B.R. 392 (Bankr.D.Idaho 2009) (standard mortgage note language does not expressly or implicitly authorize MERS to transfer the note); *In re Vargas*, 396 B.R. 511, 517 (Bankr.C.D.Cal.2008) ("[I]f FHM has transferred the note, MERS is no longer an authorized agent of the holder unless it has a separate agency contract with the new undisclosed principal. MERS presents no evidence as to who owns the note, or of any authorization to act on behalf of the present owner."); *Saxon Mortgage Services, Inc. v. Hillery*, 2008 WL 5170180 (N.D.Cal.2008) (unpublished opinion) ("[F]or there to be a valid assignment, there must be more than just assignment of the deed alone; the note must also be assigned.... MERS purportedly assigned both the deed of trust and the promissory note.... However, there is no evidence of record that establishes that MERS either held the promissory note or was given the authority ... to assign the note.").

circumstances of each particular case.")

103.     Plaintiff request this Court to take judicial notice the Salt Lake is presently

"the worst of the worst" in the foreclosure crisis snowballing across the country. *See*

Mitchell, "Foreclosures: Salt Lake Hardest Hit in Mortgage Crisis," Salt Lake Tribune,

4/29/2010 at A1, attached as Exhibit 9.

104.     Economic damages do not compensate Plaintiff for the loss of his/her home:

"Land is certainly the asset which people deem to be their most important

'possession': [t]here is no other 'thing' more important historically in our culture

than interest in land, whether that interest be in a condominium, in a house, or in a

farm. Land." *In re Stubbs*, 330 B.R. 717, 730 (N.D. Ind. 2005).

105.     To adequately protect Plaintiff's interest in the Property, it is "absolutely

imperative that transactions in land be guaranteed to vest title in the people who

invested in those transactions, and that the investors know definitively the interests

in the land in which they invest . . . . The record of land transactions in the

Recorder's Office provides this critical assurance." *Id.*

106.     No state recording statute, including Utah's, authorizes mortgagees or their

assignees to vicariously record using the name of an agent or nominee. *See* U.C.A

17-21 et seq.; *see also* U.C.A. 57-1-20 (2001).

107.     Utah's Recording Act also specifies that the name of the mortgagee or

assignee must be included so that records and indexes can be drawn up from the

names of both parties. U.C.A 17-21 et seq.

108.     The stated purpose of MERS is to undermine, or replace, the public records

system established by state recording statutes in all 50 states.

109.    MERS is a private, for profit, database and tax evasion service.

110.    Salt Lake County Recorder Gary Ott describes MERS as "the scam from hell."
*See* Semerad, *Loan Registry Raises Legal Questions*, Salt Lake Tribune, 4/25/2010 at
A1, attached as Exhibit 11.

111.    MERS was created by mortgage investors based on self-interested profit
motivations that benefit financiers and foreclosers while providing no benefit for
homeowners.  The finance industry is attempting to replace the public records
system in the absence of legislation or meaningful judicial precedent, a troubling
anti-democratic shift in housing policy.

112.    MERS facilitates predatory structured finance by decreasing exit costs for
loan originators.

113.    During the lead-up and pendency of the present housing crisis, MERS
reassured investors that, even when originators of predatory high-risk loan go
bankrupt, county property records would not be affected and foreclosures could
proceed.

114.    According to Dean Peterson, "[b]y serving as the true mortgagee's proxy in
recording and foreclosure, MERS abetted a fly-by-night, pump-and-dump, no-
accountability model of structured mortgage finance." Peterson, *supra* at 38.  Dean
Peterson further describes MERS as the "masked executioner." *Id.* at 5.

115.    Because MERS holds approximately 60% of the nation's mortgages, a
majority of homeowners in American cannot determine, through public records,

who actually owns their mortgage or with whom they should negotiate in the event

of foreclosure.

116.    According to one former mortgage lender, approximately 70% of brokered

loan applications submitted to lenders involved some sort of broker encouraged

fraud.[30]

117.    Another study of mortgage loans in Chapter 13 bankruptcy found that

residential mortgage creditors did not supply a promissory note in 41.1% of cases

involving a home mortgage.[31]

118.    MERS facilitates mortgage fraud by hiding the true name of the note holder

so that homeowners and their attorneys cannot verify either the actual identity of

the parties involved or the amount of debt in question.

119.    MERS confuses and pacifies borrowers, and oftentimes courts, at the most

crucial moment in time: on the eve of foreclosure.

120.    MERS has destroyed the integrity of the statutorily-prescribed system of

public records for real property, by engaging in "contortioned linguistic gymnastics"

by claiming that it is simultaneously both an agent and a principal with respect to

the mortgages it "owns." Peterson, *supra* at 38.

121.    MERS represents the mortgage industry's best effort to create a single,

national foreclosure plaintiff that always has foreclosure standing, but never has

foreclosure liability.

---

[30] RICHARD BITNER, CONFESSIONS OF A SUBPRIME LENDER: AN INSIDER'S TALE OF GREED, FRAUD, AND IGNORANCE 45 (2008).
[31] Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 TEX. L. REV. 121, 147(2008).

122.     Plaintiff request this Court to award declaratory and/or injunctive relief to remedy the harm to Plaintiff, and to other Utah homeowners, caused by MERS' destruction of the public records system for real property and its facilitation of mortgage fraud and predatory lending.

123.     Plaintiff request this Court to exercise its powers in equity to reform Plaintiff's mortgage contract by ordering a reduction in principal and an affordable fixed interest rate for the life of the loan.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.     For declaratory judgment that MERS and its foreclosing trustee by assignment are not the owners of any beneficial interest in any trust deed and thus they lack the legal capacity to foreclose on Plaintiff's Property.

2.     For damages pursuant to Defendants' violations of the FDCPA.

3.     For an order commanding Defendants to produce the "blue-ink" note verifying and validating both the identity of the owner of the promissory note and the amount due.

4.     For an order nullifying and releasing the trust deeds clouding title to Plaintiff's Property.

5.     For reformation of Plaintiff's mortgage loan contract and equitable injunctive and/or declaratory relief in the discretion of the Court.

6.     For additional damages and/or attorneys' fees and/or costs as allowed by contract, statute or court rule; and

7.     Such other relief as the Court deems just.

Dated this 21th day of June 2010.

*Abraham Bates*

_____

Abraham Bates
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing COMPLAINT was served upon the following parties by CERTIFIED MAIL, postage prepaid, on the 18th day of June 2010, as follows:
22nd

Lehman Brothers Bank
The Prentice-Hall Corporation System
(Registered Agent)
10 E. South Temple, Ste. 900
Salt Lake City, UT 84133

Aurora Loan Services LLC
Corporation Service Company
(Registered Agent)
2180 S. 1300 E., Ste. 650
SLC, UT 84106

MERS
1108 E. South Union Ave
Midvale, UT 84047

ITS Title Insurance Services
6925 S. Union Park Center
Midvale, UT 84047-4142

James H. Woodall
Law Offices of James H. Woodall, P.L.L.C.
10653 River Front Pkwy, Ste. 290
South Jordan, UT 84095

First American Financial Corporation
Blake T. Heiner
(Registered Agent)
560 S. 300 E.
Salt Lake City, UT 84111

KeyCorp
CT Corporation System
(Registered Agent)
50 W. Broadway 8th Floor
Salt Lake City, UT 84101-2006

*Abraham Bates*

Abraham Bates

# EXHIBIT 1

BEGINNING AT A POINT WHICH IS SOUTH 33.00 FEET AND EAST 757.89 FEET FROM THE NORTHWEST CORNER OF SECTION 27, TOWNSHIP 3 SOUTH, RANGE 1 WEST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE EAST 116.06 FEET; THENCE SOUTH 627.0 FEET; THENCE WEST 116.06 FEET; THENCE NORTH 627.0 FEET TO THE POINT OF BEGINNING.

Parcel Identification No. 27-27-101-006.

# EXHIBIT 2

10057840

Return To: AURORA LOAN SERVICES, LLC
601 5th Ave, PO Box 4000
Scottsbluff, NE 69363

10057840
4/5/2007 2:58:00 PM $54.00
Book - 9446 Pg - 2384-2406
Gary W. Ott
Recorder, Salt Lake County, UT
INTEGRATED TITLE INS. SERVICES
BY: eCASH, DEPUTY - EF 23 P.

Prepared By: ROSALINDA MEADE
AURORA LOAN SERVICES
327 INVERNESS DRIVE SOUTH
AURORA, CO 80014

ESCROW #: 31602

—————————— [Space Above This Line For Recording Data] ——————————

# DEED OF TRUST

MIN 100025440003749774

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April 3, 2007 together with all Riders to this document.

(B) "Borrower" is

RICHARD W HARRIS

Borrower is the trustor under this Security Instrument.

(C) "Lender" is LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK

Lender is a FEDERAL SAVINGS BANK
organized and existing under the laws of UNITED STATES

LOAN #: 0045940129

UTAH -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS       Form 3045 1/01

-6A(UT) (0005)

Page 1 of 15     Initials: 

VMP MORTGAGE FORMS - (800)521-7291



100025440003749774
0045940129

Lender's address is   327 INVERNESS DRIVE SOUTH, ENGLEWOOD, CO  80112

(D) "Trustee" is                    ITS TITLE

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated  April 3, 2007
The Note states that Borrower owes Lender
FIVE HUNDRED THIRTEEN THOUSAND NINE HUNDRED SEVEN & 00/100                 Dollars
(U.S. $        513,907.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  May 1, 2037

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | PREPAY/ |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(UT) (0005)                    Page 2 of 18          Initials: [signature]          Form 3045  1/01

100025440003749774
0045940129

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the                           County          [Type of Recording Jurisdiction]
of      Salt Lake                         [Name of Recording Jurisdiction] :
All that tract or parcel of land as shown on Schedule "A" attached hereto which is incorporated herein and made a part hereof.

Tax Serial Number:  27-27-101-006                          which currently has the address of
2029 WEST 11800 SOUTH                                                         [Street]
RIVERTON                                        [City]. Utah      84065     [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

-6A(UT) (0005)                          Page 3 of 15          Initials:          Form 3045  1/01

10002544003749774
0045940129

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey and warrant the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.



BK 9446 PG 2387

10002544000374977 4
0045940129

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

Initials: 

-6A(UT) (0005)          Page 5 of 16          Form 3045  1/01

BK 9446 PG 2388

10002544003745774
0045940129

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied

 

BK 9446 PG 2389

10002544000374977A
0045940129

to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(UT) (0005)    Page 7 of 16    Initials:     Form 3045 1/01

100025440003749774
0045940129

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

BK 9446 PG 2391

100025440003749774
0045940129

(b) Any such agreements will not affect the rights Borrower has – if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

BK 9446 PG 2392

10002544003749774
0045940129

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

BK 9446 PG 2393

100025440003749774
0045940129

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a



BK 9446 PG 2394

100025440003749774
0045940129

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



-6A(UT) (0005)                              Page 12 of 15                 Initials:                 Form 3045  1/01

BK 9446 PG 2395

10002544000374977‌4
0045940129

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the power of sale is invoked, Trustee shall execute a written notice of the occurrence of an event of default and of the election to cause the Property to be sold and shall record such notice in each county in which any part of the Property is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. In the event Borrower does not cure the default within the period then prescribed by Applicable Law, Trustee shall give public notice of the sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines (but subject to any statutory right of Borrower to direct the order in which the Property, if consisting of several known lots or parcels, shall be sold). Trustee may in accordance with Applicable Law, postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county clerk of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.



-6A(UT) (0005)                    Page 13 of 15              Initials:                    Form 3045   1/01

100025440003749774
0045940129

25. **Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
RICHARD W HARRIS -Borrower

_____ _____ (Seal)
-Borrower

_____ (Seal) _____ (Seal)
-Borrower -Borrower

_____ (Seal) _____ (Seal)
-Borrower -Borrower

_____ (Seal) _____ (Seal)
-Borrower -Borrower

-6A(UT) (0005)     Page 14 of 15     Form 3045  1/01

BK 9446 PG 2397

100025440003749774
0045940129

STATE OF UTAH, *Salt Lake* County ss:

The foregoing instrument was subscribed and sworn to and acknowledged before me this 4/3/07 by *Richard N. Harris*

My Commission Expires: 12/15/07



Notary Public
AMBER L. DUNN
9065 South Union Park Center #180
Midvale, Utah 84047
My Commission Expires
December 16, 2007
State of Utah

Notary Public
Residing at: *Midvale, UT*

BK 9446 PG 2398

100025440003749774
0045940129

# ADJUSTABLE RATE RIDER

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 3rd day of April, 2007 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to

LEHMAN BROTHERS BANK, FSB

("Lender") of the same date and covering the property described in the Security Instrument and located at:

2029 WEST 11800 SOUTH, RIVERTON, UTAH 84065

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of 7.825 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of May , 2012 and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal . The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 25 HUNDREDTHS percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL ) - Single Family - Fannie Mae Uniform Instrument

-838R (0402)    Form 3138 1/01

Page 1 of 3    Initials: _____

VMP Mortgage Solutions, Inc.

(800)521-7291

10002544000374977A
0045940129

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than
**13.825** % or less than **2.250** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than
**TWO** percentage points
( **2.000** %) from the rate of interest I have been paying for the preceding
**6** months. My interest rate will never be greater than **13.825** %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Initials: ____

-838R  (0402)                    Page 2 of 3                    Form 3138 1/01

BK 9446 PG 2400

100025440003749774
0045940129

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
RICHARD W HARRIS              -Borrower                                     -Borrower


_____ (Seal)          _____ (Seal)
                             -Borrower                                     -Borrower


_____ (Seal)          _____ (Seal)
                             -Borrower                                     -Borrower


_____ (Seal)          _____ (Seal)
                             -Borrower                                     -Borrower


-838R (0402)                    Page 3 of 3                    Form 3138 1/01

BK 9446 PG 2401

10002544003749774
0045940129

# ADDENDUM TO ADJUSTABLE RATE RIDER

This addendum is made   **April 3 , 2007**                 and is incorporated into and deemed to amend and supplement the Adjustable Rate Rider of the same date.

The property covered by this addendum is described in the Security Instrument and located at:
**2029 WEST 11800 SOUTH , RIVERTON , UTAH 84065**

## AMENDED PROVISIONS
In addition to the provisions and agreements made in the Security Instrument, I/we further covenant and agree as follows:

## ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
**Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than   **13.825** % or less than **2.250**   %.  Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO**                percentage point(s) (   **2.000**        %) from the rate of interest I have been paying for the preceding six (6) months.  My interest rate will never be greater than                **13.825**        %.  My interest rate will never be less than   **2.250**   %.

## TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

In Witness Thereof, Trustor has executed this addendum.

| | |
|---|---|
| Witness | |
| Date | _RICHARD W HARRIS_ |
| Date | |
| Date | |
| Date | |

DIS0221
1202  LIBOR Addendum to Rider

1/01

**BK 9446 PG 2402**

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

LOAN NUMBER: 0045940129

PROPERTY ADDRESS: 2029 WEST 11800 SOUTH
RIVERTON, UTAH 84065

THIS ADDENDUM is made this 3rd day of April , 2007          and is incorporated
into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date
as this Addendum executed by the undersigned and payable to
LEHMAN BROTHERS BANK, FSB, 327 INVERNESS DRIVE SOUTH, ENGLEWOOD, CO  80112
                                                                          (the Lender).

THIS ADDENDUM supersedes Section 4(C) of the Rider. None of the other provisions of the
Note are changed by this Addendum.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(C)  Calculation of Changes**
        Before each Change Date, the Note Holder will calculate my new interest rate by
adding 2.25                  percentage point(s) ( 2.25 %) to the Current Index for such
Change Date. The Note Holder will then round the result of this addition to the nearest one-
eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this
rounded amount will be my new interest rate until the next Change Date.


        During the Interest-Only Period, the Note Holder will then determine the amount of
the monthly payment that would be sufficient to repay accrued interest. This will be the
amount of my monthly payment until the earlier of the next Change Date or the end of the
Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I
make a voluntary prepayment of principal during the Interest-Only Period, my payment amount
for subsequent payments will be reduced to the amount necessary to pay interest at the then
current interest rate on the lower principal balance. At the end of the Interest-Only Period and
on each Change Date thereafter, the Note Holder will determine the amount of the monthly
payment that would be sufficient to repay in full the unpaid principal that I am expected to owe
at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly
payments over the remaining term of the Note. The result of this calculation will be the new
amount of my monthly payment. After the end of the Interest-Only Period, my payment
amount will not be reduced due to voluntary prepayments.

Dated: 4/3/07

RICHARD W HARRIS

## PREPAYMENT RIDER

*6 Months of Interest on Amount Prepaid*

This Prepayment Rider is made this 3rd day of April , 2007 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to LEHMAN BROTHERS BANK, FSB (the "Lender") of the same date and covering the property described in the Security Instrument and located at 2029 WEST 11800 SOUTH RIVERTON, UTAH 84065

(the "Property").

Additional Covenants. Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." A "Full Prepayment" is the Prepayment of the entire unpaid Principal due under the Note. A payment of only part of the unpaid Principal is known as a "Partial Prepayment."

If, within the 3 -year period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a Full Prepayment or Partial Prepayment in any twelve (12)-month period that exceeds 20% of the original Principal loan amount, Borrower will pay a Prepayment penalty as consideration for the Note Holder's acceptance of such Prepayment. The Prepayment penalty will be equal to the amount of interest that would accrue during a six (6)-month period on the entire amount prepaid, calculated at the rate of interest in effect under the terms of the Note at the time the Prepayment exceeds 20% of the original Principal loan amount. If the prepaid amount exceeds 20% of the original Principal loan amount in any twelve (12)-month period, the Prepayment Penalty will be enforced on 100% of the amount prepaid. No Prepayment penalty will be assessed for any Prepayment made after the Penalty Period. These provisions will be enforced unless otherwise prohibited by applicable state law or regulation.

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first 0 year(s) of the term of the Note, no Prepayment penalty will be assessed. In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

0045940129                                    100025440003749774

630R -- Prepayment Rider
6 Months Interest Amount Prepaid (Full or Partial)
A630RI                              Page 1 of 2                          2/06

BK 9446 PG 2404

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____ (Seal)
Borrower
RICHARD W HARRIS

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

0045940129                                              100025440003749774

630R – Prepayment Rider
6 Months Interest Amount Prepaid (Full or Partial)
A630R2                                Page 2 of 2                            2/06

## EXHIBIT "A"

BEGINNING AT A POINT WHICH IS SOUTH 33.00 FEET AND EAST 757.89 FEET FROM THE
NORTHWEST CORNER OF SECTION 27, TOWNSHIP 3 SOUTH, RANGE 1 WEST, SALT LAKE BASE
AND MERIDIAN, AND RUNNING THENCE EAST 116.06 FEET; THENCE SOUTH 627.0 FEET; THENCE
WEST 116.06 FEET; THENCE NORTH 627.0 FEET TO THE POINT OF BEGINNING.

Parcel Identification No. 27-27-101-006.

ITS#31602

# EXHIBIT 3

10943144

WHEN RECORDED RETURN TO:

AURORA LOAN SERVICES, LLC
2617 COLLEGE PARK DRIVE
SCOTTSBLUFF NE 69361-2294

10943144
4/29/2010 12:46:00 PM $12.00
Book - 9821 Pg - 6463-6464
Gary W. Ott
Recorder, Salt Lake County, UT
SECURITY TITLE INS AGENCY
BY: eCASH, DEPUTY - EF 2 P.

# TRUSTEE'S DEED

 

T.S. NO. 1232908-07

LOAN NO. XXXXXX0129   APN: 27-27-101-057-0000

JAMES H. WOODALL, TRUSTEE JAMES H. WOODALL, Successor Trustee under a Deed of Trust executed by
RICHARD W HARRIS
Trustors, to secure certain obligations in favor of
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
as Beneficiary, and filed for record on April 05, 2007, as Entry No. 10057840, in Book 9446
at page 2384-2406, of the Official Records of SALT LAKE County, State of Utah, after the recording of a Notice of Default upon August 18, 2009, as Entry No 10780109, in Book 9756, at Page 420-421, of the Official Records of said County;

and a copy of such Notice of Default with the date of recordation shown thereon having been mailed by Certified Mail, postage prepaid within ten (10) days after recordation, to each person entitled to receive a copy of said Notice; and three (3) months having thereafter lapsed, and then the Trustee having given written notice of the time and place of the Trustee's Sale, particularly describing the property to be sold, by publication of such Notice at least three (3) times, once a week for three (3) consecutive weeks, the last publication having been at least ten (10) days but not more than thirty (30) days prior to the sale, in a newspaper having general circulation in the County in which the property is situated, and by posting such Notice at least twenty (20) days before the date of sale in a conspicuous place on the property to be sold, and also, in three (3) public places in the precinct or city in which the property is situated; and the Trustee, having mailed a copy of said written Notice by Certified Mail, postage prepaid, at least twenty (20) days before the date of sale to those persons entitled thereto;

and the sale, having been held on April 28, 2010 at 11:30am at the time and place designated in the Notice of Sale, which was held between 9:00 A.M. and 5:00 P.M., at the Courthouse of the County in which the property is situated; and the property having been sold by the Trustee at public auction to the highest bidder, for $571,571.00 and the price bid therefore having been received by the Trustee; and the Trustee hereby conveys to

AURORA LOAN SERVICES, LLC as Grantee, whose address is:

AURORA LOAN SERVICES, LLC
2617 COLLEGE PARK DRIVE
SCOTTSBLUFF NE 69361-2294

090588448

TDUSUT.DOC                    Rev. 09/15/09                    Page 1 of 2

# TRUSTEE'S DEED

T.S. NO. 1232908-07
LOAN NO. XXXXXX0129

for valuable consideration, all of the Trustee's right, title interest and claim of the Trustor and his successors-in-interest and of all persons claiming by, through or under them, in and to the within described property, including all such right, title, interest and claim in and to such property acquired by the Trustor or his successors-in-interest subsequent to the execution of the Trust Deed. Said property is described more particularly, to-wit:

BEGINNING AT A POINT WHICH IS SOUTH 33.00 FEET AND EAST 757.89 FEET FROM THE NORTHWEST CORNER OF SECTION 27, TOWNSHIP 3 SOUTH, RANGE 1 WEST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE EAST 116.06 FEET; THENCE SOUTH 627.0 FEET; THENCE WEST 116.06 FEET; THENCE NORTH 627.0 FEET TO THE POINT OF BEGINNING.

WITNESS the hand this _29_ day of _Apil 2010_.

JAMES H. WOODALL, TRUSTEE

STATE OF _Utah_
COUNTY OF _Salt Lake_

On _April 29 2010_ before me, _Cindy Hansen_, a Notary Public, personally appeared _James H. Woodall_ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Cindy Hansen_ (this area for notary seal)
NOTARY PUBLIC

Notary Public
CINDY HANSEN
Commission #583118
My Commission Expires
June 1, 2011
State of Utah

TDUSUT.DOC                 Rev. 09/15/09                 Page 2 of 2

BK 9821 PG 8464

# EXHIBIT 4

10219231

10219231
09/11/2007 04:46 PM $20.00
Book - 9514 Ps - 1215-1220
GARY W. OTT
RECORDER, SALT LAKE COUNTY, UTAH
FIRST AMERICAN TITLE OHIO
1100 SUPERIOR AVE STE 200
CLEVELAND OH 44114
BY: ZJM, DEPUTY - MA 6 P.

When recorded mail to:
*FIRST AMERICAN TITLE INSURANCE*
*LENDERS ADVANTAGE*
*1100 SUPERIOR AVENUE, SUITE 200*
*CLEVELAND, OHIO 44114*
*ATTN: FT1120*

# HOME EQUITY LINE DEED OF TRUST

| BORROWER | GRANTOR |
|---|---|
| RICHARD W. HARRIS | RICHARD W. HARRIS |
| | 12948093 |
| ADDRESS | ADDRESS |
| 2829 W 11800 S | 2829 W 11800 S |
| RIVERTON, UT 84065 | RIVERTON, UT 84065 |
| TELEPHONE NO.    IDENTIFICATION NO. | TELEPHONE NO.    IDENTIFICATION NO. |

TRUSTEE: KeyBank National Association
5161 S STATE ST
MURRAY, UT 84123

In consideration of the loan or other credit accommodation hereinafter specified and any future advances or future Obligations, as defined herein, which may hereafter be advanced or incurred and the trust hereinafter mentioned and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor hereby irrevocably bargains, sells, transfers, grants, conveys and assigns to Trustee, his successors and assigns, in trust, for KeyBank National Association

4910 Tiedeman Road, Suite 3, Brooklyn, Ohio 44144 ("Lender"), the beneficiary under this Deed of Trust, with power of sale and right of entry and possession all of Grantor's present and future estate, right, title and interest in and to the real property described in Schedule A which is attached to this Deed of Trust and incorporated herein by this reference, together with all present and future improvements and fixtures; all tangible personal property including, without limitation, all machinery, equipment, building materials, and goods of every nature (excluding household goods) now or hereafter located on or used in connection with the real property, whether or not affixed to the land; all privileges, hereditaments, and appurtenances; all leases, licenses and other agreements; all rents, issues and profits; all water, well, ditch, reservoir and mineral rights and stocks pertaining to the real property (cumulatively "Property"); to have and to hold the Property and the rights hereby granted for the use and benefit of Trustee, his successors and assigns, until payment in full of all Obligations secured hereby.

Moreover, in further consideration, Grantor does, for Grantor and Grantor's heirs, representatives, successors, and assigns, hereby expressly warrant, covenant and agree with Lender and Trustee and their successors and assigns as follows:

1. **OBLIGATIONS.** This Deed of Trust shall secure the payment and performance of all present and future indebtedness, liabilities, obligations and covenants of Borrower or Grantor (cumulatively "Obligations") to Lender pursuant to:
(a) this Deed of Trust and the following promissory notes and other agreements:

| INTEREST RATE | PRINCIPAL AMOUNT/ CREDIT LIMIT | FUNDING/ AGREEMENT DATE | MATURITY DATE | CUSTOMER NUMBER | LOAN NUMBER |
|---|---|---|---|---|---|
| VARIABLE | $44,500.00 | 08/27/07 | 08/27/42 | 072261350210C | 445102429654 |

(b) all other present or future written agreements with Lender which refer specifically to this Deed of Trust (whether executed for the same or different purposes than the foregoing);
(c) any guaranty of obligations of other parties given to Lender now or hereafter executed which refers to this Deed of Trust;
(d) future advances, whether obligatory or optional, to the same extent as if made contemporaneously with the execution of this Deed of Trust made or extended to or on behalf of Grantor or Borrower. Grantor agrees that if one of the Obligations is a line of credit, the lien of this Deed of Trust shall continue until payment in full of all debt due under the line notwithstanding the fact that from time to time (but before termination of this line) no balance may be outstanding. At no time shall the lien of this Deed of Trust, not including amounts advanced to protect the security of this Deed of Trust, exceed $ 44,500.00 ; and
(e) all amendments, extensions, renewals, modifications, replacements or substitutions to any of the foregoing.

As used in this Paragraph 1, the terms Grantor and Borrower shall include and also mean any Grantor or Borrower if more than one.

2. **REPRESENTATIONS, WARRANTIES AND COVENANTS.** Grantor represents, warrants and covenants to Lender that:
(a) Grantor has fee simple marketable title to the Property and shall maintain the Property free of all liens, security interests, encumbrances and claims except for this Deed of Trust and those described in Schedule B which is attached to this Deed of Trust and incorporated herein by reference, which Grantor agrees to pay and perform in a timely manner;
(b) Grantor is in compliance in all respects with all applicable federal, state and local laws and regulations, including, without limitation, those relating to "Hazardous Materials", as defined herein, and other environmental matters (the "Environmental Laws"), and neither the federal government nor the state where the Property is located nor any other governmental or quasi governmental entity has filed a lien on the Property, nor are there any governmental, judicial or administrative actions with respect to environmental matters pending, or to the best of the Grantor's knowledge, threatened, which involve the Property. Neither Grantor nor, to the best of Grantor's knowledge, any other party has used, generated, released, discharged, stored, or disposed of any Hazardous Materials as defined herein, in connection with the Property or transported any Hazardous Materials to or from the Property. Grantor shall not commit or permit such actions to be taken in the future. The term "Hazardous Materials" shall mean any substance, material, or waste which is or becomes regulated by any governmental authority including, but not limited to: (i) petroleum; (ii) friable or nonfriable asbestos; (iii) polychlorinated biphenyls; (iv) those substances, materials or wastes designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act or listed pursuant to Section 307 of the Clean Water Act or any amendments or replacements to these statutes; (v) those substances, materials or wastes defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act or any amendments or replacements to that statute; and (vi) those substances, materials or wastes defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, or any amendments or replacements to that statute or any other similar state or federal statute, rule, regulation or ordinance now or hereafter in effect. Grantor shall not lease or permit the sublease of the Property to a tenant or subtenant whose operations may result in contamination of the Property with Hazardous Materials or toxic substances;
(c) All applicable laws and regulations including, without limitation, the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. (and all regulations promulgated thereunder) and all zoning and building laws and regulations relating to the Property by virtue of any federal, state or municipal authority with jurisdiction over the Property, presently are and shall be observed and complied with in all material respects, and all rights, licenses, permits, and certificates of occupancy (including but not limited to zoning variances, special exceptions for nonconforming uses, and final inspection approvals), whether temporary or permanent, which are material to the use and occupancy of the Property, presently are and shall be obtained, preserved and, where necessary, renewed;

LPUT6418 © John H. Harland Co. (06/27/98) (800) 937-3799

(d) Grantor has the right and is duly authorized to execute and perform its Obligations under this Deed of Trust and these actions do not and shall not conflict with the provisions of any statute, regulation, ordinance, rule of law, contract or other agreement which may be binding on Grantor at any time;

(e) No action or proceeding is or shall be pending or threatened which might materially affect the Property; and

(f) Grantor has not violated and shall not violate any statute, regulation, ordinance, rule of law, contract or other agreement which might materially affect the Property (including, but not limited to, those governing Hazardous Materials) or Lender's rights or interest in the Property pursuant to this Deed of Trust.

**3. PRIOR DEEDS OF TRUST.** Grantor represents and warrants that there are no prior deeds of trust or mortgages affecting any part of the Property except as set forth on Schedule A attached to this Deed of Trust which Grantor agrees to pay and perform in a timely manner. If there are any prior deeds of trust or mortgages then Grantor agrees to pay all amounts owed, and perform all obligations required, under such deeds of trust and the indebtedness secured thereby.

**4. TRANSFERS OF THE PROPERTY OR BENEFICIAL INTERESTS IN GRANTORS OR BORROWERS.** In the event of a sale, conveyance, lease, contract for deed or transfer to any person of all or any part of the real property described in Schedule A, or any interest therein, or of all or any beneficial interest in Borrower or Grantor (if Borrower or Grantor is not a natural person or persons but is a corporation, limited liability company, partnership, trust, or other legal entity), Lender may, at its option, declare the outstanding principal balance of the Obligations plus accrued interest thereon immediately due and payable. At Lender's request, Grantor or Borrower, as the case may be, shall furnish a complete statement setting forth all of its stockholders, members or partners, as appropriate, and the extent of their respective ownership interests.

**5. ASSIGNMENT OF RENTS.** In consideration of the Obligations which are secured by this Deed of Trust, Grantor absolutely assigns to Lender all Grantor's estate, right, title, interest, claim and demand now owned or hereafter acquired in all existing and future leases of the Property (including extensions, renewals and subleases), all agreements for use and occupancy of the Property (all such leases and agreements whether written or oral, are hereafter referred to as the "Leases"), and all guaranties of lessees' performance under the Leases, together with the immediate and continuing right to collect and receive all of the rents, income, receipts, revenues, issues, profits and other income of any nature now or hereafter due (including any income of any nature coming due during any redemption period) under the Leases or from or arising out of the Property, including minimum rents, additional rents, percentage rents, parking or common area maintenance contributions, tax and insurance contributions, deficiency rents, liquidated damages following default in any Lease, all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by destruction or damage to the Property, all proceeds payable as a result of a lessee's exercise of an option to purchase the Property, all proceeds derived from the termination or rejection of any Lease in a bankruptcy or other insolvency proceeding, and all proceeds from any rights and claims of any kind which Grantor may have against any lessee under the Leases or any occupants of the Property (all of the above are hereafter collectively referred to as the "Rents"). This assignment is subject to the right, power and authority given to the Lender to collect and apply the Rents. This assignment is recorded in accordance with applicable Utah law (Section 57-1-35 of the Utah Code Annotated); the lien created by this assignment is intended to be specific, perfected, and choate upon the recording of this Deed of Trust. As long as there is no default under the Obligations or this Deed of Trust, Lender grants Grantor a revocable license to collect all Rents from the Leases when due and to use such proceeds in Grantor's business operations. However, Lender may at any time require Grantor to deposit all Rents into an account maintained by Grantor or Lender at Lender's institution. Upon default in the payment of, or in the performance of, any of the Obligations, Lender may at its option take possession of the Property and have, hold, manage, lease and operate the Property on terms and for a period of time that Lender deems proper. Lender may proceed to collect and receive all Rents from the Property, and Lender shall have full power to periodically make alterations, renovations, repairs or replacements to the Property as Lender may deem proper. Lender may apply all Rents in Lender's sole discretion, to payment of the Obligation or to the payment of the cost of such alterations, renovations, repairs and replacements and any expenses incident to taking and retaining possession of the Property and the management and operation of the Property. Lender may keep the Property properly insured and may discharge any taxes, charges, claims, assessments and other liens which may accrue. The expense and cost of these actions may be paid from the Rents received, and any unpaid amounts shall be added to the principal of the Obligations. These amounts, together with other costs, shall become part of the Obligations secured by this Deed of Trust.

**6. LEASES AND OTHER AGREEMENTS.** Grantor shall not take or fail to take any action which may cause or permit the termination or the withholding of any payment in connection with any Lease pertaining to the Property. In addition, Grantor, without Lender's prior written consent, shall not: (a) collect any monies payable under any Lease more than one month in advance; (b) modify any Lease; (c) assign or allow a lien, security interest or other encumbrance to be placed upon Grantor's rights, title and interest in and to any Lease or the amounts payable thereunder; or (d) terminate or cancel any Lease except for the nonpayment of any sum or other material breach by the other party thereto. If Grantor receives at any time any written communication asserting a default by Grantor under any Lease or purporting to terminate or cancel any Lease, Grantor shall promptly forward a copy of such communication (and any subsequent communications relating thereto) to Lender. All such Leases and the amounts due to Grantor thereunder are hereby assigned to Lender as additional security for the Obligations.

**7. COLLECTION OF INDEBTEDNESS FROM THIRD PARTY.** Lender shall be entitled to notify or require Grantor to notify any third party (including, but not limited to, lessees, licensees, governmental authorities and insurance companies) to pay Lender any indebtedness or obligation owing to Grantor with respect to the Property (cumulatively "Indebtedness") whether or not a default exists under this Deed of Trust. Grantor shall diligently collect the Indebtedness owing to Grantor from these third parties until the giving of such notification. In the event that Grantor possesses or receives possession of any instruments or other remittances with respect to the Indebtedness following the giving of such notification or if the instruments or other remittances constitute the prepayment of any Indebtedness or the payment of any insurance or condemnation proceeds, Grantor shall hold such instruments and other remittances in trust for Lender apart from its other property, endorse the instruments and other remittances to Lender, and immediately provide Lender with possession of the instruments and other remittances. Lender shall be entitled, but not required, to collect (by legal proceedings or otherwise), extend the time for payment, compromise, exchange or release any obligor or collateral, or otherwise settle any of the Indebtedness whether or not an Event of Default exists under this Deed of Trust. Lender shall not be liable to Grantor for any action, error, mistake, omission or delay pertaining to the actions described in this paragraph or any damages resulting therefrom. Notwithstanding the foregoing, nothing herein shall cause Lender to be deemed a mortgagee-in-possession.

**8. USE AND MAINTENANCE OF PROPERTY.** Grantor shall take all actions and make any repairs needed to maintain the Property in good condition. Grantor shall not commit or permit any waste to be committed with respect to the Property. Grantor shall use the Property solely in compliance with applicable law and insurance policies. Grantor shall not make any alterations, additions or improvements to the Property without Lender's prior written consent. Without limiting the foregoing, all alterations, additions and improvements made to the Property shall be subject to the beneficial interest belonging to Lender, shall not be removed without Lender's prior written consent, and shall be made at Grantor's sole expense.

**9. LOSS OR DAMAGE.** Grantor shall bear the entire risk of any loss, theft, destruction or damage (cumulatively "Loss or Damage") to the Property or any portion thereof from any cause whatsoever. In the event of any Loss or Damage, Grantor shall, at the option of Lender, repair the affected Property to its previous condition or pay or cause to be paid to Lender the decrease in the fair market value of the affected Property.

**10. INSURANCE.** The Property will be kept insured for its full insurable value (replacement cost) against all hazards including loss or damage caused by flood, earthquake, tornado and fire, theft or other casualty to the extent required by Lender. Grantor may obtain insurance on the Property from such companies as are acceptable to Lender in its sole discretion. The insurance policies shall require the insurance company to provide Lender with at least __ days' written notice before such policies are altered or cancelled in any manner. The insurance policies shall name Lender as a loss payee and provide that no act or omission of Grantor or any other person shall affect the right of Lender to be paid the insurance proceeds pertaining to the loss or damage of the Property. In the event Grantor fails to acquire or maintain insurance, Lender (after providing notice as may be required by law) may in its discretion procure appropriate insurance coverage upon the Property and the insurance cost shall be an advance payable and bearing interest as described in Paragraph 21 and secured hereby. Grantor shall furnish Lender with evidence of insurance indicating the required coverage. Lender may act as attorney-in-fact for Grantor in making and settling claims under insurance policies, cancelling any policy or endorsing Grantor's name on any draft or negotiable instrument drawn by any insurer. All such insurance policies shall be immediately assigned, pledged and delivered to Lender as further security for the Obligations. In the event of loss, Grantor shall immediately give Lender written notice and Lender is authorized to make proof of loss. Each insurance company is directed to make payments directly to Lender instead of to Lender and Grantor. Lender shall have the right, at its sole option, to apply such monies toward the Obligations or toward the cost of rebuilding and restoring the Property. Any amounts applied against the Obligations shall be applied in the inverse order of the due dates thereof.

**11. ZONING AND PRIVATE COVENANTS.** Grantor shall not initiate or consent to any change in the zoning provisions or private covenants affecting the use of the Property without Lender's prior written consent. If Grantor's use of the Property is or becomes a nonconforming use under any zoning provision, Grantor shall not cause or permit such use to be discontinued or abandoned without the prior written consent of Lender. Grantor will immediately provide Lender with written notice of any proposed changes to the zoning provisions or private covenants affecting the Property.

**12. CONDEMNATION.** Grantor shall immediately provide Lender with written notice of any actual or threatened condemnation or eminent domain proceeding pertaining to the Property. All monies payable to Grantor from such condemnation or taking are hereby assigned to Lender and shall be applied first to the payment of Lender's attorneys' fees, legal expenses and other costs (including appraisal fees) in connection with the condemnation or eminent domain proceedings and then, at the option of Lender, to the payment of the Obligations or the restoration or repair of the Property.

**13. LENDER'S RIGHT TO COMMENCE OR DEFEND LEGAL ACTIONS.** Grantor shall immediately provide Lender with written notice of any actual or threatened action, suit, or other proceeding affecting the Property. Grantor hereby appoints Lender as its attorney-in-fact to commence, intervene in, and defend such actions, suits, or other legal proceedings and to compromise or settle any claim or controversy pertaining thereto. Lender shall not be liable to Grantor for any action, error, mistake, omission or delay pertaining to the actions described in this paragraph or any damages resulting therefrom. Nothing contained herein will prevent Lender from taking the actions described in this paragraph in its own name.

**14. INDEMNIFICATION.** Lender shall not assume or be responsible for the performance of any of Grantor's Obligations with respect to the Property under any circumstances. Grantor shall immediately provide Lender with written notice of and indemnify and hold Lender and its shareholders, directors, officers, employees and agents harmless from all claims, damages, liabilities (including attorneys' fees and legal expenses), causes of action, actions, suits and other legal proceedings (cumulatively "Claims") pertaining to the Property (including, but not limited to, those involving Hazardous Materials). Grantor, upon the request of Lender, shall hire legal counsel to defend Lender from such Claims, and pay the attorneys' fees, legal expenses and other costs incurred in connection therewith. In the alternative, Lender shall be entitled to employ its own legal counsel to defend such Claims at Grantor's cost. Grantor's obligation to indemnify Lender under this paragraph shall survive the termination, release or foreclosure of this Deed of Trust.

15. **TAXES AND ASSESSMENTS.** Grantor shall pay all taxes and assessments relating to the Property when due and immediately provide Lender evidence of payment of same. Upon the request of Lender, Grantor shall deposit with Lender each month one-twelfth (1/12) of the estimated annual insurance premium, taxes and assessments pertaining to the Property. So long as there is no default, Lender shall have the right, at its sole option, to apply the funds so held to pay any taxes or against the Obligations. Any funds applied may, at Lender's option, be applied in reverse order of the due date thereof.

16. **INSPECTION OF PROPERTY, BOOKS, RECORDS AND REPORTS.** Grantor shall allow Lender or its agents to examine and inspect the Property and examine, inspect and make copies of Grantor's books and records pertaining to the Property from time to time. Grantor shall provide any assistance required by Lender for these purposes. All of the signatures and information contained in Grantor's books and records shall be genuine, true, accurate and complete in all respects. Grantor shall note the existence of Lender's beneficial interest in its books and records pertaining to the Property. Additionally, Grantor shall report, in a form satisfactory to Lender, such information as Lender may request regarding Grantor's financial condition or the Property. The information shall be for such periods, shall reflect Grantor's records as such time, and shall be rendered with such frequency as Lender may designate. All information furnished by Grantor to Lender shall be true, accurate and complete in all respects, and signed by Grantor if Lender requests.

17. **ESTOPPEL CERTIFICATES.** Within ten (10) days after any request by Lender, Grantor shall deliver to Lender, or any intended transferee of Lender's rights with respect to the Obligations, a signed and acknowledged statement specifying (a) the outstanding balance on the Obligations; and (b) whether Grantor possesses any claims, defenses, set-offs or counterclaims with respect to the Obligations and, if so, the nature of such claims, defenses, set-offs or counterclaims. Grantor will be conclusively bound by any representation that Lender may make to the intended transferee with respect to these matters in the event that Grantor fails to provide the requested statement in a timely manner.

18. **EVENTS OF DEFAULT.** An Event of Default shall occur under this Deed of Trust and the Trustee's power shall become operative in the event that Grantor, Borrower or any guarantor of any Obligation:

(a) commits fraud or makes a material misrepresentation at any time in connection with the Obligations or this Deed of Trust;

(b) fails to meet the repayment terms of the Obligations for any outstanding balance; or

(c) by any action or inaction, adversely affects the Property, or any right of Lender in such Property, including, but not limited to, transfer of title to or sale of the Property without the permission of Lender, failure to maintain required insurance or to pay taxes on the Property, allowing the filing of a lien senior to that held by Lender, death of the sole Borrower obligated under the Obligations, allowing the taking of the Property through eminent domain, or allowing the Property to be foreclosed by a lienholder other than Lender. In addition, an Event of Default shall occur if, as a result of any of the following, the property, or any right of the Lender in the Property, is adversely affected: the Borrower, Grantor or any guarantor of any Obligation commits waste or otherwise destructively uses or fails to maintain the Property, uses the property in an illegal manner which may subject the Property to seizure, or moves from the Property; a judgment is filed against the Borrower, Grantor or any guarantor of any Obligation; or one of two Borrowers obligated under the Obligations dies.

19. **RIGHTS OF LENDER ON EVENT OF DEFAULT.** Upon the occurrence of an Event of Default under this Deed of Trust, Lender shall be entitled to exercise one or more of the following remedies without notice or demand (except as required by law):

(a) to declare the Obligations immediately due and payable in full, such acceleration shall be automatic and immediate if the Event of Default is a filing under the Bankruptcy Code;

(b) to collect the outstanding Obligations with or without resorting to judicial process;

(c) to require Grantor to deliver and make available to Lender any personal property or Chattels constituting the Property at a place reasonably convenient to Grantor and Lender;

(d) to enter upon and take possession of the Property without applying for or obtaining the appointment of a receiver and, at Lender's option, and as allowed by law, to appoint a receiver without bond, without first bringing suit on the Obligations and without otherwise meeting any statutory conditions regarding receivers, it being intended that Lender shall have this contractual right to appoint a receiver;

(e) to employ a managing agent of the Property and let the same, either in Trustee's own name, in the name of Lender or in the name of Grantor, and receive the rents, incomes, issues and profits of the Property and apply the same, after payment of all necessary charges and expenses, on account of the Obligations;

(f) to pay any sums in any form or manner deemed expedient by Lender to protect the security of this Deed of Trust or to cure any default other than payment of interest or principal on the Obligations;

(g) to foreclose this Deed of Trust judicially or nonjudicially in accordance with Section 57-1-23 of the Utah Code Annotated;

(h) to set-off Grantor's Obligations against any amounts owed Grantor by Lender including, but not limited to, monies, instruments, and deposit accounts maintained with Lender or any currently existing or future affiliate of Lender; and

(i) to exercise all other rights available to Lender under any other written agreement or applicable law.

Lender's rights are cumulative and may be exercised together, separately, and in any order. In the event that Lender institutes an action seeking the recovery of any of the Property by way of a prejudgment remedy in an action against Grantor, Grantor waives the posting of any bond which might otherwise be required. Lender or Lender's designee may purchase the Property at any sale. In the event Lender purchases the Property at the Trustee's sale, to the extent Lender's bid price exceeds the Obligations, Lender shall pay Trustee cash equal to such excess. The Property or any part thereof may be sold in one parcel, or in such parcels, manner or order as Lender in its sole discretion may elect, and no exercise of the power herein granted shall not extinguish or exhaust the power unless the entire Property is sold or the Obligations are paid in full.

20. **SECURITY INTEREST UNDER THE UNIFORM COMMERCIAL CODE.** This Deed of Trust shall be considered a financing statement and a fixture filing pursuant to the provisions of the Uniform Commercial Code (as adopted in the state where the Property is located) covering fixtures, chattels, and articles of personal property now owned or hereafter attached to or to be used in connection with the Property together with any and all replacements thereof and additions thereto (the "Chattels"), and Grantor hereby grants Lender a security interest in such Chattels. The debtor is the Grantor described above. The secured party is the Lender described above. Upon demand, Grantor shall make, execute and deliver such security agreements (as such term is defined in said Uniform Commercial Code of Utah) as Lender at any time may deem necessary or proper or require to grant to Lender a perfected security interest in the Chattels, and upon Grantor's failure to do so, Lender is authorized to sign any such agreement as the agent of Grantor. Grantor hereby authorizes Lender to file financing statements (as such term is defined in said Uniform Commercial Code) with respect to the Chattels, at any time, without the signature of Grantor. Grantor will, however, at any time upon request of Lender, sign such financing statements. Grantor will pay all filing fees for the filing of such financing statements and for the refiling thereof at the times required, in the opinion of Lender, by said Uniform Commercial Code. If the lien of this Deed of Trust is subject to any security agreement covering the Chattels, then in the event of any default under this Deed of Trust, all the right, title and interest of Grantor in and to any and all of the Chattels is hereby assigned to Lender, together with the benefit of any deposits or payments now or hereafter made thereof by Grantor or the predecessors or successors in title of Grantor in the Property.

21. **REIMBURSEMENT OF AMOUNTS EXPENDED BY LENDER.** Lender, at Lender's option, may expend funds (including attorneys' fees and legal expenses) to perform any act required to be taken by Grantor or to exercise any right or remedy of Lender under this Deed of Trust. Upon demand, Grantor shall immediately reimburse Lender for all such amounts expended by Lender together with interest thereon at the lower of the highest rate described in any Obligation or the highest rate allowed by law from the date of payment until the date of reimbursement. These sums shall be included in the definition of Obligations herein and shall be secured by the beneficial interest granted herein. If the Obligations are paid after the beginning of publication of notice of sale, as herein provided, or in the event Lender shall, at its sole option, permit Grantor to pay any part of the Obligations after the beginning of publication of notice of sale, as herein provided, then, Grantor shall pay on demand all expenses incurred by the Trustee and Lender in connection with said publication, including reasonable attorneys' fees to the attorneys for the Trustee and for the Lender, and a reasonable fee to the Trustee, and this Deed of Trust shall be security for all such expenses and fees.

22. **APPLICATION OF PAYMENTS.** All payments made by or on behalf of Grantor may be applied against the amounts paid by Lender (including attorneys' fees and legal expenses) in connection with the exercise of its rights or remedies described in this Deed of Trust and then to the payment of the remaining Obligations in whatever order Lender chooses.

23. **POWER OF ATTORNEY.** Grantor hereby appoints Lender as its attorney-in-fact to endorse Grantor's name on all instruments and other documents pertaining to the Obligations or indebtedness. In addition, Lender shall be entitled, but not required, to perform any action or execute any document required to be taken or executed by Grantor under this Deed of Trust. Lender's performance of such action or execution of such documents shall not relieve Grantor from any Obligation or cure any default under this Deed of Trust. The powers of attorney described in this Deed of Trust are coupled with an interest and are irrevocable.

24. **SUBROGATION OF LENDER.** Lender shall be subrogated to the rights of the holder of any previous lien, security interest or encumbrance discharged with funds advanced by Lender regardless of whether these liens, security interests or other encumbrances have been released of record.

25. **COLLECTION COSTS.** To the extent permitted by law, Grantor agrees to pay Lender's reasonable fees and costs, including, but not limited to, fees and costs of attorneys and other agents (including without limitation paralegals, clerks and consultants), whether or not such attorney or agent is an employee of Lender, which are incurred by Lender in collecting any amount due or enforcing any right or remedy under this Deed of Trust, whether or not suit is brought, including, but not limited to, all fees and costs incurred on appeal, in bankruptcy, and for post-judgment collection actions.

26. **PARTIAL RELEASE.** Lender may release its interest in a portion of the Property by executing and recording one or more partial releases without affecting its interest in the remaining portion of the Property. Nothing herein shall be deemed to obligate Lender to release any of its interest in the Property (except as required under paragraph 35), nor shall Lender be obligated to release any part of the Property if Grantor is in default under this Deed of Trust.

27. **MODIFICATION AND WAIVER.** The modification or waiver of any of Grantor's Obligations or Lender's rights under this Deed of Trust must be contained in a writing signed by Lender. Lender may perform any of Borrower's or Grantor's Obligations, delay or fail to exercise any of its rights or accept payments from Grantor or anyone other than Grantor without causing a waiver of those Obligations or rights. A waiver on one occasion shall not constitute a waiver on any other occasion. Grantor's Obligations under this Deed of Trust shall not be affected if Lender amends, compromises, exchanges, fails to exercise, impairs or releases any of the Obligations belonging to any Grantor, Borrower or third party or any of its rights against any Grantor, Borrower or third party or any of the Property. Lender's failure to insist upon strict performance of any of the Obligations shall not be deemed a waiver, and Lender shall have the right at any time thereafter to insist upon strict performance.

28. **SUBSTITUTE TRUSTEE.** In case of the death, inability, refusal to act or absence of the Trustee from the state where the Property is located or in case the holder of the Obligations shall desire for any reason to remove the Trustee or any substitute trustee as trustee hereunder and to appoint a new trustee in his place and stead, the holder of the Obligations is hereby granted full power to appoint in writing a substitute trustee for said Trustee, and the substitute trustee shall, when appointed, become successor to all rights of Trustee hereunder and the same shall become vested in him for the purposes and objects of this Deed of Trust with all the power, duties and obligations herein conferred on the Trustee.

29. **SUCCESSORS AND ASSIGNS.** This Deed of Trust shall be binding upon and inure to the benefit of Grantor and Lender and their respective successors, assigns, trustees, receivers, administrators, personal representatives, legatees and devisees.

30. **NOTICES.** Except as otherwise required by law, any notice or other communication to be provided under this Deed of Trust shall be in writing and sent to the parties at the addresses described in this Deed of Trust or such other address as the parties may designate in writing from time to time. Any such notice so given and sent by first class mail, postage prepaid, shall be deemed given the earlier of three (3) days after such notice is sent when received by the person to whom such notice is being given.

31. **SEVERABILITY.** Whenever possible, each provision of this Deed of Trust shall be interpreted so as to be effective and valid under applicable state law. If any provision of this Deed of Trust violates the law or is unenforceable, the rest of this Deed of Trust shall continue to be valid and enforceable.

32. **APPLICABLE LAW.** This Deed of Trust shall be governed by the laws of the state where the Property is located. Unless applicable law provides otherwise, Grantor consents to the jurisdiction and venue of any court selected by Lender, in its sole discretion, located in that state.

33. **NO THIRD-PARTY RIGHTS.** No person is or shall be a third-party beneficiary of any provision of this Deed of Trust. All provisions of this Deed of Trust in favor of Lender are intended solely for the benefit of Lender, and no third party shall be entitled to assume or expect that Lender will waive or consent to the modification of any provision of this Deed of Trust, in Lender's sole discretion.

34. **PRESERVATION OF LIABILITY AND PRIORITY.** Without affecting the liability of Borrower, Grantor, or any guarantor of the Obligations, or any other person (except a person expressly released in writing) for the payment and performance of the Obligations, and without affecting the rights of Lender with respect to any Property not expressly released in writing, and without impairing in any way the priority of this Deed of Trust over the interest of any person acquired or first evidenced by recording subsequent to the recording of this Deed of Trust, Lender may, either before or after the maturity of the Obligations, and without notice or consent: release any person liable for payment or performance of all or any part of the Obligations; make any agreement altering the terms of payment or performance of all or any part of the Obligations; exercise or refrain from exercising or waive any right or remedy that Lender may have under this Deed of Trust; accept additional security of any kind for any of the Obligations; or release or otherwise deal with any real or personal property securing the Obligations. Any person acquiring or recording evidence of any interest of any nature in the Property shall be deemed, by acquiring such interest or recording any evidence thereof, to have consented to all or any such actions by Lender.

35. **DEFEASANCE.** Upon the payment and performance in full of all of the Obligations, Lender will execute and deliver to Grantor those documents that may be required to release this Deed of Trust of record. Grantor shall be responsible to pay any costs of recordation.

36. **WAIVER OF HOMESTEAD.** Grantor hereby waives all homestead exemptions in the Property to which Grantor would otherwise be entitled under any applicable law.

37. **MISCELLANEOUS.** Grantor and Lender agree that time is of the essence. Grantor waives presentment, demand for payment, notice of dishonor and protest except as required by law. All references to Grantor in this Deed of Trust shall include all persons signing below. If there is more than one Grantor, their Obligations shall be joint and several. This Deed of Trust represents the complete integrated understanding between Grantor and Lender pertaining to the terms and conditions hereof.

38. **ORAL AGREEMENTS.** ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER UTAH LAW.

39. **JURY TRIAL WAIVER.** LENDER AND GRANTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY CIVIL ACTION ARISING OUT OF, OR BASED UPON, THIS DEED OF TRUST.

40. **ADDITIONAL TERMS:**

Grantor acknowledges that Grantor has read, understands, and agrees to the terms and conditions of this Deed of Trust, and acknowledges receipt of an exact copy of same.

Dated this __22nd__ day of __August 2007__

GRANTOR: RICHARD W. HARRIS

RICHARD W. HARRIS

GRANTOR:

GRANTOR:

GRANTOR:

GRANTOR:

GRANTOR:

GRANTOR:

State of Utah )
County of __Salt Lake__ )
The foregoing Instrument was acknowledged before me this __22nd__ day of __August__ _____, by
__Richard W Harris__

My Commission Expires: __06/07/08__

CHRISTOPHER M. SHINGLER
Notary Public
State of Utah
My Commission Expires Jan. 7, 2008

Notary Public __Christopher M Shingler__

Residing at: _____

State of Utah )
County of _____ )
The foregoing Instrument was acknowledged before me this _____ day of _____ _____, by
_____

My Commission Expires: _____

Notary Public _____

Residing at: _____

State of Utah )
County of _____ )
The foregoing Instrument was acknowledged before me this _____ day of _____ _____, by
_____

My Commission Expires: _____

Notary Public _____

Residing at: _____

State of Utah )
County of _____ )
The foregoing Instrument was acknowledged before me this _____ day of _____ _____, by
_____

My Commission Expires: _____

Notary Public _____

Residing at: _____

### SCHEDULE A

The following described real property located in the County of __SALT LAKE__, State of __Utah__:

See Addendum A

PPN # 27-27-101-006-0000

### SCHEDULE B

BORROWER AND LENDER REQUEST THE HOLDER OF ANY MORTGAGE, DEED OF TRUST OR OTHER ENCUMBRANCE WITH A LIEN WHICH HAS PRIORITY OVER THIS MORTGAGE TO GIVE NOTICE TO LENDER, AT LENDER'S ADDRESS SET FORTH ON PAGE ONE OF THIS MORTGAGE, OF ANY DEFAULT UNDER THE SUPERIOR ENCUMBRANCE AND OF ANY SALE OR OTHER FORECLOSURE ACTION.

THIS DOCUMENT WAS PREPARED BY:   KeyBank National Association / David G. Fisher

AFTER RECORDING RETURN TO LENDER AT ITS ADDRESS DESCRIBED ABOVE.

LPUT8 10E  © John H. Harland Co. (09/21/94) (800) 937-3798

## EXHIBIT "A"

### LEGAL DESCRIPTION

BEGINNING AT A POINT WHICH IS SOUTH 33.00 FEET AND EAST 757.89 FEET FROM THE NORTHWEST CORNER OF SECTION 27, TOWNSHIP 3 SOUTH, RANGE 1 WEST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE EAST 116.06 FEET; THENCE SOUTH 627.0 FEET; THENCE WEST 116.06 FEET; THENCE NORTH 627.0 FEET TO THE POINT OF BEGINNING.County of Salt Lake.

27-27-101-006-0000
2029 MYERS LN; RIVERTON, UT 84065-7824

22872086 / 072261350210C
12948093/f

HARRIS
12948093                    UT

FIRST AMERICAN LENDERS ADVANTAGE
DEED OF TRUST

BK 9514 PG 1220

10231606

10231606
09/25/2007 11:18 AM $22.00
Book - 9518 Ps - 8035-8041
GARY W. OTT
RECORDER, SALT LAKE COUNTY, UTAH
FIRST AMERICAN TITLE OHIO
BY: KLD, DEPUTY - WA 7 P.

When recorded mail to:
*FIRST AMERICAN TITLE INSURANCE*
*LENDERS ADVANTAGE*
*1100 SUPERIOR AVENUE, SUITE 200*
*CLEVELAND, OHIO 44114*
*ATTN: FT1120*

## HOME EQUITY LINE DEED OF TRUST

| BORROWER | GRANTOR |
|---|---|
| RICHARD W. HARRIS | RICHARD W. HARRIS |
| ADDRESS | ADDRESS |
| 2829 W 11800 S | 2829 W 11800 S |
| RIVERTON, UT 84065 | RIVERTON, UT 84065 |
| TELEPHONE NO. IDENTIFICATION NO. | TELEPHONE NO. IDENTIFICATION NO. |

TRUSTEE: KeyBank National Association
5301 S STATE ST
MURRAY, UT 84107

In consideration of the loan or other credit accommodation hereinafter specified and any future advances or future Obligations, as defined herein, which may hereafter be advanced or incurred and the true hereinafter mentioned and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor hereby irrevocably bargains, sells, transfers, grants, conveys and assigns to Trustee, his successors and assigns, in trust, for **KeyBank National Association** ("Lender"), the beneficiary **4910 Tiedeman Road, Suite B, Brooklyn, Ohio 44144**, and right of entry and possession of all of Grantor's present and future estate, right, title and interest in and under this Deed of Trust, with power of sale and right of entry and possession of all of Grantor's present and future estate, right, title and interest in and to the real property described in Schedule A which is attached to this Deed of Trust and incorporated herein by this reference, together with all present and future improvements and fixtures; all tangible personal property including, without limitation, all machinery, equipment, building materials, and goods of every nature (including household goods) now or hereafter located on or used in connection with the real property, whether or not affixed to the land; all privileges, hereditaments, and appurtenances; all leases, licenses and other agreements; all rents, issues and profits; all water, well, ditch, reservoir and mineral rights and stocks pertaining to the real property (cumulatively "Property"); to have and to hold the Property and the rights hereby granted for the use and benefit of Trustee, his successors and assigns, until payment in full of all Obligations secured hereby.

Moreover, in further consideration, Grantor does, for Grantor and Grantor's heirs, representatives, successors, and assigns, hereby expressly warrant, covenant, and agree with Lender and Trustee and their successors and assigns as follows:

1. **OBLIGATIONS.** This Deed of Trust shall secure the payment and performance of all present and future indebtedness, liabilities, obligations and covenants of Borrower or Grantor (cumulatively "Obligations") to Lender pursuant to:

   (a) this Deed of Trust and the following promissory notes and other agreements:

1308 9712

| INTEREST RATE | PRINCIPAL AMOUNT/ CREDIT LIMIT | FUNDING/ AGREEMENT DATE | MATURITY DATE | CUSTOMER NUMBER | LOAN NUMBER |
|---|---|---|---|---|---|
| VARIABLE | $30,000.00 | 08/27/07 | 08/27/42 | 072281132090C | 445102429655 |

   (b) all other present or future written agreements with Lender which refer specifically to this Deed of Trust (whether executed for the same or different purposes than the foregoing);

   (c) any guaranty of obligations of other parties given to Lender now or hereafter which refers to this Deed of Trust;

   (d) future advances, whether obligatory or optional, to the same extent as if made contemporaneously with the execution of this Deed of Trust, made or extended to or on behalf of Grantor or Borrower. Grantor agrees that if one of the Obligations is a line of credit, the lien of this Deed of Trust shall continue until payment in full of all debt due under the line notwithstanding the fact that from time to time but before termination of the line no balance may be outstanding. At no time shall the lien of this Deed of Trust, not including amounts advanced to protect the security of this Deed of Trust, exceed $ **30,000.00** ; and

   (e) all amendments, extensions, renewals, modifications, replacements or substitutions to any of the foregoing.

As used in this Paragraph 1, the terms Grantor and Borrower shall include and also mean any Grantor or Borrower if more than one.

2. **REPRESENTATIONS, WARRANTIES AND COVENANTS.** Grantor represents, warrants and covenants to Lender that:

   (a) Grantor has fee simple marketable title to the Property and shall maintain the Property free of all liens, security interests, encumbrances and claims except for this Deed of Trust and those described in Schedule B which is attached to this Deed of Trust and incorporated herein by reference, which Grantor agrees to pay and perform in a timely manner;

   (b) Grantor is in compliance in all respects with all applicable federal, state and local laws and regulations, including, without limitation, those relating to "Hazardous Materials," as defined herein, and other environmental matters (the "Environmental Laws"), and neither the federal government nor the state where the Property is located nor any other governmental or quasi governmental entity has filed a lien on the Property, nor are there any governmental, judicial or administrative actions with respect to environmental matters pending, or to the best of the Grantor's knowledge, threatened, which involve the Property. Neither Grantor nor, to the best of Grantor's knowledge, any other party has used, generated, released, discharged, stored, or disposed of any Hazardous Materials as defined herein, in connection with the Property or transported any Hazardous Materials to or from the Property. Grantor shall not commit or permit such actions to be taken in the future. The term "Hazardous Materials" shall mean any substance, material, or waste which is or becomes regulated by any governmental authority including, but not limited to: (i) petroleum; (ii) friable or nonfriable asbestos; (iii) polychlorinated biphenyls; (iv) those substances, materials or wastes designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act or listed pursuant to Section 307 of the Clean Water Act or any amendments or replacements to these statutes; (v) those substances, materials or wastes defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act or any amendments or replacements to that statute; and (vi) those substances, materials or wastes defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, or any amendments or replacements to that statute or any other similar state or federal statute, rule, regulation or ordinance now or hereafter in effect. Grantor shall not lease or permit the sublease of the Property to a tenant or subtenant whose operations may result in contamination of the Property with Hazardous Materials or toxic substances;

   (c) All applicable laws and regulations including, without limitation, the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. (and all regulations promulgated thereunder) and all zoning and building laws and regulations relating to the Property by virtue of any federal, state or municipal authority with jurisdiction over the Property, presently are and shall be observed and complied with in all material respects, and all rights, licenses, permits, and certificates of occupancy (including but not limited to zoning variances, special exceptions for nonconforming uses, and final inspection approvals), whether temporary or permanent, which are material to the use and occupancy of the Property, presently are and shall be obtained, preserved and, where necessary, renewed;

LPUTS16 © John H. Harland Co. (08/21/96) (800) 937-3799

**BK 9518 PG 8035**

Page 1 of 8

(d) Grantor has the right and is duly authorized to execute and perform its Obligations under this Deed of Trust and these actions do not and shall not conflict with the provisions of any statute, regulation, ordinance, rule of law, contract or other agreement which may be binding on Grantor at any time;

(e) No action or proceeding is or shall be pending or threatened which might materially affect the Property; and

(f) Grantor has not violated and shall not violate any statute, regulation, ordinance, rule of law, contract or other agreement which might materially affect the Property (including, but not limited to, those governing Hazardous Materials) or Lender's rights or interest in the Property pursuant to this Deed of Trust.

**3. PRIOR DEEDS OF TRUST.** Grantor represents and warrants that there are no prior deeds of trust or mortgages affecting any part of the Property except as set forth on Schedule B attached to this Deed of Trust which Grantor agrees to pay and perform in a timely manner. If there are any prior deeds of trust or mortgages then Grantor agrees to pay all amounts owed, and perform all obligations required, under such deeds of trust and the indebtedness secured thereby.

**4. TRANSFERS OF THE PROPERTY OR BENEFICIAL INTERESTS IN GRANTORS OR BORROWERS.** In the event of a sale, conveyance, lease, contract for deed or transfer to any person of all or any part of the real property described in Schedule A, or any interest therein, or of all or any beneficial interest in Borrower or Grantor (if Borrower or Grantor is not a natural person or persons but is a corporation, limited liability company, partnership, trust, or other legal entity), Lender may, at its option, declare the outstanding principal balance of the Obligations plus accrued interest thereon immediately due and payable. At Lender's request, Grantor or Borrower, as the case may be, shall furnish a complete statement setting forth all of its stockholders, members or partners, as appropriate, and the extent of their respective ownership interests.

**5. ASSIGNMENT OF RENTS.** In consideration of the Obligations which are secured by this Deed of Trust, Grantor absolutely assigns to Lender all Grantor's estate, right, title, interest claim and demand now owned or hereafter acquired in all existing and future leases of the Property (including extensions, renewals and subleases), all agreements for use and occupancy of the Property (all such leases and agreements whether written or oral, are hereafter referred to as the "Leases"), and all guaranties of lessees' performance under the Leases, together with the immediate and continuing right to collect and receive all of the rent, income, receipts, revenues, issues, profits and other proceeds from the Leases and other income of any nature now or hereafter due (including any income of any nature coming due during any redemption period) under the Leases or from or arising out of the Property, including minimum rents, additional rents, percentage rents, parking or common area maintenance contributions, tax and insurance contributions, deficiency rents, liquidated damages following default in any Lease, all proceeds payable under any policy of insurance covering loss of rents resulting from unancerability caused by destruction or damage to the Property, all proceeds payable as a result of a lessee's exercise of an option to purchase the Property, all proceeds derived from the termination or rejection of any Lease in a bankruptcy or other insolvency proceeding, and all proceeds from any rights and claims of any kind which Grantor may have against any lessee under the Leases or any occupants of the Property (all of the above are hereafter collectively referred to as the "Rents"). This assignment is subject to the right, power and authority given to Lender to collect and apply the Rents. This assignment is recorded in accordance with applicable Utah law (Section 57-1-35 of the Utah Code Annotated). The lien created by this assignment is intended to be specific, perfected, and choate upon the recording of this Deed of Trust. As long as there is no default under the Obligations or this Deed of Trust, Lender grants Grantor a revocable license to collect all Rents from the Leases when due and to use such proceeds in Grantor's business operations. However, Lender may at any time require Grantor to deposit all Rents into an account maintained by Grantor or Lender at Lender's institution. Upon default in the payment of, or in the performance of, any of the Obligations, Lender may at its option take possession of the Property and have, hold, manage, lease and operate the Property on terms and for a period of time that Lender deems proper. Lender may proceed to collect and receive all Rents from the Property, and Lender shall have full power to periodically make alterations, renovations, repairs or replacements to the Property as Lender may deem proper. Lender may apply all Rents in Lender's sole discretion to payment of the Obligation or to the payment of the cost of such alterations, renovations, repairs and replacements and any expenses incident to taking and retaining possession of the Property and the management and operation of the Property. Lender may keep the Property insured and may discharge any taxes, charges, claims, assessments and other liens which may accrue. The expense and cost of these actions may be paid from the Rents received, and any unpaid amounts shall be added to the principal of the Obligations. These amounts, together with other costs, shall become part of the Obligations secured by this Deed of Trust.

**6. LEASES AND OTHER AGREEMENTS.** Grantor shall not take or fail to take any action which may cause or permit the termination or the withholding of any payment in connection with any Lease pertaining to the Property. In addition, Grantor, without Lender's prior written consent, shall not: (a) collect any monies payable under any Lease more than one month in advance; (b) modify any Lease; (c) assign or allow a lien, security interest or other encumbrance to be placed upon Grantor's rights, title and interest in and to any Lease or the amounts payable thereunder; or (d) terminate or cancel any Lease except for the nonpayment of any sum or other material breach by the other party thereto. If Grantor receives at any time any written communication asserting a default by Grantor under an Lease or purporting to terminate or cancel any Lease, Grantor shall promptly forward a copy of such communication (and any subsequent communications relating thereto) to Lender. All such Leases and the amounts due to Grantor thereunder are hereby assigned to Lender as additional security for the Obligations.

**7. COLLECTION OF INDEBTEDNESS FROM THIRD PARTY.** Lender shall be entitled to notify or require Grantor to notify any third party (including, but not limited to, lessees, licensees, governmental authorities and insurance companies) to pay Lender any indebtedness or obligation owing to Grantor with respect to the Property (cumulatively "Indebtedness") whether or not a default exists under this Deed of Trust. Grantor shall diligently collect the Indebtedness owing to Grantor from these third parties until the giving of such notification. In the event that Grantor possesses or receives possession of any instruments or other remittances with respect to the Indebtedness following the giving of such notification or if the instruments or other remittances constitute the prepayment of any Indebtedness or the payment of any insurance or condemnation proceeds, Grantor shall hold such instruments and other remittances in trust for Lender apart from its other property, endorse the instruments and other remittances to Lender, and immediately provide Lender with possession of the instruments and other remittances. Lender shall be entitled, but not required, to collect (by legal proceedings or otherwise), extend the time for payment, compromise, exchange or release any obligor or collateral, or otherwise settle any of the Indebtedness whether or not an Event of Default exists under this Deed of Trust. Lender shall not be liable to Grantor for any action, error, mistake, omission or delay pertaining to the actions described in this paragraph or any damages resulting therefrom. Notwithstanding the foregoing, nothing herein shall cause Lender to be deemed a mortgagee-in-possession.

**8. USE AND MAINTENANCE OF PROPERTY.** Grantor shall take all actions and make any repairs needed to maintain the Property in good condition. Grantor shall not commit or permit any waste to be committed with respect to the Property. Grantor shall use the Property solely in compliance with applicable law and insurance policies. Grantor shall not make any alterations, additions or improvements to the Property without Lender's prior written consent. Without limiting the foregoing, all alterations, additions and improvements made to the Property shall be subject to the beneficial interest belonging to Lender, shall not be removed without Lender's prior written consent, and shall be made at Grantor's sole expense.

**9. LOSS OR DAMAGE.** Grantor shall bear the entire risk of any loss, theft, destruction or damage (cumulatively "Loss or Damage") to the Property or any portion thereof from any cause whatsoever. In the event of any Loss or Damage, Grantor shall, at the option of Lender, repair the affected Property to its previous condition or pay or cause to be paid to Lender the decrease in the fair market value of the affected Property.

**10. INSURANCE.** The Property will be kept insured for its full insurable value (replacement cost) against all hazards including loss or damage caused by flood, earthquake, tornado and fire, theft or other casualty to the extent required by Lender. Grantor may obtain insurance on the Property from such companies as are acceptable to Lender in its sole discretion. The insurance policies shall require the insurance company to provide Lender with at least ___30___ days' written notice before such policies are altered or cancelled in any manner. The insurance policies shall name Lender as a loss payee and provide that no act or omission of Grantor or any other person shall affect the right of Lender to be paid the insurance proceeds pertaining to the loss or damage of the Property. In the event Grantor fails to acquire or maintain insurance, Lender (after providing notice as may be required by law) may in its discretion procure appropriate insurance coverage upon the Property and the insurance cost shall be an advance payable and bearing interest as described in Paragraph 21 and secured hereby. Grantor shall furnish Lender with evidence of insurance indicating the required coverage. Lender may act as attorney-in-fact for Grantor in making and settling claims under insurance policies, cancelling any policy or endorsing Grantor's name on any draft or negotiable instrument drawn by any insurer. All such insurance policies shall be immediately assigned, pledged and delivered to Lender as further security for the Obligations. In the event of loss, Grantor shall immediately give Lender written notice and Lender is authorized to make proof of loss. Each insurance company is directed to make payments directly to Lender instead of to Lender and Grantor. Lender shall have the right, at its sole option, to apply such monies toward the Obligations or toward the cost of rebuilding and restoring the Property. Any amounts may at Lender's option be applied in the inverse order of the due dates thereof.

**11. ZONING AND PRIVATE COVENANTS.** Grantor shall not initiate or consent to any change in the zoning provisions or private covenants affecting the use of the Property without Lender's prior written consent. If Grantor's use of the Property is or becomes a nonconforming use under any zoning provision, Grantor shall not cause or permit such use to be discontinued or abandoned without the prior written consent of Lender. Grantor will immediately provide Lender with written notice of any proposed changes to the zoning provisions or private covenants affecting the Property.

**12. CONDEMNATION.** Grantor shall immediately provide Lender with written notice of any actual or threatened condemnation or eminent domain proceeding pertaining to the Property. All monies payable to Grantor from such condemnation or taking are hereby assigned to Lender and shall be applied first to the payment of Lender's attorneys' fees, legal expenses and other costs (including appraisal fees) in connection with the condemnation or eminent domain proceedings and then, at the option of Lender, to the payment of the Obligations or the restoration or repair of the Property.

**13. LENDER'S RIGHT TO COMMENCE OR DEFEND LEGAL ACTIONS.** Grantor shall immediately provide Lender with written notice of any actual or threatened action, suit, or other proceeding affecting the Property. Grantor hereby appoints Lender as its attorney-in-fact to commence, intervene in, and defend such actions, suits, or other legal proceedings and to compromise or settle any claim or controversy pertaining thereto. Lender shall not be liable to Grantor for any action, error, mistake, omission or delay pertaining to the actions described in this paragraph or any damages resulting therefrom. Nothing contained herein will prevent Lender from taking the actions described in this paragraph in its own name.

**14. INDEMNIFICATION.** Lender shall not assume or be responsible for the performance of any of Grantor's obligations with respect to the Property under any circumstances. Grantor shall immediately provide Lender with written notice of and indemnify and hold Lender and its shareholders, directors, officers, employees and agents harmless from all claims, damages, liabilities (including attorneys' fees and legal expenses), causes of action, actions, suits and other legal proceedings (cumulatively "Claims") pertaining to the Property (including, but not limited to, those involving Hazardous Materials). Grantor, upon the request of Lender, shall hire legal counsel, acceptable to Lender, to defend Lender from such Claims, and pay the attorneys' fees, legal expenses and other costs incurred in connection therewith. In the alternative, Lender shall be entitled to employ its own legal counsel to defend such Claims at Grantor's cost. Grantor's obligation to indemnify Lender under this paragraph shall survive the termination, release or foreclosure of this Deed of Trust.

**15. TAXES AND ASSESSMENTS.** Grantor shall pay all taxes and assessments relating to the Property when due and immediately provide Lender evidence of payment of same. Upon the request of Lender, Grantor shall deposit with Lender each month one-twelfth (1/12) of the estimated annual insurance premium, taxes and assessments pertaining to the Property. So long as there is no default, these amounts shall be applied to the payment of taxes, assessments and insurance as required on the Property. In the event of default, Lender shall have the right, at its sole option, to apply the funds so held to pay any taxes or against the Obligations. Any funds applied may, at Lender's option, be applied in reverse order of the due date thereof.

**16. INSPECTION OF PROPERTY, BOOKS, RECORDS AND REPORTS.** Grantor shall allow Lender or its agents to examine and inspect the Property and examine, inspect and make copies of Grantor's books and records pertaining to the Property from time to time. Grantor shall provide any assistance required by Lender for these purposes. All of the signatures and information contained in Grantor's books and records shall be genuine, true, accurate and complete in all respects. Grantor shall note the existence of Lender's beneficial interest in its books and records pertaining to the Property. Additionally, Grantor shall report, in a form satisfactory to Lender, such information as Lender may request regarding Grantor's financial condition or the Property. The information shall be for such periods, shall reflect Grantor's records at such time, and shall be rendered with such frequency as Lender may designate. All information furnished by Grantor to Lender shall be true, accurate and complete in all respects, and signed by Grantor if Lender requests.

**17. ESTOPPEL CERTIFICATES.** Within ten (10) days after any request by Lender, Grantor shall deliver to Lender, or any intended transferee of Lender's rights with respect to the Obligations, a signed and acknowledged statement specifying (a) the outstanding balance on the Obligations; and (b) whether Grantor possesses any claims, defenses, set-offs or counterclaims with respect to the Obligations and, if so, the nature of such claims, defenses, set-offs or counterclaims. Grantor will be conclusively bound by any representation that Lender may make to the intended transferee with respect to these matters in the event that Grantor fails to provide the requested statement in a timely manner.

**18. EVENTS OF DEFAULT.** An Event of Default shall occur under this Deed of Trust and the Trustee's power shall become operative in the event that Grantor, Borrower or any guarantor of any Obligation:

(a) commits fraud or makes a material misrepresentation at any time in connection with the Obligations or this Deed of Trust;

(b) fails to meet the repayment terms of the Obligations for any outstanding balance; or

(c) by any action or inaction, adversely affects the Property, or any right of Lender in such Property, including, but not limited to, transfer of title to or sale of the Property without the permission of Lender, failure to maintain required insurance or to pay taxes on the Property, allowing the filing of a lien senior to that held by Lender, death of the sole Borrower obligated under the Obligations, allowing the taking of the Property through eminent domain, or allowing the Property to be foreclosed by a lienholder other than Lender. In addition, an Event of Default shall occur if, as a result of any of the following, the property, or any right of Lender in such Property, including Lender or in the name of Grantor or any guarantor of any Obligation commits waste or otherwise destructively uses or fails to maintain the Property, or the property in an illegal manner which may subject the Property to seizure, or moves from the Property; a judgment is filed against the Borrower, Grantor or any guarantor of any Obligation; or one of two Borrowers obligated under the Obligations dies.

**19. RIGHTS OF LENDER ON EVENT OF DEFAULT.** Upon the occurrence of an Event of Default under this Deed of Trust, Lender shall be entitled to exercise one or more of the following remedies without notice or demand (except as required by law):

(a) to declare the Obligations immediately due and payable in full, such acceleration shall be automatic and immediate if the Event of Default is a filing under the Bankruptcy Code;

(b) to collect the outstanding Obligations with or without resorting to judicial process;

(c) to require Grantor to deliver and make available to Lender any personal property or Chattels constituting the Property at a place reasonably convenient to Grantor and Lender;

(d) to enter upon and take possession of the Property without applying for or obtaining the appointment of a receiver and, at Lender's option, and as allowed by law, to appoint a receiver without bond, without first bringing suit on the Obligations and without otherwise meeting any statutory conditions regarding receivers. It being intended that Lender shall have this contractual right to appoint a receiver;

(e) to employ a managing agent of the Property and let the same, either in Trustee's own name, in the name of Lender or in the name of Grantor, and receive the rents, incomes, issues and profits of the Property and apply the same, after payment of all necessary charges and expenses, on account of the Obligations;

(f) to pay any sums in any form or manner deemed expedient by Lender to protect the security of this Deed of Trust or to cure any default other than payment of interest or principal on the Obligations;

(g) to foreclose this Deed of Trust judicially or nonjudicially in accordance with Section 57-1-23 of the Utah Code Annotated;

(h) to set-off Grantor's Obligations against any amounts owed Grantor by Lender including, but not limited to, monies, instruments, and deposit accounts maintained with Lender or any currently existing or future affiliate of Lender; and

(i) to exercise all other rights available to Lender under any other written agreement or applicable law.

Lender's rights are cumulative and may be exercised together, separately, and in any order. In the event that Lender institutes an action seeking the recovery of any of the Property by way of a prejudgment remedy in an action against Grantor, Grantor waives the posting of any bond which might otherwise be required. Lender or Lender's designee may purchase the Property at any sale. In the event Lender purchases the Property at the Trustee's sale, to the extent Lender's bid price exceeds the Obligations, Lender shall pay Trustee cash equal to such excess. The Property or any part thereof may be sold in one parcel, or in such parcels, manner or order as Lender in its sole discretion may elect, and one or more exercises of the power herein granted shall not extinguish or exhaust the power unless the entire Property is sold or the Obligations are paid in full.

**20. SECURITY INTEREST UNDER THE UNIFORM COMMERCIAL CODE.** This Deed of Trust shall be considered a financing statement and a fixture filing pursuant to the provisions of the Uniform Commercial Code (as adopted in the state where the Property is located) covering fixtures, chattels, and articles of personal property now owned or hereafter attached to or to be used in connection with the Property together with any and all replacements thereof and additions thereto (the "Chattels"), and Grantor hereby grants Lender a security interest in such Chattels. The debtor is the Grantor described above. The secured party is the Lender described above. Upon demand, Grantor shall make, execute and deliver such security agreements (as such term is defined in said Uniform Commercial Code of Utah) as Lender at any time may deem necessary or proper or require to grant to Lender a perfected security interest in the Chattels, and upon Grantor's failure to do so, Lender is authorized to sign any such agreement as the agent of Grantor. Grantor hereby authorizes Lender to file financing statements (as such term is defined in said Uniform Commercial Code) with respect to the Chattels, at any time, without the signature of Grantor. Grantor will, however, at any time upon request of Lender, sign such financing statements. Grantor will pay all filing fees for the filing of such financing statements and for the refiling thereof at the times required, in the opinion of Lender, by said Uniform Commercial Code. If the lien of this Deed of Trust is subject to any security agreement covering the Chattels, then in the event of any default under this Deed of Trust, all the right, title and interest of Grantor in and to any and all of the Chattels is hereby assigned to Lender, together with the benefit of any deposits or payments now or hereafter made thereof by Grantor or the predecessors or successors in title of Grantor in the Property.

**21. REIMBURSEMENT OF AMOUNTS EXPENDED BY LENDER.** Lender, at Lender's option, may expend funds (including attorneys' fees and legal expenses) to perform any act required to be taken by Grantor or to exercise any right or remedy of Lender under this Deed of Trust. Upon demand, Grantor shall immediately reimburse Lender for all such amounts expended by Lender together with interest thereon at the lower of the highest rate described in any Obligation or the highest rate allowed by law from the date of payment until the date of reimbursement. These sums shall be included in the definition of Obligations herein and shall be secured by the beneficial interest granted herein. If the Obligations are paid after the beginning of publication of notice of sale, as herein provided, or in the event Lender shall, at its sole option, permit Grantor to pay any part of the Obligations after the beginning of publication of notice of sale, as herein provided, then, Grantor shall pay on demand all expenses incurred by the Trustee and Lender in connection with said publication, including reasonable attorneys' fees to the attorneys for the Trustee and for the Lender, and a reasonable fee to the Trustee, and this Deed of Trust shall be security for all such expenses and fees.

**22. APPLICATION OF PAYMENTS.** All payments made by or on behalf of Grantor may be applied against the amounts paid by Lender (including attorneys' fees and legal expenses) in connection with the exercise of its rights or remedies described in this Deed of Trust and then to the payment of the remaining Obligations in whatever order Lender chooses.

**23. POWER OF ATTORNEY.** Grantor hereby appoints Lender as its attorney-in-fact to endorse Grantor's name on all instruments and other documents pertaining to the Obligations or Indebtedness. In addition, Lender shall be entitled, but not required, to perform any action or execute any document required to be taken or executed by Grantor under this Deed of Trust. Lender's performance of such action or execution of such documents shall not relieve Grantor from any Obligation or cure any default under this Deed of Trust. The powers of attorney described in this Deed of Trust are coupled with an interest and are irrevocable.

**24. SUBROGATION OF LENDER.** Lender shall be subrogated to the rights of the holder of any previous lien, security interest or encumbrance discharged with funds advanced by Lender regardless of whether these liens, security interests or other encumbrances have been released of record.

**25. COLLECTION COSTS.** To the extent permitted by law, Grantor agrees to pay Lender's reasonable fees and costs, including, but not limited to, fees and costs of attorneys and other agents (including without limitation paralegals, clerks and consultants), whether or not such attorney or agent is an employee of Lender, which are incurred by Lender in collecting any amount due or enforcing any right or remedy under this Deed of Trust, whether or not suit is brought, including, but not limited to, all fees and costs incurred on appeal, in bankruptcy, and for post-judgment collection actions.

**26. PARTIAL RELEASE.** Lender may release its interest in a portion of the Property by executing and recording one or more partial releases without affecting its interest in the remaining portion of the Property. Nothing herein shall be deemed to obligate Lender to release any of its interest in the Property (except as required under paragraph 35), nor shall Lender be obligated to release any part of the Property if Grantor is in default under this Deed of Trust.

**27. MODIFICATION AND WAIVER.** The modification or waiver of any of Grantor's Obligations or Lender's rights under this Deed of Trust must be contained in a writing signed by Lender. Lender may perform any of Borrower's or Grantor's Obligations, delay or fail to exercise any of its rights or accept payments from Grantor or anyone other than Grantor without causing a waiver of those Obligations or rights. A waiver on one occasion shall not constitute a waiver on any other occasion. Grantor's Obligations under this Deed of Trust shall not be affected if Lender amends, compromises, exchanges, fails to exercise, impairs or releases any of the Obligations belonging to any Grantor, Borrower or third party or any of its rights against any Grantor, Borrower or third party or any of the Property. Lender's failure to insist upon strict performance of any of the Obligations shall not be deemed a waiver, and Lender shall have the right at any time thereafter to insist upon strict performance.

**28. SUBSTITUTE TRUSTEE.** In case of the death, inability, refusal to act or absence of the Trustee from the state where the Property is located or in case the holder of the Obligations shall desire for any reason to remove the Trustee or any substitute trustee as trustee hereunder and to appoint a new trustee in his place and stead, the holder of the Obligations is hereby granted full power to appoint in writing a substitute trustee for said Trustee, and the substitute trustee shall, when appointed, become successor to all rights of Trustee hereunder and the same shall become vested in him for the purposes and objects of this Deed of Trust with all the power, duties and obligations herein conferred on the Trustee.

**29. SUCCESSORS AND ASSIGNS.** This Deed of Trust shall be binding upon and inure to the benefit of Grantor and Lender and their respective successors, assigns, trustees, receivers, administrators, personal representatives, legatees and devisees.

**30. NOTICES.** Except as otherwise required by law, any notice or other communication to be provided under this Deed of Trust shall be in writing and sent to the parties at the addresses described in this Deed of Trust or such other address as the parties may designate in writing from time to time. Any such notice so given and sent by first class mail, postage prepaid, shall be deemed given the earlier of three (3) days after such notice is sent when received by the person to whom such notice is being given.

**31. SEVERABILITY.** Whenever possible, each provision of this Deed of Trust shall be interpreted so as to be effective and valid under applicable state law. If any provision of this Deed of Trust violates the law or is unenforceable, the rest of this Deed of Trust shall continue to be valid and enforceable.

**32. APPLICABLE LAW.** This Deed of Trust shall be governed by the laws of the state where the Property is located. Unless applicable law provides otherwise, Grantor consents to the jurisdiction and venue of any court selected by Lender, in its sole discretion, located in that state.

**33. NO THIRD-PARTY RIGHTS.** No person is or shall be a third-party beneficiary of any provision of this Deed of Trust. All provisions of this Deed of Trust in favor of Lender are intended solely for the benefit of Lender, and no third party shall be entitled to assume or expect that Lender will waive or consent to the modification of any provision of this Deed of Trust, in Lender's sole discretion.

**34. PRESERVATION OF LIABILITY AND PRIORITY.** Without affecting the liability of Borrower, Grantor, or any guarantor of the Obligations, or any other person (except a person expressly released in writing) for the payment and performance of the Obligations, and without affecting the rights of Lender with respect to any Property not expressly released in writing, and without impairing in any way the priority of this Deed of Trust over the interest of any person acquired at or first evidenced by recording subsequent to the recording of this Deed of Trust, Lender may, either before or after the maturity of the Obligations, and without notice or consent: release any person liable for payment or performance of all or any part of the Obligations; make any agreement altering the terms of payment or performance of all or any part of the Obligations; exercise or refrain from exercising or waive any right or remedy that Lender may have under this Deed of Trust; accept additional security of any kind for any of the Obligations; or release or otherwise deal with any real or personal property securing the Obligations. Any person acquiring or recording evidence of any interest of any nature in the Property shall be deemed, by acquiring such interest or recording any evidence thereof, to have consented to all or any such actions by Lender.

**35. DEFEASANCE.** Upon the payment and performance in full of all of the Obligations, Lender will execute and deliver to Grantor those documents that may be required to release this Deed of Trust of record. Grantor shall be responsible to pay any costs of recordation.

**36. WAIVER OF HOMESTEAD.** Grantor hereby waives all homestead exemptions in the Property to which Grantor would otherwise be entitled under any applicable law.

**37. MISCELLANEOUS.** Grantor and Lender agree that time is of the essence. Grantor waives presentment, demand for payment, notice of dishonor and protest except as required by law. All references to Grantor in this Deed of Trust shall include all persons signing below. If there is more than one Grantor, their Obligations shall be joint and several. This Deed of Trust represents the complete integrated understanding between Grantor and Lender pertaining to the terms and conditions hereof.

**38. ORAL AGREEMENTS.** ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER UTAH LAW.

**39. JURY TRIAL WAIVER.** LENDER AND GRANTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY CIVIL ACTION ARISING OUT OF, OR BASED UPON, THIS DEED OF TRUST.

**40. ADDITIONAL TERMS:**

Grantor acknowledges that Grantor has read, understands, and agrees to the terms and conditions of this Deed of Trust, and acknowledges receipt of an exact copy of same.

Dated this ___22nd___ day of ___August, 2007___

GRANTOR: RICHARD M. HARRIS                          GRANTOR:

_____                    _____
RICHARD M. HARRIS

GRANTOR:                                            GRANTOR:

_____                    _____

GRANTOR:                                            GRANTOR:

_____                    _____

GRANTOR:                                            GRANTOR:

_____                    _____

State of Utah
County of _SALT LAKE_
    The foregoing instrument was acknowledged before me this _2nd_ day of _August_ _2007_ , by
_Richard L. Horn_

My Commission Expires: _06/07/08_

Notary Public

Residing at: _____

State of Utah
County of _____
    The foregoing instrument was acknowledged before me this _____ day of _____ , by

My Commission Expires: _____

Notary Public

Residing at: _____

State of Utah
County of _____
    The foregoing instrument was acknowledged before me this _____ day of _____ , by

My Commission Expires: _____

Notary Public

Residing at: _____

State of Utah
County of _____
    The foregoing instrument was acknowledged before me this _____ day of _____ , by

My Commission Expires: _____

Notary Public

Residing at: _____

SCHEDULE A

The following described real property located in the County of _SALT LAKE_ , State of _Utah_ :

See Addendum A

PPN # 27-27-101-006-0000

SCHEDULE B

BORROWER AND LENDER REQUEST THE HOLDER OF ANY MORTGAGE, DEED OF TRUST OR OTHER ENCUMBRANCE WITH A LIEN WHICH HAS PRIORITY OVER THIS MORTGAGE TO GIVE NOTICE TO LENDER, AT LENDER'S ADDRESS SET FORTH ON PAGE ONE OF THIS MORTGAGE, OF ANY DEFAULT UNDER THE SUPERIOR ENCUMBRANCE AND OF ANY SALE OR OTHER FORECLOSURE ACTION.

THIS DOCUMENT WAS PREPARED BY:   KeyBank National Association / David G. Fisher

AFTER RECORDING RETURN TO LENDER AT ITS ADDRESS DESCRIBED ABOVE.

LPUTX-UT  9  John H. Harland Co. (02/21/98)  (800) 937-3799

BK 9518 PG 8039

Page 2 of 3 _____

STATE OF Utah
ss.
COUNTY Salt Lake

The foregoing instrument was acknowledged before me this 22nd day of August, 2007 by Richard W Harris.



Notary Public CHRISTOPHER M. SHINGLER

CHRISTOPHER M. SHINGLER
Notary Public
State of Utah
My Commission Expires Jun. 7, 2008
348 E 12300 S Draper, UT 84020

My Commission Expires:
06/07/08


Residing at:
348 E 12300 S
Draper, UT 84020

EXHIBIT A

BEGINNING AT A POINT WHICH IS SOUTH 33.00 FEET AND EAST
757.89 FEET FROM THE NORTHWEST CORNER OF SECTION 27, TOWNSHIP
3 SOUTH, RANGE 1 WEST, SALT LAKE BASE AND MERIDIAN, AND
RUNNING THENCE EAST 116.06 FEET; THENCE SOUTH 627.0 FEET;
THENCE WEST 116.06 FEET; THENCE NORTH 627.0 FEET TO THE POINT
OF BEGINNING. COUNTY OF SALT LAKE, STATE OF UTAH.

2029 W 11800 S, RIVERTON UT 84065
Loan Reference Number  :  22872086/072261350210C
First American Order No:  12948093
Identifier: FLG

HARRIS
13089712                          UT
FIRST AMERICAN LENDERS ADVANTAGE
DEED OF TRUST

BK 9518 PG 8041

# EXHIBIT 5

10780109

10780109
8/18/2009 2:09:00 PM $12.00
Book - 9756 Pg - 420-421
Gary W. Ott
Recorder, Salt Lake County, UT
SECURITY TITLE INS AGENCY
BY: eCASH, DEPUTY - EF 2 P.

WHEN RECORDED RETURN TO:

LAW OFFICES OF WOODALL & WASSERMANN
10653 RIVER FRONT PARKWAY, SUITE 290
SOUTH JORDAN UT 84095

 

# NOTICE OF DEFAULT

T.S NO. 1232908-07        LOAN NO. XXXXXX0129        APN. 27-27-101-057

NOTICE IS HEREBY GIVEN THAT
RICHARD W HARRIS as Trustor,
ITS TITLE as Trustee,
in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. as Beneficiary, under Deed
of Trust dated April 03, 2007, recorded April 05, 2007, in the official records of SALT LAKE County,
Utah, as Entry No. 10057840, in Book 9446, at Page 2384-2406, covering the following described real
property situated in said County and State, to-wit:
BEGINNING AT A POINT WHICH IS SOUTH 33.00 FEET AND EAST 757.89 FEET FROM THE
NORTHWEST CORNER OF SECTION 27, TOWNSHIP 3 SOUTH, RANGE 1 WEST, SALT LAKE
BASE AND MERIDIAN, AND RUNNING THENCE EAST 116.06 FEET; THENCE SOUTH 627.0
FEET; THENCE WEST 116.06 FEET; THENCE NORTH 627.0 FEET TO THE POINT OF
BEGINNING.
Said obligation included a Note for the principal sum of $513,907.00; that the beneficial interest under
such Deed of Trust and the obligations secured thereby are presently owned by MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC.

That a breach or a default in the obligation for which said Deed of Trust is security has occurred as
follows: Failure to pay the monthly payment due May 01, 2009 of principal and interest and subsequent
installments due thereafter; plus late charges; together with all subsequent sums advanced by beneficiary
pursuant to the terms and conditions of said deed of trust.
Trustee's fees and costs and expenses associated with this foreclosure and any further breach of any term
or condition contained in subject note and deed of trust.
Monthly Payments: $4,474.44
Monthly Late Charge: $167.56
Total Delinquency as of August 17, 2009 is $18,663.00

That by reason of such default, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. the
Beneficiary under such Deed of Trust, has executed and delivered to said Trustee a written declaration of
default and a demand for sale, and has deposited with said Trustee such deed and all documents
evidencing the obligation secured thereby are immediately due and payable and has elected and does elect
to cause the trust property to be sold to satisfy the obligations secured thereby..

NODUT.DOC                    Rev. 1/11/2006                    Page 1 of 2

# NOTICE OF DEFAULT

T.S NO. 1232908-07
LOAN NO. XXXXXX0129

Dated: August 17, 2009

JAMES H. WOODALL, TRUSTEE
10653 RIVER FRONT PARKWAY, SUITE 290
SOUTH JORDAN UT 84095

(801)254-9450

STATE OF Utah
COUNTY OF Salt Lake )

On August 17, 2009 before me, Cindy Hansen a Notary Public
in and for said state, personally appeared James H. Woodall

personally known to me (or proved to me on the
basis of satisfactory evidence) to be the person(s)
whose name(s) is/are subscribed to the within
instrument and acknowledged to me that
he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal          (this area for Notary Seal)

Signature  Cindy Hansen

Notary Public
CINDY HANSEN
Commission 000016
My Commission Expires
June 1, 2011
State of Utah

NODUT.DOC                 Rev. 1/11/2006              Page 2 of 2

BK 9756 PG 421

# EXHIBIT 6

# FORECLOSURE, SUBPRIME MORTGAGE LENDING, AND THE MORTGAGE ELECTRONIC REGISTRATION SYSTEM

*Christopher L. Peterson*[*]

## TABLE OF CONTENTS

I.  THE AMERICAN REAL PROPERTY RECORDING SYSTEM
II. THE ORIGIN AND OPERATION OF MERS
III. THE QUESTIONABLE LEGAL FOUNDATION OF MERS
  A. *MERS Does Not Own Legal Title to Mortgages Registered On Its Database*
  B. *MERS Lacks Standing to Bring Mortgage Foreclosures*
  C. *MERS' Foreclosure Efforts Implicate the Federal Fair Debt Collection Practices Act*
    i.  *MERS is a Third Party Debt Collector*
    ii. *Mortgage Servicers that Cloak Themselves in MERS' Name Should be Construed as Debt Collectors*
  D. *Loans Recorded in MERS' Name May Lack Priority Against Subsequent Purchasers for Value and Bankruptcy Trustees*
IV. ANALYZING MERS' ROLE IN THE RESIDENTIAL MORTGAGE MARKET
  A. *MERS and the Mortgage Foreclosure Crisis*
  B. *MERS and Atrophy of the Land Title Information Infrastructure*
  C. *Title Recording Law and Democratic Governance*
V.  CONCLUSION

## INTRODUCTION

In the past two years, subprime mortgage lending has forced the American economy to the brink of a depression and fundamentally undermined world faith in American consumer financial markets.[1] A host of dubiously underwritten mortgage loans helped inflate a bubble in residential real estate values.[2] As it has

---

[*] Associate Dean of Academic Affairs and Professor of Law, University of Utah, S.J. Quinney College of Law. The author wishes to thank the following for helpful conversations, comments, encouragement, research assistance, and/or suggestions: April Charney, Prentis Cox, Ron Fuller, Michael Kent, Kathleen Keest, Tera Peterson, Diane Thompson, and Michael Wolf. I am also grateful for helpful comments and questions posed by faculty, students, and other participants attending presentations related to this project at Seton Hall University, the University of Houston Law Center, Ohio State University, and Harvard Law School.
[1] *Compare* Paul Krugman, *Crisis of Confidence*, N.Y. TIMES, April 14, 2008 *with* Robert J. Samuelson, *How this Crisis is Different*, WASH. POST., March 18, 2008.
[2] Kareem Fahim & Janet Roberts, *Foreclosures, With No End in Sight*, N.Y. TIMES, May 17, 2009, at NJ 1.

1

Electronic copy available at: http://ssrn.com/abstract=1469749

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    2

become clear that millions of Americans are not capable of repaying loans crafted for them by commission hungry brokers. the liquidity of securities drawn from those loans froze.[3] Currently about 25 percent of all subprime home mortgages are delinquent with millions more likely to follow.[4] One rating agency predicts that between 40% and 50% of all subprime mortgages originated since 2006 will eventually end in foreclosure.[5] As the volume of foreclosures increased. it put downward pressure home prices creating the first decline in the national median price for previously owned homes since the Great Depression of the 1930s.[6] According to one estimate over a quarter of all American households are currently have negative equity—they owe more on their home mortgage than their home is worth.[7] About half of all subprime borrowers are underwater on their loans.[8] Thousands of financial "foreclosure rescue" predators and con artists are openly stalking desperate families looking for a financial lifeline.[9] County and municipal governments in the Los Angeles area have begun campaigns to exterminate a scourge of mosquitoes breeding in the rotten water of swimming pools behind thousands of abandoned suburban homes.[10] In Cleveland. Ohio an estimated 15.000 of the area's 84.000 single-family homes is sitting vacant and deteriorating into urban blight with squatters and scavengers taking over entire neighborhoods.[11] America lost friends in places as far off as Norway and Australia when municipal pension funds bottomed out on investments in American subprime

---

[3] Joshua Boak. *IMF Puts Subprime Loss Near $1 Trillion: Economic Damage Equals $143 for Every Person on the Planet,* CHI. TRIB.. April 9. 2008. C1.

[4] Paul Gores. *Trouble at Home Among the 50 States and District of Columbia.* MILWAUKEE JOURNAL SENTINEL. August 21. 2009. at 1: E. Scott Reckard, *State's Mortgage Woes forecast to Rise: Delinquencies on Loans will continue to Climb through 2009, TransUnion Projects.* L.A. TIMES. August 25. at 2.

[5] Grant Bailey. Vincent Barberio. & Glenn Costello. *Revised Loss Expectations for 2006 and 2007 Subprime Vintage Collateral,* www.fitchratings.com. March 25. 2008. at 2.

[6] *Banks Collect Houses Amid Subprime Fallout.* INT'L HERALD TRIB.. July 3. 2007, 10.

[7] Jody Shenn. '*Underwater' Mortgages to Hit 48%, Deutsche Bank Says.* Bloomberg.com. August 5. 2009. available at: http://www.bloomberg.com/apps/news?pid=20601110&sid=ac9y1xr7yNhQ.

[8] Les Christie. *Underwater World.* CNNMoney.com. August 6. 2009

[9] Donna Leinwand. *Foreclosure Rescue Scams Multiply: States, FTC Tackle 'Fraud Virus' Hitting Some Homeowners.* USA TODAY. August 4. 2008. at 3A.

[10] Steve Chawkins. *A Magical Misery Tour in Stockton.* L.A. TIMES. December 13. 2007, A1: Devid Streitfeld. *Blight Moves in After Foreclosures: Untended Properties Become Eyesores; Then There are the Uninvited Guests: Mosquitoes, Vandals and Squatters.* L.A. TIMES. August 28. 2007. A1.

[11] Erik Eckholm. *Foreclosures Force Suburbs to Fight Blight.* N.Y. TIMES. March 3. 2007, A1 ("Many of the houses are filled with smelly trash and mattresses used by vagrants. They have been stripped of aluminum siding. appliances. pipes and anything else that scavengers can sell to scrap dealers."): Alex Kotlowitz. *All Boarded Up.* N.Y. TIMES. March 8. 2009 ("The city estimates that 10.000 houses. or 1 in 13. are vacant. The county treasurer says it's more likely 15.000. Most of the vacant houses are owned by lenders who foreclosed on the properties and by the wholesalers who are now sweeping in to pick up houses in bulk. as if they were trading in baseball cards."

Electronic copy available at: http://ssrn.com/abstract=1469749

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    3

mortgage securities.[12] The International Monetary Fund estimates subprime losses at nearly a trillion dollars; about $143 for every person on the planet.[13]

Reckless overleveraging on Wall Street combined with losses in mortgage securities to squeeze the investment banking establishment. Two of the nation's formerly most reputable investment houses, Bear Stems and Lehman Brothers, collapsed when it became clear that its billions of dollars of their subprime mortgage assets were virtually worthless.[14] For its part, the Federal Reserve Board of Governors slashed interest rates on loans offered to member banks, keeping the economy afloat, but fueling concerns of a return to 1970s-style stagflation.[15] Teetering on the edge of financial abyss, the Fed opened up new credit lines to Wall Street investment firms, creating financial arrangements not unlike deposit insurance, but chillingly devoid of traditional deposit insurance regulatory oversight—without any explicit prior approval from Congress,[16] In addition to the crumpled Wall Street investment houses and hedge funds, smaller subprime mortgage loan originators folded up their tents like the Bedouin—over 100 different subprime mortgage origination companies systematically collapsed.[17] Currently over four hundred banks are on the FDIC's "problem list."[18]

With so many fundamental changes, opportunities for moral hazard, agency cost problems, consumer abuses, and impending lawsuits, perhaps the only group with plethora of opportunities are law professors looking for salient article topics. Indeed, the academy has responded with a new crop of scholarship exploring the role of investment bankers, rating agencies, hedge funds, mortgage brokers, mortgage originators, and loan servicers. It is, however, somewhat ironic that virtually no academic attention has been paid to the one particular company that has been a party in more subprime Mortgage loans than any other. Mortgage Electronic Registration Systems, Inc., commonly known as "MERS", is a corporation registered in Delaware and headquartered in the Virginia suburbs of Washington, D.C.[19] MERS operates a computer database designed to track

---

[12] Julia Werdigier, *Wall St.'s Pullback on Financing Creates Openings for Europe's Smaller Banks*, N.Y. TIMES, March 22, 2008, C3.

[13] Boak, *supra* note X, at C1.

[14] WILLIAM D. COHAN, HOUSE OF CARDS; A TALE OF HUBRIS AND WRETCHED EXCESS ON WALL STREET 4 (2009); Devin Leonard, *How Lehman got Its Real Estate Fix*, N.Y. TIMES, May 3, 2009, at BU 1.

[15] Tom Lauricella, *Quarterly Markets Review: Trying to Get Up Off the Mat — Bernanke Offers a Hand. As Stocks Fall in Quarter; Where's the Turning Point?* WALL ST. J., April 1, 2008, C1.

[16] *Top Officials; Bear Rescue was not a Bailout; Senators are Told Possible Collapse was Threat to Global Financial System*, CHI. TRIB., April 4, 2008, C1.

[17] Steve Stecklow, *Subprime Lender's Failure Sparks Lawsuit Against Wall Street Banks; People Who Bought Its Notes Lost All; FBI Comes Calling*, WALL. ST. J., April 9, 2008, A1.

[18] Damian Paletta & David Enrich, *Banks on Sick List Top 400; Industry's Helath Slides as Bad Loans Pile Up; Deposit-Insurance Fund Shrinks*, WALL. ST. J., August 28, 2009.

[19] Carson Mullen, *MERS: Tracking Loans Electronically*, MORTGAGE BANKING, May 31, 2000, 62

2008]     *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*          4

servicing and ownership rights of mortgage loans anywhere in the United States.[20] Originators and secondary market players pay membership dues and per-transaction fees to MERS in exchange for the right to use and access MERS records.[21]

But, in addition to keeping track of ownership and servicing rights, MERS has attempted to take on a different, more aggressive, legal role. When closing on home mortgages, mortgage lenders now often list MERS as the "mortgagee of record" on the paper mortgage—rather than the lender that is the actual mortgagee.[22] The mortgage is then recorded with the county property recorder's office under MERS, Inc.'s name, rather than the lender's name—even though MERS does not solicit, fund, service, or ever actually own any mortgage loans. MERS then purports to remain the mortgagee for the life of a mortgage loan even after the original lender or a subsequent assignee transfers the loan into a pool of loans that are ultimately sold to investors—a process known as securitization. Although MERS is a young company, 60 million mortgage loans are registered on its system.[23] Indeed, today MERS is legally involved in the origination of approximately 60% of all mortgage loans in the United States.[24] In past generations, employees of county recording offices kept records of each individual company that recorded mortgage loans and mortgage loan assignments. But today, increasingly recording officials carry on something of a bizarre puppet show, dutifully filing away records of the name of one company repeated over, and over again: MERS.

MERS justifies its role in mortgage loan closings and securitization deals by explaining that it is acting as a "nominee" for the parties.[25] The mortgage lending industry obtains two principal benefits from attempting to use MERS as a "mortgagee of record in nominee capacity." First, under state secured credit laws, when a mortgage is assigned, the assignee must record the assignment with the county recording office, or risk losing priority vis-à-vis other creditors, buyers, or lienors. Most counties charge a fee, ranging from $25 to $50, to record the assignment, and use these fees to cover the cost of maintaining the real property records.[26] Some counties also use recording fees to fund their court systems, legal aid organizations, low income housing programs, or schools.[27] In this respect, MERS' role in acting as a mortgagee of record in nominee capacity is simply a tax

[20] Howard Schneider, *MERS Aids Electronic Mortgage Program*, MORTGAGE BANKING, January 1, 1997.

[21] *Id.*

[22] *See infra* note X and accompanying text.

[23] Kate Berry, *Foreclosures Turn Up Heat on MERS*, AM. BANKER, July 10, 2007, at 1.

[24] *Id.*

[25] *See infra* note X and accompanying text.

[26] Andrew Lipton, *Mortgage Electronic Registration Systems, Inc. (MERS): Its Impact on the Credit Quality of First-Mortgage Jumbo MBS Transactions*, Moody's Investors Service Structure Finance Special, April 30, 1999, at 2.

[27] *See, e.g.*, Chelan County Auditor, Recording Fee Disbursement, http://www.co.chelan.wa.us/ad/adr_fees.htm, (viewed Sept. 2, 2009) (illustrating distribution of county recording fees in the State of Washington).

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*          5

evasion tool.[28] By paying MERS a fee, the parties to a securitization lower their operating costs. The second advantage MERS offers its customers comes later when homeowners fall behind on their monthly payments. In addition to its document custodial role, and its role as a tax evasion broker, MERS also frequently attempts to bring home foreclosure proceedings in its own name, rather than the name of the actual owner of the loan, which is often a trust owned by investors.[29] This eliminates the need for the trust—a purely legal business entity with no employees, offices, or assets other than its loans—to foreclose in its own name, or to reassign the loan to a loan servicing company to bring the foreclosure.[30] Throughout history, executioners have always worn masks. In the American mortgage lending industry, MERS has become the veiled man wielding the home foreclosure axe.

This Article is the first academic piece that explores the legal and public policy foundations of the MERS system. Part I provides a brief explanation of the origins of the county real property recording systems and the law governing real property liens. Part II explains how MERS works, why mortgage bankers created the company, and what MERS has done to transform the underlying assumptions of state real property recording law. Part III explores three controversial legal issues confronting MERS and the companies that have relied on it. In particular, this Part queries whether MERS actually has standing to bring foreclosure actions; whether MERS should be considered a debt collector under the federal Fair Debt Collection Practices Act; and whether loans recorded in MERS' name should have priority in various collateral competitions under state law and the federal bankruptcy code. Next, Part IV explores whether MERS bears some responsibility for the current mortgage foreclosure crisis and what the long term effects of privatized land title records will have on our public information infrastructure. Part IV also considers the deeper question of whether the mortgage banking industry, in creating and embracing MERS, has subverted the democratic governance of the nation's real property recording system.

## I. THE AMERICAN REAL PROPERTY RECORDING SYSTEM

Public land title records have been a fundamental feature of American law since before the founding of the Republic. Unlike feudal Europe, where most real property was tied up in successive generations of aristocratic families, most early colonists came to America seeking new opportunities.[31] Relatively wide availability and lack of ancestral estates facilitated more frequent transfers of real property among businesses and families.[32] Moreover, the American entrepreneurial

---

[28] *See infra* note X and accompanying text.
[29] Christopher L. Peterson, *Predatory Structured Finance*, 28 CARDOZO L. REV. 2185, 2208-12 (2007).
[30] *Id.*
[31] POWELL ON REAL PROPERTY §82.01[1][b] (Michael Allen Wolf ed., 2007)
[32] *Id.*

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*          6

spirit combined with the modest means of most colonists to create great demand for loans secured by the one widely available asset: land.[33]

Perhaps then, it is not surprising that in the early seventeenth century, Americans began experimenting with laws requiring that parties create public records of conveyances and mortgages.[34] For example, in 1636 the General Court of Massachusetts' Plymouth Bay Colony adopted its first recording law which required that "all sales exchanges fites mortgages leases or other Conveyences of howses and lands the sale to be acknowledged before the Governor or any one of the Assistants and committed to the public Record."[35] Similarly, in 1639 the Connecticut General Court insisted that "all bargines or mortgages of land whatsoever shall be accounted of no value until they be recorded."[36] Particularly suspicious of concealed ownership, early Virginia law only required public recording of real property interests when the grantee did not take possession of the property.[37] By the revolution, every English colony had adopted a statutes requiring that parties to a mortgage record their names, and a description of the property in public office designed for that purpose.[38] Then, as now, mortgagees that fail to record their mortgages or assignments, risk losing the ability to enforce their contract as against a subsequent purchaser for value.[39]

The necessity and usefulness of these early public title records is attested to by their nearly universal and uninterrupted force in subsequent American law. Indeed, Pennsylvania's first recording act, first adopted in 1717, remains in force to this day.[40] Currently, all fifty states and the District of Columbia have recording statutes similar to their colonial predecessors.[41] Moreover, preservation of public records of mortgages proved so successful, in the twentieth century, all fifty states have adopted Article 9 of the Uniform Commercial Code which creates an analogous recording system for virtually all forms of personal property.[42] The early colonial objective of these laws was, as it is today, to prevent disputes over property rights and to facilitate the use of land as collateral by creating a transparent public record that facilitates certainty in private bargains. Title recording acts preserve an accessible history of land ownership with "the same dignity and evidentiary value that attaches to public records" all for the benefit of

[33] SYDNEY HOMER & RICHARD SYLLA, A HISTORY OF INTEREST RATES 280-81 (3d ed. 1996).

[34] *See. e.g.*, Piddge v. Tyler, 4 Mass. 541, 543-44 (1808) (discussing evolution of title and mortgage recording law in Massachusetts).

[35] Powell, *supra* note X, at § 82.01[1][b] (quoting 11 *Records of the Colony of New Plymouth in New England* 12 (D. Pulsifer ed. 1861)). The earliest American deed record was a deed copied into the Plymouth Bay Colony's record book in 1627. PATTON AND PALOMAR ON LAND TITLES § 4 (3d ed. 2003).

[36] *Id.* (quoting Trumbell, *Connecticut Public Records of the Colony Prior to the Union with the New Haven Colony May 1665* 35 (1850)).

[37] POWELL, *supra* note X, at §82.01[1][b]. Virginia adopted its first recording statute in 1639. PATTON AND PALOMAR. *supra* note X. at § 4 n.7.

[38] PATTON AND PALOMAR, *supra* note X, at § 4.

[39] 5 TIFFANY ON REAL PROPERTY § 1457 (1939); CARYL A. YZENBAARD, RESIDENTIAL REAL ESTATE TRANSACTIONS §5:7 (1991); GRANT S. NELSON & DALE WHITMAN, 1 REAL ESTSTE FINANCE LAW § 5.34 (5th ed. 2007

[40] PATTON AND PALOMAR, *supra* note X, at § 4 n.7.

[41] PATTON & PALOMAR, *supra* note X, at § 4.

[42] UNIF. COM. CODE. Art. 9. § X.

the entire community. [43] Real property recording systems create an archive that protects communities from commercial chaos following floods, earthquakes, fire, hurricanes, financial panics, wars, and other disasters. Public land title records created a platform, or infrastructure, upon which private commerce could take place. Indeed, real property recording statutes are the earliest and most practical expression of the American commitment to the use of transparent rule of law in the preservation and orderly exchange of property rights.

All this is not to suggest that maintaining public land title records has been easy or inexpensive. To record a mortgage or an assignment of a mortgage, the mortgagee must generally deliver a copy of the document in question (often executed in the presence of witnesses or a notary public) to a county clerk that time stamps, indexes, and files the document. Most counties charge a fee, ranging from $25 to $50, to cover the cost of maintaining the recording system, and possibly to generate revenue for other county services such as schools, roads, or legal aid offices. [44] The basic structure of most county title recording systems has included two indexes: one that alphabetically lists the name of every grantor that has recorded a document within a given time frame, and another that lists the name of every grantee that has recorded a document within the same time frame. [45] When a mortgage lender—which, like a buyer, is characterized as a "purchaser" under property law—contemplates offering a loan secured by the land, it can use these indexes to verify that the debtor actually owns clear title to the land in question. [46] The lender wants to know whether the prospective debtor has already sold the land or granted a mortgage to someone else. Historically, prospective purchasers began their search by looking for the debtor's name in the grantee index in reverse chronological order. The prospective lender searches under the borrower's name until it finds a record showing the name of the individual or business that sold or gave the property to the borrower. This process is repeated for the debtor's grantor, and in turn the grantor's grantor, creating a chain of title all the way back until a "root of title" is found. [47] Next, the creditor searches the grantor index in chronological order for each past owner of the land to discover whether it has been sold or mortgaged to anyone not yet discovered. The creditor will want to find a release showing that any past mortgages granted by any past or present owner have been satisfied. After a thorough search, the recording system can reassure prospective purchasers of the safety of their investment.

As America's population has grown, time has passed, and commerce has become more complex, real property title recording systems have become voluminous and increasingly difficult to search. [48] In addition to deeds and mortgages, they also can now include other property interests such as mechanics' liens, tax liens, and easements. As a result, title insurance companies have

---

[43] PATTON & PALOMAR, *supra* note X, at § 4.

[44] Lipton, *supra* note X, at 2.

[45] POWELL, *supra* note X, at § 82.03[2][b].

[46] POWELL, *supra* note X, at § 82.01[2][a].

[47] POWELL, *supra* note X, at § 82.03[2][b].

[48] Charles Szypszak, *Public Registries and Private Solutions: An Evolving American Real Estate Conveyance Regime*, 24 WHITTIER L. REV. 663, 665-67 (2003).

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    8

developed expertise in bearing the cost of uncertainty associated with purchasing
interests in real property. Mortgage originators generally purchase insurance from
companies that specialize in searching title records that can be transferred to
secondary market mortgage assignees.[49] Moreover, because many counties
continue to use older, paper-based real property records, title insurance companies
have been maintaining "plant" copies of the public real property records since the
1960s.[50] These insurers, in effect, have carbon copies of most county real property
records and continually update them by entering each new recorded document into
their systems.[51] These private plant real property records are now generally
maintained on computers and are easier to search than public title records, but they
cannot function without the law creating legal incentives to deposit records into the
central government maintained system. Moreover, private plant recording systems
lack the permanence and stability of public records since title insurers are subject
to computer malfunction, fires, theft, bankruptcy, and are only willing maintain
records to the extent that is profitable to do so. While plant systems are easier to
search, they do not have the track record of hundreds of years of stability that
backs up public systems. Despite the introduction of private plant records, the
public title records continue to serve as the authoritative evidentiary benchmark in
disputes and as an archive upon which plant records can be constructed or
reconstructed.

---

[49] Szypszak, *supra* note X, at 683.

[50] 11 THOMPSON ON REAL PROPERTY § 92.05(b) (David A. Thomas, ed., 2nd
Thomas ed. 2002).

[51] Quintin Johnstone, *Land Transfers: Process and* Processors, 22 Valpo. U. L.
Rev. 493, 507-08 (1988).



**Figure A. Subprime Mortgage Loan Origination under Traditional Interpretation of State Land Title Recording Acts.**

Figure A. provides a graphic representation of the origination, assignment, and recording of a typical subprime mortgage loan under a traditional interpretation of state land title recording acts. In a typical subprime mortgage loan, a homeowner communicates with a mortgage broker that receives a commission for selling the loan. At closing the homeowner signs a promissory note on behalf of the originating lender and a mortgage or deed of trust with the originator as the mortgagee or the trust beneficiary. Before closing the originator generally purchases a title insurance policy from a title insurer that searches the public land title records, or a plant copy taken from the public records. Typically subprime originators quickly assign their loans to a seller, which is usually a subsidiary of an investment bank. Ultimately the promissory note and mortgage are then assigned, along with many other loans, to a special purpose vehicle that usually takes the form of a trust. A special purpose vehicle is a business entity that is exclusively a repository for the loans—it does not have any employees, offices, or assets other than the loans it purchases. A pooling and servicing agreement specifies a trustee to manage the loan assets and a servicer to collect monthly payments and interact with the homeowner. The trust, then, transfers the right to receive the income stream to an underwriter and then various investors such as mutual funds, hedge funds, pension funds, and insurance companies. Under a traditional interpretation of state land title recording acts, the seller and the trust must both record their assignments in order to protect the priority of their mortgage against a subsequent bona fide purchaser for value. Despite the costs recording mortgages and

assignments, not a single American legislature has ever seriously considered eliminating their public land title recording acts.[52]

## II. The Origin and Operation of MERS

Given the venerable and uninterrupted legacy of land title recording acts, it is interesting that first fundamental change to the American public land title recording systems in over three hundred years was not initiated by publically elected leaders. Instead, the Mortgage Electronic Recording System was conceived of and created by a tight-knit group of powerful mortgage industry insiders.[53] In October of 1993, a task force of mortgage finance companies released a "white paper" at an annual convention of mortgage bankers.[54] The paper suggested that an electronic book entry system of tracking mortgage loans would be better for the mortgage lending industry than the legal system of county recording offices.[55] The paper encouraged comments from the real estate finance industry, leading to the formation of a steering committee affiliated with the Mortgage Bankers Association of America (MBA).[56] The MBA is a trade association supported through dues paid by mortgage lending companies that conducts public relations for the industry. This committee of mortgage bankers retained Ernst & Young, an accounting firm, to study the feasibility of developing MERS. In addition to studying the technological and financial hurdles, the accounting firm also did some telephone interviews with mortgage loan originators, servicers, warehouse lenders, custodians, assignment processors, and employees at Fannie Mae and Freddie Mac. The accountants' primary conclusion was that that the finance industry could save a lot of money by deciding not to pay the fees that local governments require to record mortgage assignments.[57]

The legislative history of the MERS concept is not found in Congressional or state assembly records, but in the trade magazine *Mortgage Banking*. In 1995 and 1996 the MBA trade association's steering committee developed a business plan that would make MERS a reality.[58] The principal consultant involved in creating MERS explained that the "[o]riginal investors came in 'on faith' ... because the

---

[52] Patton & Palomar, *supra* note X, at §4 ("Recording acts are now in force in all the states and the District of Columbia.").

[53] Mullen, *supra* note X ("MERSCORP, Inc., was formed by Mortgage Bankers Association of America (MBA) member companies as a central electronic loan registry in an ambitious attempt to help lenders streamline the lending process and eliminate the need to record assignments when selling loans to other mortgage companies.").

[54] Phyllis K. Slesinger & Daniel McLaughlin, *Mortgage Electronic Registration System*, 31 Id. L. Rev. 805, 810-11 (1995).

[55] *Id.*

[56] *Id.*

[57] Slessinger & McLaughlin, *supra* note X, at 811-12 (estimating savings of $51.7 million annually for mortgage servicers and $14.1 million annually for mortgage originators).

[58] Schneider, *supra* note X.

details of how MERS would work weren't ironed out until mid-1996 at working group meetings involving different industry players."[59] MERS' Senior Vice President of Operations and Information Management explained that the legal and technological questions behind MERS were answered when "[l]enders and servicers of various sizes, along with the secondary market agencies, 'got in a room together, walked through the process, and came to an agreement.'"[60] Two years after releasing the initial white paper, MERS, Inc. incorporated in Delaware as a non-stock corporation owned by mortgage banking companies that made initial capital contributions ranging from $10,000 to $1,000,000.[61] According to a Mortgage Banking Association Executive Vice President involved in the creation of MERS the primary goal of the MERS initiative was to "[l]ower costs for servicers."[62]

Although at first, MERS was only able to attract the participation of Fannie Mae and Freddie Mac, private label subprime mortgage securitizers began using MERS in 1999.[63] Today, mortgage finance companies currently use the MERS' name to interact with the land title recording system in one of two ways: either by recording MERS' name as an assignee, or by recording MERS' name as the original mortgagee. Figure B provides a graphic representation of the former. Under this recording strategy the originating lender makes a traditional mortgage loan by listing itself as the payee on the promissory note and as the mortgagee on the security instrument. The loan is then assigned to a seller for repackaging through securitization for investors. However, instead of recording the assignment to the seller or the trust that will ultimately own the loan, the originator pays MERS a fee to record an assignment to MERS in the county records. MERS' counsel maintains that MERS becomes a "mortgagee of record" even though its ownership of the mortgage is fictional.[64]

---

[59] *Id.*

[60] *Id.*

[61] *Id.* The charter members of MERS, Inc. were: 1ˢᵗ Nationwide Mortgage; Allied Group Mortgage, Inc.; American Home Funding; American Land Title Association; Crestar Mortgage Corp.; Fannie Mae; Freddie Mac; GE Capital Mortgage Services, Inc.; GMAC Residential Funding Corp.; HomeSide Lending, Inc.; Knutson Mortgage Corp; Lau Capital Funding; Merrill Lynch Credit Corp; Mortgage Bankers Association of America; Mortgage Guaranty Insurance Corp.; Northwest Mortgage, Inc.; ReliaStar Mortgage Corp.; Source One Mortgage Services Corp.; Texas Commerce Bank, NA; Chase Manhattan Mortgage; and, Weyerhaeuser Mortgage Company. *Id.* Mortgage Electronic Registration Systems, Inc. is actually a wholly owned subsidiary of MERSCORP, Inc. The dual structure of the company was designed to prevent creditors of MERSCORP from attempting to seize loans recorded in the Mortgage Electronic Registration Systems, Inc.'s name in the event that MERSCORP, Inc. declares bankruptcy. Mullen, *supra* note X, at 62.

[62] *Id.*

[63] Mullen, *supra* note X.

[64] R.K. Arnold, *Yes, There is Life on MERS*, 11 PROBATE & PROPERTY 32, 34 (July/August 1997). Arnold explains:

2008]           *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                        12



**Figure B. Subprime Mortgage Loan Recording with MERS as Purported Assignee.**

Although MERS records an assignment in the real property records, the promissory note which creates the legal obligation to repay the debt is not negotiated to MERS.[65] Everyone agrees that MERS is never entitled to receive a borrower's monthly payments, nor is MERS ever entitled to receive the proceeds of a foreclosure or deed of trust sale. MERS has no actual financial interest in any mortgage loan. MERS does not even provide lien releases of the mortgages it purports to own, instead referring title attorneys, refinancing lenders, and consumers to the loan's servicer.[66] MERS' revenue comes, not from repayment of

When a mortgage is registered on the MERS system, it receives a mortgage identification number (MIN). The borrower executes a traditional paper mortgage naming the lender as mortgagee, and the lender executes an assignment of the mortgage to MERS. Both documents are recorded in the public land records, making MERS the mortgagee of record. From that point on, no additional mortgage assignments will be recorded because MERS will remain the mortgagee of record throughout the life of the loan.

*Id.*
[65] Lipton, *supra* note X, at 3.
[66] *Please Release Me!*, INSIDE MERS, Jan./Feb. 2004, 2. MERS instructs servicers to prepare and record lien releases entirely on their own. But, the servicers are instructed to do so in MERS' name, even though MERS has nothing to do with the decision to release the lien. *Id.*

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    13

the loan or the disposition of collateral, but from fees that the originator and other mortgage finance companies pay to MERS. Once a loan is assigned to MERS, the public land title records no longer reveal who (or what) actually owns a lien on the property in question.

After a few years in business, MERS decided it could help mortgage financiers pay even less to county governments by simply doing away with the first assignment to MERS, and instead listing MERS as the mortgagee in the original mortgage. Figure C provides a graphic representation of subprime mortgage loan origination where the parties record MERS' name as the original mortgagee. Once again, although MERS does not actually advance any loan principal to the homeowner, does not have the right to receive any payments from the borrower, and is not the actual party in interest in any foreclosure proceeding. Nevertheless, the actual mortgagee pays a fee to MERS to induce MERS to record the mortgage in MERS' name. By eliminating the reference to an actual mortgagee or the actual assignee, MERS estimated it would save the originator an average of $22.00 per loan.[67]

---

[67] *MERS Frequently Asked Questions, Does MERS change the current mortgage closing process?*, www.mersinc.org/why_mers/faq.aspx, viewed June 9, 2004 ("[Y]ou'll save $22 or more per loan when you specify MERS as the Original Mortgage of Record in the mortgage or deed of trust."); Mullen, *supra* note X ("The good news for companies embracing the system changes was that using MOM [MERS as Original Mortgagee], as the practice has come to be known, provides an immediate cost reduction of approximately $22 per loan."). Early estimates suggest that the average cost reduction when MERS acts as an "assignee" were "between $15 and $17 a loan." Lipton, *supra* note X, at 2. More recent estimates suggest that using MERS saves lenders and servicers approximately $40 over the entire life of a mortgage loan. David F. Borrino, *MERS: Ten Years Old*, USFN, http://imis.usfn.org/Resources/ArticleLibrary/1733.aspx, (May 11, 2006) viewed July 13, 2006.



**Figure C. Subprime Mortgage Loan Recording with MERS as Purported Mortgagee.**

In addition to its record keeping and recording system liaison roles, MERS has also become directly involved in consumer finance litigation. Historically, when a homeowner defaults on a home mortgage the owner of the mortgage loan, or a servicer hired to collect borrower payments, sues the homeowner in a foreclosure action. In states requiring judicial proceedings for foreclosure, this process also typically involves either in-house or retained outside legal counsel.[68] In states that allow non-judicial foreclosure, this process is often faster and may not involve significant participation by attorneys.[69] But, when MERS is listed in county records as the owner of a mortgage, courts have generally made the natural assumption that the appropriate plaintiff to bringing a foreclosure action is MERS. In order to move foreclosures along as quickly as possible, MERS has allowed actual mortgagees and loan assignees or their servicers to bring foreclosure actions in MERS' name, rather than in their own name.[70] Thus, not only does use of MERS' services allow financiers to avoid county recording taxes, it also allows

---

[68] 12 THOMPSON ON REAL PROPERTY § 101.04(b)(1) (1994 & Supp. 2007).

[69] 12 THOMPSON ON REAL PROPERTY § 101.04(c)(1) (1994 & Supp. 2007).

[70] MERS, STATE BY STATE MERS RECOMMENDED FORECLOSURE PROCEDURES, *supra* note X, at 8 ("Employees of the servicer will be certifying officers of MERS. This means they are authorized to sign any necessary documents as an officer of MERS. . . . In other words, the same individual that signs the documents for the servicer will continue to sign the documents, but now as an officer of MERS.")

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                15

them to list an obscure, evidently official institution as the instigator of a foreclosure.

With these services on offer, the mortgage finance industry quickly and wholeheartedly embraced recording and foreclosing its mortgage loans in the name of MERS, rather than the actual parties in interest. Instead of legislation or a landmark court ruling, mortgage industry insiders report that the key development in the acceptance of the MERS was the endorsement of credit rating agencies such as Moody's, Standard and Poor's, and Fitch Investment.[71] For example, in 1999—before any significant appellate judicial opinion on the subject—Moody's investor services issued a report concluding that MERS' mechanism to put creditors on notice of a mortgage would not be harmed.[72] Moody's concluded without citation to any court opinion, or even to any state recording statute, that "subsequent creditors of the entity selling the mortgages to the MBS [mortgage backed securities] transactions [sic] should not be able to contest the conveyance of the mortgages based on lack of notice."[73] In a front page article covering the Moody's opinion *Mortgage Banking* reported that "the most significant finding in the report specified that in transactions where the securitizer used MERS, there would be no need for new assignments of mortgages to the trustee of MBS transactions."[74]

With the rating agencies' stamp of approval, the use of MERS exploded in the early 2000s. By late 2002 MERS had recorded its name, instead of the actual assignee or mortgagee, in ten million residential home mortgages.[75] As the subprime mortgage refinancing boom took off, MERS registered an average of 21,000 loans on its system per day.[76] Only a year later, the total number of loans recorded in MERS name doubled to 20 million.[77] By May of 2007, this number had tripled again to 60 million loans.[78] Sixty percent of all new mortgage loan originations are recorded under MERS' name, and more than half of the nation's existing residential loans are recorded under MERS name.[79] Not satisfied, MERS' CEO insists that "[o]ur mission is to capture every mortgage loan in the country."[80]

III. THE QUESTIONABLE LEGAL FOUNDATION OF MERS

Because MERS came to "own" over half of the nation's mortgage loans in a time span more brief than many lawsuits, there is sparse appellate law explicitly dealing with the company and its unprecedented attempt to usurp county title recording systems and become the national foreclosure plaintiff. The few opinions that exist confronted issues of first impression with little in the way of legislative

---

[71] Mullen, *supra* note X.

[72] Lipton, *supra* note X, at 3.

[73] Lipton, *supra* note X, at 3.

[74] Mullen, *supra* note X.

[75] *MERS Registers 10 Million Loans,* INSIDE MERS, Nov./Dec. 2002, 1.

[76] *Id.*

[77] *MERS Registers 20 Million* Loans, INSIDE MERS, Jan./Feb. 2004, 1.

[78] Berry, *supra* note, X, at 1.

[79] MERS Registers 20 Million Loans, *supra* note X, at 1; Berry, *supra* note X.

[80] *Id.*

or scholarly advice. Moreover, most of these opinions were written without the benefit of hindsight brought to light by the recent collapse of the nation's subprime mortgage lending industry. Accordingly, as the judiciary presides over the forced displacement of millions of American families from their homes, it is worthwhile to take a fresh look at the legal foundation of MERS' role in the land title recording and home foreclosure systems. This Part looks at three important doctrinal questions that remain unanswered regarding MERS: whether MERS owns title to mortgages either as a mortgagee or an assignee; whether MERS has standing to bring foreclosure lawsuits; whether MERS is a "debt collector" for purposes of the federal Fair Debt Collection Practices Act; and, whether MERS has priority against subsequent bona fide purchasers for value (including bankruptcy trustees). While these are basic doctrinal questions, they nonetheless have profound consequences, not only for the mortgage lending industry, but also for the world economy.

### A. MERS Does Not Own Legal Title to Mortgages Registered on Its Database

While the preceding Parts of this article have explained what MERS does, it remains unclear what MERS *is*. Obviously, at the most simple level, MERS is a Delaware corporation that provides mortgage loan related services. But even MERS' own contracts, attorneys, and spokespersons present a muddled account of MERS' identity in relationship to the mortgage loans registered on its database. For example, the boilerplate contract provision used by mortgage originators in "MERS as original mortgagee" loan contract states:

> "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is *acting solely as nominee for Lender* and Lender's successors and assigns. *MERS is the mortgagee* under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.[81]

The second sentence seems to suggest that MERS is some sort of agent—a "nominee"—of the actual mortgagee. Yet, the third sentence flatly asserts that "MERS is the mortgagee." Which is it?[82] What is clear is that MERS cannot be both. Surely, it is axiomatic the same entity cannot simultaneously be both an agent *and* a principal with respect to the same property right.[83]

---

[81] Mortgage Electronic Registration Systems, Inc. v. Bluming, No. GD05-16795, Civil Division, Court of Common Pleas of Allegheny County, PA, slip op. (May 31, 2006) (J. Timothy Patrick O'Reilly).

[82] *Cf* Landmark Nat. Bank v. Kesler, No. 98489, 2008 WL 4180346, (Kan. App. Sept 12, 2008) ("Specifically, the mortgage says that the mortgagee is MERS, though 'solely as nominee for the Lender.' Does this mean that MERS really *was* the mortgagee, even though it didn't lend money or have any rights to loan repayments?").

[83] The very first section of the Restatement of Agency Law clearly delineates that an agent and a principal are different persons. Restatement (Third) of Agency Law

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                      17

Nevertheless, other explanatory materials written by MERS to assist its members in understanding the MERS system are equally schizophrenic. For example, the company's *Recommended Foreclosure Procedures* report takes the position that MERS is merely an agent:

> MERS acts as a *nominee (a form of agent)* for the servicer and beneficial owner of a mortgage loan in the public land records. MERS is designed to operate within the legal framework in all U.S. jurisdictions and did not require any changes to existing laws.[84]

In contrast, MERS takes the opposite position when confused loan officers and foreclosure attorneys press with pointed questions like "Under what section of law does MERS, if named 'nominee' have the authority to assign and/or discharge the mortgage?"; "Is a nominee like a power of attorney for the lender?"; and, "How ought the mortgage be recorded in the clerk's office?"[85]  In response to these three questions MERS' Vice President and Corporate Counsel explained:

> Mortgage Electronic Registration systems, Inc. (MERS) gets its authority to assign and/or discharge a mortgage because *MERS is the mortgagee*, and as such holds legal title to the mortgage. … The nominee language does not take away from the fact that *MERS is the mortgagee.*[86]

MERS' position is no clearer in litigation. Interestingly, the company tends to argue it is an actual mortgagee or assignee when it brings foreclosure actions; but, when sued in cases alleging fraud, deceptive practices, or other statutory consumer protection claims associated with loans registered on its system, MERS argues it is merely an agent without exposure to liability.[87]  Even more

---

§1.01 ("Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control. . . ."). Moreover, neither the popularity of MERS' self-characterization, nor its contractual recitation, are controlling. *Id.* § 1.02 ("An agency relationship arises only when the elements stated in § 1.01 are present. Whether a relationship is characterized as agency in an agreement between the parties or in the context of industry or popular usage is not controlling.").

[84] MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC., STATE-BY-STATE MERS RECOMMENDED FORECLOSURE PROCEDURES 4 (2002) (hereinafter "MERS STATE-BY-STATE FORECLOSURE PROCEDURES").  Interestingly, the report does not cite any legal authority for the proposition that MERS operates within the legal authority of every state in the Union.

[85] MERS Forum, FAQ with Sharon Horstkamp, MERS Vice President and Corporate Counsel, www.mersinc.org/forum/viewreplies.aspx?id=13&tid=73 last viewed June 9, 2004.

[86] *Id.* (emphasis added).

[87] *Compare* Landmark Nat. Bank v. Kesler, No. 98,489, 2008 WL 4180346, at *1–*2 (Kan. Ct. App., Sept. 12 ,2008) ("What is MERS's interest? MERS claims that it holds the title to the second mortgage . . . .  MERS objects to its

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    18

perplexing, in a series of bankruptcy cases filed and then consolidated in the same bankruptcy court, MERS simultaneously brought the same type of foreclosure related actions *both* solely in its own name *and* as a nominee on behalf of other entities.[88]

While the language in MERS boilerplate contracts is not particularly enlightening, the basic economic principals of the law provide a simple answer to this puzzle. The American legal tradition looks to the economic realities of a transaction in determining whether a business is a secured creditor—including a mortgagee.[89] The most familiar application of this principal is found in the Uniform Commercial Code's distinction between a security interest and a lease.[90] The U.C.C. insists that the words used by the parities to a contract are not controlling.[91] Contracts where the parties explicitly describe a transaction as a lease are universally construed as a security agreement where there is no reasonably foreseeable likelihood of the "lessor" regaining possession of the goods after the "lease" term.[92] Security agreements governing realty—mortgages and deeds of trust—are no different on this point. Contracts creating mortgages are construed as such even where the parties choose to describe the bargain with different language.[93] It is equally axiomatic that where contracts do not create a

---

characterization as an agent...") *with* *In re* Escher, 369 B.R. 862 (E.D. Pa. 2007) ("MERS' role as nominee leads the Court to conclude that it cannot be liable on any of the Plaintiff's [Truth in Lending or Pennsylvania consumer protection] claims. A nominee is understood to be an agent for another. . . . Therefore MERS will be dismissed from this action and no further reference to MERS will be made." ); Hartman v. Deutsche Bank Nat. Trust Co., No. 07-5407, 2008 WL 2996515, *2 (E.D.Pa. Aug. 1, 2008) (accepting MERS' argument that it could not be liable under the Truth in Lending Act because there was no colorable allegation "that ... [the plaintiff's] mortgage loan was assigned to MERS, or that MERS was ever the owner of that obligation."); Brief in Support of Defendant's Motion *to* Dismiss at 3, King v. Ocwen, Civil Action No. 07-11359, 2008 WL 2063553 (E.D.Mich, April 14, 2008) (arguing that MERS could not be liable for Fair Debt Collection Practices Act violations because "*HSBC was the mortgagee* for the property. Ocwen is the servicer for the property. [And,] MERS acted solely as the nominee for the original mortgagee of the property") (emphasis added).

[88] In re Hawkins, No. BK-S-07-13593-LBR, 2009 WL 901766 (Bkrctcy.D.Nev. March 31, 2009) (holding MERS lacks standing to lift automatic stay).

[89] Blanco v. Novoa, 854 So.2d 672, 674 (Fla.App.Ct., 2003); Land Mark Nat. Bank v. Kessler, No. 98,489, 2008 WL 4180346, at *1 (Kan. Ct. App., Sept. 12 ,2008); Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc., 602 F.2d 538, 543 (3rd Cir.1979)

[90] U.C.C. § 1-203 (2005).

[91] In re Homeplace Stores, Inc., 228 B.R. 88, 94 (Bankr.D.Del.1998).

[92] In re WorldCom, Inc., 339 B.R. 56, 64 (Bankr..S.D.N.Y. 2006); Edwin E. Huddleson, III, Old Wine in New Bottles:UCC Article 2a Leases, 39 Ala. L. Rev. 615, 627 (1988).

[93] Standard Leasing Corp. v. Schmidt Aviation, Inc., 576 S.W.2d 181, 184 (Ark., 1979); Trustees of Zion Methodist Church v. Smith, 81 N.E.2d 649, 650 (Ill.App. Ct.,1948); Parry v. Reinertson, 224 N.W. 489, 490 (Iowa 1929); Hargrove v. Gerill

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*        19

mortgage, courts will not construe one to exist merely because of boilerplate language in the written memorialization of the deal.[94] MERS is not a mortgagee (or an assignee) simply because ink on paper makes this assertion—rather the law compels courts to look to the economic nature of the transaction to identify MERS' role.[95]

Indeed, the fundamental economic reality of MERS involvement in the mortgage lending industry suggests that MERS is not a mortgagee with respect to any loan registered on its database. A mortgagee is simply the party to whom a parcel of real estate is mortgaged. Or, as Blacks Law Dictionary explains, a "mortgagee" is "[o]ne to whom property is mortgaged; the mortgage creditor, or lender. -- Also termed *mortgage-holder*."[96] MERS is not the party to whom family homes are mortgaged for at least three fundamental economic reasons. First, MERS does not fund any loans. No money coming out of a MERS deposit account is tendered as loan principal to homeowners. Second, no homeowners promise to pay MERS any money. To this effect, MERS is never identified as the payee in a promissory note and MERS is never entitled to receive any monthly payments from the mortgagor. Finally, and perhaps most important, MERS is never entitled to receive the proceeds of a foreclosure sale. Instead, these funds go to the actual mortgagee (or assignee of the mortgagee) that is the true owner of the lien.

In cases where MERS claims to own legal title to mortgages by virtue of assignment its position is no stronger. Unlike the investment trust that actually owns the mortgage in a typical subprime securitization structure, MERS does not pay the loan originator value in exchange for the mortgage. On the contrary, the originator or a servicer *pays MERS* to take the "assignment."[97] In these cases

---

Corp., 464 N.E.2d 1226, 1230, (Ill.App. Ct.1984); In re Berg, 387 B.R. 524, 555 (Bankr..N.D., 2008).

[94] Secretary of Veterans Affairs v. Roma Food Enterprises of Florida, Inc., 840 So.2d 1066, 1066-67 (Fla.App.Ct., 2003); Moon v. Moon, 776 N.Y.S.2d 324, 325 (N.Y.A.D., 2004).

[95] Ja-Mo Associates, Inc. v. 56 Fulton St. Garage Corp. 30 A.D.2d 287, 290 (N.Y. A.D. 1968) ("While the court is not bound by the label which the parties applied to the payment and may examine the true nature of the transaction, the payment here bore none of the distinguishing characteristics which would render section 233 (of the Real Property Law . . . ) applicable. There was no intention that the landlord hold the money as security.") (citations omitted); Szabo Food Service, Inc. of North Carolina v. Balentines, Inc., 206 S.E.2d 242, 249 (N.C. 1974); ("It has long been the rule with us that in determining whether a contract is one of bailment for use, a lease with an option to purchase, or one of sale with an attempt to retain a lien for the purchase price, the courts 'do not consider what description the parties have given to it, but what is its essential character.") (citation omitted); Lee v. Barnes, 362 P.2d 237, 240 (Wash. 1961) ("The label affixed to a security interest by the parties does not necessarily determine its legal significance."); *See also* Dougherty v. Salt, 125 N.E. 94 (1919) (widely studied case explaining that "[a] note so given is not made for "value received," however its maker may have labeled it.")

[96] BLACK'S LAW DICTIONARY (8th ed. 2004), mortgage.

[97] Arnold, *supra* note , at 33.

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    20

MERS is still not entitled to receive repayment of the mortgage loan.[98] Nor is MERS entitled to the proceeds of a foreclosure sale.[99] MERS is being paid fees to provide record keeping and foreclosure services, rather than MERS paying to own liens on family residences.

Federal consumer protection and bankruptcy law also suggests that the MERS does not own legal title to loans registered on its database. For example, under both the Truth in Lending Act and the Home Ownership and Equity Protection Act a mortgage assignee can be liable for an original lender's violations of those statutes.[100] If MERS actually does own legal title mortgages it takes on "assignment," then it would have taken on potential liability under these statutes for millions of the nation's residential mortgage loans. Perhaps even more absurd, suppose for a moment that MERS were to declare bankruptcy. If courts ultimately agreed that MERS owns legal title to mortgage liens, it stands to reason that the company's creditors would have a claim on that property. Yet it is commercial madness to suggest that the right to foreclose on over half nation's residential loans could be sucked into one small company's bankruptcy proceedings—even though that company never paid value for a single mortgage loan.[101]

Moreover, the venerable rule that a mortgage follows a negotiated promissory note belies MERS' claim of owning legal title to mortgages.[102] Courts are virtually unanimous in holding that where a mortgage lender with a promissory note negotiates that note to a holder, the holder of the promissory note also obtains any mortgage securing that note.[103] Indeed, this is the very reason why the U.S.

---

[98] MERS Recommended Foreclosure Procedures, *supra* note X, at 4 ("MERS does not create or transfer beneficial interests in mortgage loans or create electronic assignments of the mortgage. What MERS does do is eliminate the need for subsequent recorded assignments altogether. The transfer process of the beneficial ownership of mortgage loans does not change with the arrival of MERS.").

[99] *Id.*

[100] 15 U.S.C. § 1641 (2006).

[101] Section 541 of the Bankruptcy Code states that a bankrupt company's estate "is comprised of all the following property, wherever located and by whomever held: all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (2009). Realistically, if the issue were ever forced to the forefront, one would expect a court to conclude that the liens "owned" by MERS were not included in MERS, Inc.'s bankruptcy estate because "[p]roperty of the states does not include . . . any power that the debtor may exercise soley for the benefit of an entity other than the debtor." *Id.* at 541(b)(1). This merely affirms the point: MERS does not own mortgages.

[102] Restatment (Third) of Property: Mortgages §5.4 (a), cmt. B (1997); Nelson & Whitman, *supra* note X, at §5.27; George E. Osborne, Handbook on the Law of Mortgages § 223 (1970);

[103] In re Ivy Properties, Inc., 109 B.R. 10, 14 (Bkrtcy.D.Mass.,1989) (under Massachusetts common law the assignment of a debt carries with it the underlying mortgage); Margiewicz v. Terco Properties of Miami Beach, Inc., 441 So.2d 1124, 1125 (Fla.Dist. Ct. App.1983) (When a note secured by a mortgage is assigned, the mortgage follows the note into the hands of the assignee); Rodney v. Arizona

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    21

Supreme Court held—over a century ago—that a "mortgage can have no separate existence" from its promissory note.[104] MERS claim to own legal title to mortgages, despite the promissory notes those mortgages secure having been negotiated elsewhere, flies in the face of the legal maxim endorsed by the Supreme Court: *accessorium non ducit, sequitur principalem*—the accessory does not lead, but rather follows the principal.[105] Mortgages are inseparable from promissory notes because of "the 'dependent and incidental relation' that a mortgage has with the obligation it secures...."[106] The parties to mortgage securitizations do not generally negotiate promissory notes to MERS.[107] Doing so would make no sense, since MERS does not pay value for the note and is not entitled to receive payment. Moreover, negotiating a note to MERS would expose MERS to assignee liability for misbehavior on the part of loan originators by virtue of statutory and common law assignee liability rules.[108] If a mortgage follows the note, then ultimately the mortgage is owned by the trustee (assuming the securitization parities successfully complete their paperwork), to whom the note is eventually endorsed. Suppose for a moment that a disagreement arose between MERS and a securitization trustee over who had legal title to a mortgage loan deposited into a securitization trust: No one

---

Bank, 836 P.2d 434, 436 (Ariz. Ct. App. 1992); Brewer v. Atkeison, 25 So. 992, 993 (Ala. 1899) ("[A]n assignment by the mortgagee of one of the mortgage notes operates as an assignment pro tanto of the lien upon the lands."); Martindale v. Burch, 10 N.W. 670, 671 (Iowa 1881) ("That an assignment or transfer of a note, secured by a mortgage, operates as an assignment of the mortgage lien, is a settled rule of law."); Robinson Female Seminary v. Campbell, 55 P. 276, 277 (Kan. 1898) ("the assignment of the note operated as an assignment of the mortgage made to secure the note."); Page v. Pierce, 26 N.H. 371, 1853 WL 2428, at *4 (1853) ("It is settled in this State, that the assignment of a debt secured by a mortgage of land, is *ipso facto* an assignment of the security also.").

[104] Carpenter v. Longan, 83 U.S. 271, 274 (1872). *Compare* Jackson v. Mortgage Electronic Registration Systems, Inc., Slip Op., 2009 WL 2461257, *5 (Minn. Aug. 13, 2009) ("By acting as the nominal mortgagee of record for its members, MERS has essentially separated the promissory note and the security instrument, allowing the debt to be transferred without an assignment of the security instrument.") *with* MERS STATE-BY-STATE FORECLOSURE PROCEDURES, *supra* note X, at 5 ("To reflect the interrelationship of the promissory note and mortgage and to ensure these two instruments are tied together properly, the recital paragraph names MERS, solely as nominee for Lender, as beneficiary.").

[105] *Id.* at 276.

[106] *In re* Hwang, – B.R.–, 2008 WL 4200129 at *5 (Bkrtcy.C.D.Cal. Sept. 4 2008) (quoting Carpenter, 83 U.S. at 276).

[107] Landmark Nat'l Bank v. Kessler, Land Mark Nat. Bank v. Kessler, No. 98,489, 2008 WL 4180346, at *1 (Kan. Ct. App., Sept. 12 ,2008); Peterson, *Predatory Structured Finance, supra* note X, at X; Steven L. Schwarcz, *The Alchemy of Asset Securitization,* 1 STAN. J.L. BUS. & FIN. 133, X (1994).

[108] *See, e.g.,* 15 U.S.C. § 1641. Furthermore, although MERS would be considered a holder, it would not be considered a holder in due course, since it does not pay value for the negotiated instrument. Uniform Commercial Code § 3-3XX.

2008]       *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    22

can seriously claim that courts would award legal title to MERS instead of the trustee acting on behalf of investors that actually paid for the loan.

In thousands of cases around the country MERS' counsel continues to recite the statement that "MERS holds legal title to the mortgage" as though it were the finance equivalent of some tantric mantra. Yet, any meaningful economic analysis of this claim exposes it as a simple falsehood. MERS does not own the lien because it does not own the proceeds of the sale rendering disposition of the property seized in exercising the lien.

### B. MERS Lacks Standing to Bring Foreclosure Actions

If MERS does not own the liens on which it is recorded as mortgagee or assignee, this naturally raises the question of where it gets the authority to bring lawsuits attempting to eject families from their homes. The concept of standing, or *locus standi*, refers to the capacity of a litigant to show a sufficient connection to the subject matter of a lawsuit to justify the party's participation in the case. In state courts, the requirement of standing sounds in the police powers of the state's sovereign authority to administer justice.[109] But in federal courts, the standing doctrine derives from the justiciability requirement of Article III, §2 of the Constitution which grants the federal judiciary the power to resolve only actual cases and controversies.[110] The Supreme Court has developed an extensive jurisprudence for determining whether the standing requirement of Article III is satisfied.[111] Many state supreme courts have imbedded this federal jurisprudence into their own state law, making their standing doctrines indistinguishable despite differing sources of law.[112] On the other hand, some states have not followed federal law in resolving the outer bounds of their standing requirements.[113] States that have developed their own standing rules have generally been more permissive

---

[109] *See* Hawkeye Bancorporation v. Iowa College Aid Com'n, 360 N.W.2d 798, 802 (Iowa 1985) (Unlike the federal courts, state courts are not bound by constitutional strictures on standing; with state courts, standing is a self-imposed rule of restraint); N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 8 n.2 (1988) ("the special limitations that Article III of the Constitution imposes on the jurisdiction of the federal courts are not binding on the state courts"); Asarco Inc. v. Kadish, 490 U.S. 605, 617 (1989) (holding that the constraints of Article III do not apply to state courts).
[110] U.S. CONST. Art. III, § 2.
[111] Allen v. Wright, 468 U.S. 737, 751 (1984) (court recognizes the extensive body of case law on standing).
[112] *See* Stasha D. McBride, Civil Procedure: Time to Stand back: Unnecessary Gate-Keeping to Oklahoma Courts, 56 Okla. L. Rev. 177, 177 (2003) (the Oklahoma Supreme Court has implemented state standing requirements that precisely mirror the federal standing doctrine)
[113] Helen Hershkoff, State Courts and the "Passive Virtues": Rethinking the Judicial Function, 114 Harv. L. Rev. 1833, 1838 (2001) (Many state courts do conform the scope of their judicial function to the Article III model).

in allowing plaintiffs to state a claim.[114] And, the Supreme Court has conceded to states the power to do so, even where state courts adjudicate federal questions.[115]

Federal courts, and states that model federal justiciability requirements, impose a three part standing test requiring: (1) an injury in fact, (2) causation, and (3) redressability.[116] Under the injury element, the Supreme Court has explained that courts must find a "concrete and particularized invasion of a legally protected interest."[117] The causation element requires a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant.[118] And, for an injury to be redressable, it must be likely that "the plaintiff's injury will be remedied by the relief the plaintiff seeks in bringing the suit."[119] When a debtor cannot repay a mortgage loan this causes a clear injury in fact to the investors that have purchased securities that draw on revenue from that loan's monthly payments. What is less is clear how a debtor's failure to pay causes an injury in fact to MERS, a company that has no factual expectation of receiving loan payments or the proceeds of a foreclosure sale. MERS makes the same amount of money with respect to the original mortgage agreement whether the borrower repays or not.

Even if a court is willing to accept MERS' dubious claim that it owns legal title to a mortgage, this purely nominal ownership does not give rise to an actual injury in fact required by the latest standing precedent. In June of 2008 the Supreme Court confronted for the first time the question of whether "bare legal title" to a financial obligation is sufficient to create standing under Article III. In *Sprint Communications, Co. v. APCC Services, Inc.*[120] the Court heard facts which bear a resemblance to those involved in MERS transactions. The *Sprint* case involved public payphone customers who made long-distance telephone calls using

---

[114] It is unclear whether under their police powers states may adopt more restrictive standing rules than federal courts. Arguably state courts may be obliged to apply law at least as permissive on standing as federal standing rules when adjudicating a federal claim. However, when adjudicating a state claim, one would suspect that state courts are free to decline to exercise their sovereign power provided that doing so does not deny due process of law. *See generally* Helen Hershoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function*, 114 HARV. L. REV. 1833, 1835-37 (2001) (analyzing relationship of state standing law in relation to the federal case and controversy requirement).

[115] Asarco, Inc. v. Kadish, 490 U.S. 605, 617-18 (1989) (permitting adjudication of federal claims in state court where plaintiff would not have met federal justiciability requirements). In contrast, where a state claim is removed from state court to federal court, the federal judiciary applies federal standing law. Int'l Primate Prot. League v. Adm'rs Tulane Educ. Fund, 895 F.2d 1056, 1058 (5th cir. 1990).

[116] Sprint Communications Co., L.P. v. APCC Services, Inc., 128 S.Ct. 2531, 2535 (2008).

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] Sprint Communications Co., L.P. v. APCC Services, Inc., 128 S.Ct. 2531 (2008).

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    24

a toll free "1-800" telephone number and an access code that allowed customers to draw on prepaid calling cards issued by Sprint Communications, a long-distance carrier.[121] Sprint Communications, in turn, had contracts with payphone operators to pay "dial-around" fees to the operators to compensate them for the cost of allowing payphone users to connect to Sprint's long-distance services in the first place.[122] Because payphone operating companies have had difficulty obtaining payment from Sprint and other long distance carriers, many operators assigned their dial-around claims to billing and collection firms called "aggregators" to sue on their behalf.[123] The named plaintiff, an aggregator called APCC Services, had separately agreed to remit all the proceeds of its lawsuit back to the payphone operators and that the operators would pay quarterly fees for the aggregator's services based on the number of payphones maintained by each operator.[124] In defending the lawsuit, Sprint argued that the APCC services did not have standing because it was the payphone operators, rather than the aggregator that brought the suit, that were injured in fact.[125] The federal district court disagreed arguing that an assignee for purposes of collection is entitled to bring a lawsuit when an assignor transfers absolute legal title to a debt.[126] The U.S. Court of Appeals for D.C. Circuit eventually agreed, allowing APCC's claims to go forward.[127] In a close 5-4 decision, Justice Breyer delivered a majority opinion with an extensive discussion of the history of standing in assignment. Although prior to the 17th century English law did not recognize assignments at all, by the early 18th century equity would allow suits by an assignee of the equitable interest in a debt where the assignee also had a power of attorney granted by the original obligee.[128] The original obligee could also sue based on the theory that it retained legal title to the debt, even though it had assigned away its beneficial interest.[129] The majority then went on to point to a more recent history suggesting that "courts have long found ways to allow assignees to bring suit; that where assignment is at issue, courts— both before and after the founding—have always permitted the party with legal title alone to bring suit; and that there is a strong tradition of specifically so suits by assignees for collection."[130]

Chief Justice Roberts, writing the *Sprint* minority, focused on the fact that under its compensation arrangement with payphone operators APCC did not was not entitled to any of the proceeds of a successful lawsuit. Chief Justice Roberts' dissent took issue with the majority's historical characterizations emphasizing that "[w]e have never approved federal-court jurisdiction over a claim where the entire

---

[121] *Id* at 2534.
[122] Sprint Communications Co., L.P. v. APCC Services, Inc., 128 S.Ct. 2531, 2534 (2008).
[123] *Id.*
[124] *Id.*
[125] *Id.* at 2542.
[126] *Id.* at 2534.
[127] *Id.* at 2534–35.
[128] *Id.* at 2536–37.
[129] *Id.* at 2537.
[130] *Id.* at 2541.

relief requested will run to a party not before the court. Never."[131] The dissent expressed concern that by granting standing to collection agencies that lack some beneficial interest, such as the payphone claim aggregators, the right to sue risks becoming a "marketable commodity" severed from a personal stake in the litigation.[132] For its part, the majority contended that the dissent's concerns were over-stated since federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit" such as where "[t]rustees bring suits to benefit their trusts."[133]

In its role as a foreclosure lawsuit plaintiff, MERS is in many respects comparable to APCC services and other payphone dial around fee claim aggregators. Like the aggregators, MERS does not own any equitable or beneficial interest in the debts it collects.[134] Similar to APCC, MERS remits the proceeds of any foreclosure sale to the actual, beneficial loan owners and is compensated out fees for registering loans on the MERS system.

Still, there are at least two crucial distinctions between payphone aggregators, such as APCC Services, and MERS. First, MERS' claim of ownership rests on an argument that it holds only legal title to the mortgage, rather than legal title to the debt. But this claim flies in the face of Supreme Court jurisprudence treating notes and mortgages securing notes as inseparable.[135] Thus, the Court's holding that "an assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity."[136] Second (and perhaps even more fundamentally), the *Sprint* case is distinguishable from MERS because in the relationship between payphone operators and claim aggregators, such as APCC Services, there is only one assignment and one party that purports to hold legal title to the debt. In a mortgage securitization deals, there is *another* party that *already* lays claim to legal title to the debt: the trustee that holds legal title to trust assets on behalf of investors that purchase beneficial interests—meaning asset backed securities— drawn from the trust. In securitization deals, mortgage loans are deposited into a trust where the trustee holds legal title to trust assets for the benefit of the investors who, by definition, hold a beneficial interest in trust assets.[137] It is an ancient and universally accepted common law principal tested again and again on bar exams across our country that trustees derive their power to control trust assets by a

---

[131] Id. at 2551 (Roberts, C.J., dissenting).

[132] *Id.*

[133] *Id.* at 2543 (majority opinion).

[134] Landmark Nat'l Bank v. Kessler, X at *5 (labeling MERS as "a party with no beneficial interest [that] is outside the realm of necessary parties.")

[135] Carpenter v. Longan, 83 U.S. 271, 274, (1872). (Where negotiable note is secured by mortgage, "the note and mortgage are inseparable…, the assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity.")

[136] *Carpenter*, 83 U.S. at 274. *See also In re Hwang*, -- B.R.--, 2008 WL 4200129 at *6 (Bkrtcy.C.D.Cal. Sept. 4 2008) (holding "Only the Holder of the Note is the 'Real Party in Interest.'").

[137] Peterson, *Predatory Structured Finance, supra* note X, at 2209; Steven L. Schwarcz, *The Alchemy of Asset Securitization*, 1 STAN. J.L. BUS. & FIN. 133, 135 (1994).

dividing equitable ownership and legal ownership of trust assets.[138] Prior to the introduction of MERS to the mortgage markets, in the history of the Anglo-American common law, there has been no case that holds that a debt collection plaintiff that lacks any beneficial interest in the debt has standing to sue *even* where legal title to that debt is held by a trustee. Nor has there ever been a case that holds that there are *two* separate legal titles to the same property. Indeed, MERS owns neither the beneficial interest in the debt that is owned by investors; nor does it own legal title to the debt because that is held by the trustee. In order to reconcile MERS' claim to owning legal title to mortgage loans registered on its system, with the trustee's right to claim the same thing, one must hypothesize some new form of "meta" legal title hitherto unknown in our system. To grant MERS standing based on legal title held by someone else, is to treat the notion of legal title as some magical nonsense where ownership means nothing other than a willingness on the part of courts to let financiers seize homes however is most convenient for them.

The case against MERS' standing is only stronger where MERS acts as an "original mortgagee" instead of an assignee. In these cases, MERS is not an assignee at all, and therefore must base its claim to standing purely on its economically fictitious claim of owning a borrower's home in title theory states, or on owning a valuable lien in lien theory states.[139] Particularly in title theory states, surely it is absurd to claim that MERS, rather than the trustee of the investors that paid value, *legally owns* the hundreds of thousands of family homes with loans registered on MERS' record keeping system.

In at least one sense MERS' argument that it has standing to bring foreclosure lawsuits is fortuitous. Currently there is a growing split in authority on whether MERS has standing to bring foreclosure actions against homeowners.[140] Generally, courts that look beyond the formal labels affixed to MERS by the parties have been reluctant to grant standing.[141] In contrast, courts granting standing have generally

---

[138] Rest. 2d Trusts § 2, cmnt. f. ("In a trust there is a separation of interests in the subject matter of the trust, the beneficiary having an equitable interest and the trustee having an interest which is normally a legal interest.").

[139] A majority of American jurisdictions adhere to a lien theory of mortgages that holds the mortgagor retains legal title to the realty, while mortgagee holds only a lien as security. Thompson on Real Property, *supra* note X at §101.01(b)(2). A minority of jurisdictions continue to adhere to the English view that mortgages are a conveyance of a defeasible interest. *Id.* at § 101.01(b)(1). In this older, minority view title shifts to the mortgagee, but the mortgagor retains a rights of possession and redemption. *Id.*

[140] *See* Baxter Dunaway, Statutory prerequisites--Standing and assignment of mortgages to be of record, 5 L. Distressed Real Est. § 73:15 (Updated 2008) (there has been litigation over the standing of MERS, however the majority of the cases have held MERS has standing); LaSalle Bank NA v. Lamy, 12 Misc.3d 1191, 824 N.Y.S.2d 796, at *2 (2006).

[141] *Compare* LaSalle Bank NA v. Lamy, 12 Misc.3d 1191, 824 N.Y.S.2d 796, at *2 (2006) ("[T]his court and others have repeatedly held that a nominee of the owner of the note and mortgage, such as Mortgage Electronic Registration Systems, Inc. MERS), may not prosecute a mortgage foreclosure action in its own name as

written conclusory opinions that refuse to look beyond MERS' nominal claims of ownership.[142] Perhaps the issue of whether MERS has standing to foreclose on homeowners will present an ideal test case to erect a bulwark on the holding in *Sprint Communications*. Chief Justice Roberts and the other *Sprint* dissenters were concerned that allowing debt collectors with only naked legal title to bring collection lawsuits would lead to the commoditization of standing. By holding that MERS does not have standing to bring lawsuits courts would at least take the position that assignees for purposes of debt collection lack standing where another party, such as a trustee for a loan held in trust, already holds legal title to the debt.

### C.  *MERS' Foreclosure Efforts Implicate the Federal Fair Debt Collection Practices Act*

The primary federal statute promoting civility, transparency, and accuracy in debt collection is the federal Fair Debt Collection Practices Act (FDCPA).[143] This statute, adopted in 1977, aims to provide minimum standards of public decency and civilized behavior in the collection of debts.[144] For example, the statute forbids harassment, false or misleading representations, and a variety of other unfair collection tactics, including threatening foreclosure when not legally entitled to do so.[145] The statute also includes disclosure provisions, such as a requirement that debt collectors give consumers written validation and verification of the debt itself as well as the identity of the creditor in order to prevent collection of debts or fees not actually owed.[146] The statute is enforced by the Federal Trade Commission, banking regulators, and a private right of action allowing consumers to sue for statutory punitive damages, costs, and attorney's fees.[147] While there is a well established tradition of robust judicial interpretation of the boundaries of this important federal statute, its application to MERS, the country's leading home mortgage foreclosure specialist, remains unsettled. At least two important legal

---

nominee for the original lender because it lacks ownership of the note and mortgage at the time of the prosecution of the action.") (unreported disposition) *with In re* Sheridan, No. 08-20381-TLM, 2009 WL 631355 (Bkrtcy.D.Idaho March 12, 2009) (In homeowner's bankruptcy, MERS lacked standing to file a motion for relief from the automatic stay that would facilitate foreclosure under state law).

[142] *See, e.g., In re* Sina, 2006 WL 2729544 (Minn.App. 2006) ("Although the record shows that ALS serviced the mortgage, the assignment of the mortgage was recorded in MERS's name. And by agreement, MERS retained the power to foreclose the mortgage in its name. Because MERS is the record assignee of the mortgage, we conclude that MERS has standing to foreclose the property by advertisement.").

[143] Pub. L. No. 95-109, 91 Stat. 874, codified at 15 U.S.C. § 1692 et seq.

[144] *Id.*

[145] 15 U.S.C. §§ 1692d-1692f.

[146] 15 U.S.C. § 1692g(a); Hubbard v. Nat'l Bond & Collection Assocs., Inc., 126 B.R. 422, 427-28 (Bankr. Del. 1991).

[147] 15 U.S.C. § 1692k, l.

2008]         *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    28

conclusions are likely: first, MERS itself should be covered by the statute; and second, servicers and foreclosure attorneys that use MERS' name without actual involvement of MERS itself should also be covered by the statute.

> *I.   MERS is a Third Party Debt Collector Subject to the Fair Debt Collection Practices Act*

While ambitious in its goals, the FDCPA is confined in scope. The statute only governs the practices of "debt collectors" which are generally defined as "any person who ... regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."[148] By contrast, creditors—the entity that originally extends credit creating a debt—are generally not required to comply with the statute.[149] The purpose behind this somewhat artificial distinction was to focus enforcement independent third party debt collection agencies that specialize in collecting loans and accounts in default.[150] In the late '70s Congress believed that debt collection agencies accounted for the most serious and widespread debt collection abuses.[151] This view was supported by the belief that market forces would discipline abusive practices by creditors, since they could be expected to fear the loss of repeat business and reputational harm. In contrast, third party debt collectors are not selected by consumers in a market transaction. Since creditors contract with third party debt collectors, consumers do not have the ability to discipline collection agencies by refusing to do business with them.

Over the lifespan of the FDCPA, demarcating this important legal boundary between a creditor and a debt collector has proven troublesome, particularly with respect to residential mortgage markets. Thus, in an exception the statute directs that the definition of "debt collector" does not include:

> [A]ny person collecting or attempting to collect any debt owed or due
> or asserted to be owed or due another to the extent such activity ...
> (ii) concerns a debt which was originated by such person [or] (iii)
> concerns a debt which was not in default at the time it was obtained
> by such person.[152]

Thus, in most cases, the FDCPA does not apply to servicers that collect monthly payments on behalf of the securitization trustee because the servicer generally obtains servicing rights prior to the borrower's default.[153] Indeed, Congress designed the exception for third party collectors that obtain debts prior to default with mortgage loan servicers primarily in mind.[154]

---

[148] 15 U.S.C. § 1692a(6).

[149] 15 U.S.C. § 1692a(4), (6).

[150] SENATE REPORT NO. 95-382, at 3-4(1977).

[151] SENATE REPORT NO. 95-382, at 3-4(1977).

[152] 15 U.S.C. § 1692a(6)(F).

[153] Dawson v. Dovenmuehle Mortgage inc., No. 00-6171, 2002 WL 501499, at *5 ("A loan servicer, someone who services but does not own the debt, is not a 'debt collector' if the servicer begins servicing of the loan before default....").

[154] SENATE REPORT NO. 95-382, at 3-4(1977); Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097, 50103 (Dec. 13, 1988) ("The exception [in 1692a(6)(F)(iii)] for debts

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    29

Unlike mortgage loan servicers and actual mortgage creditors, there is a strong argument that MERS should be treated as a debt collector under the FDCPA. Certainly, by bringing foreclosure lawsuits is MERS is "attempt[ing] to collect, [either] directly or indirectly, debts" within the meaning of the statute.[155] While some earlier cases dissented, the overwhelming majority of state and federal courts have concluded that bringing a foreclosure action is a debt collection activity governed by the Act.[156] Moreover, whatever the mortgage closing documents say, because MERS remits all proceeds of its collection activities to the actual owner of the loan (usually a securitization trustee) MERS is clearly collecting a debt that is owed to another business entity. MERS is also not a "creditor" as it is defined in the statue since creditors "offer or extend credit."[157] While MERS does keep track of servicing rights on its database, and does allow actual creditors to use MERS' name in communicating with county government officials, MERS does not ever extend credit by actually funding loans with its own capital. Similarly, unlike mortgage brokers or mortgage origination companies, MERS does not "originate" loans in any meaningful sense.[158] On the contrary, MERS is more akin to third party debt collectors that are immune from shopping discipline since it is the creditor that chooses to do business with MERS rather than the borrower.

MERS' best argument that it is not merely a third party debt collector (that also happens to maintain a database and communicate with county officials) is that, like a mortgage loan servicer, MERS "obtains" its loans prior to those loans entering into default.[159] Unfortunately, the FDCPA does not provide a definition of the term "obtain." Moreover, the word's ordinary meaning, "to gain or attain usually by planned action or effort," is not particularly enlightening in this commercial context.[160] Clearly if MERS "obtains" a mortgage loan by registering it on its database and by listing itself as a mortgagee or assignee on loan documents and with county officials, then the statute does not apply to the company. However, the legislative history of this provision of the statute was intended to provide an exception for mortgage loan servicers and assignees where servicing rights or ownership of the debt were transferred prior to the loan falling into

---

not in default when obtained applies to parties such as mortgage service companies whose business is servicing current accounts."); Wagner v. Am. Nat'l Educ. Corp., Clearinghouse No. 36,132 (D. Conn. 1983) (servicing company was not a debt collector for purposes of the FDCPA).
[155] 15 U.S.C. § 1692a(6). The Supreme Court has held that collection lawsuits are debt collection within the FDCPA. *Hientz v. Jenkins*, 514 U.S. 291, 294 (1995).
[156] Wilson v. Draper & Goldberg, 443 F.3d 373 (4th Cir. 2006); Kaltenbach v. Richards, 464 F.3d 524 (5th Cir. 2006); Shapiro & Meinhold v. Zartman, 823 P.2d 120 (Colo. 1992); Galusk v. Blumenthal, 1994 WL 323121 (N.D.Ill. June 26, 1994). *Cf* Bergs v. Hoover, Bax, & Slovacek, LL.P., 2003 WL 22255679 (N.D. Tex. Sept. 24, 2003).
[157] 15 U.S.C. § 1692a(4).
[158] 15 U.S.C. § 1692a(6)(F)(ii).
[159] 15 U.S.C. § 1692a(6)(F)(iii).
[160] MERRIAM-WEBSTER ONLINE DICTIONARY. 2009

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                     30

arrears.[161] MERS is not a servicing company because, prior to default, it does not actually collect any payments nor communicate with debtors regarding loan repayment terms. Nor does MERS obtain a loan in the same way a traditional assignee would, since—at best—it only has a highly dubious claim of owning some form of nominal legal title.[162] The Senate Report accompanying passage of the original Act, explains that a loan is obtained by a servicer "when taken for servicing."[163] In this more meaningful and contextually relevant sense, MERS "obtains" an account to collect through foreclosure action once the loan servicer or trustee makes the effort of bringing a foreclosure suit in MERS' name. Indeed, the only time MERS ever has any actual responsibility with respect to any mortgage loan collection or servicing is when—*after default*—the actual parities in interest turn to MERS' legal identity to bring a foreclosure action. If, for a moment, one disregards the ink on paper and instead looks at the actual economic activity engaged in by the various parities, MERS looks much less like a servicer or creditor than it does a third party foreclosure specialist. Unlike servicers, "whose business is servicing current accounts," MERS' collection activities are focused exclusively and completely on collecting loans on the eve of foreclosure.

As FDCPA jurisprudence goes forward, failing to treat MERS as a debt collector risks opening up a gaping loophole in the FDCPA. If MERS is not a debt collector, third party debt collection mills may attempt to circumvent the statute by instructing doctors, hospitals, landlords, credit card lenders, and others to list MERS, or some similar company, as an "obligee of record in nominee capacity" in the loan or account origination documents. Even if the actual creditor only calls on the debt collector to collect the account or loan in the event that it falls into arrears, the debt collector's argument for a statutory exemption would be functionally indistinguishable from that currently asserted by MERS in foreclosure cases. Debt collection mills must not be allowed to insulate themselves from the FDCPA by including an economically meaningless claim of ownership in loan origination documents. Indeed, it was the possibility of just this type of circumvention that grounds the universally accepted rule that as a remedial consumer protection statute, the FDCPA must be construed broadly in favor of debtors.[164]

---

[161] S. Rep. No. 95-382, at 3 (1977) ( X- quote ). The Federal Trade Commission's Staff Commentary also reflects this policy by explaining that: "The exception (iii) for debts not in default when obtained applies to parties such as mortgage service companies whose business is servicing current accounts."). 53 Fed. Reg. 500097, 50103 (Dec. 13, 1988).

[162] *See infra* note X and accompanying text.

[163] SENATE REPORT NO. 95-382, at 3-4(1977) ("[T]he committee does not intend the definition [of debt collector] to cover the activities of . . . mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default *when taken for servicing.*") (emphasis added);

[164] *See, e.g.,* Brown v. Card Service Center. 464 F.3d 450, 453 ("Because the FDCPA is a remedial statute, we construe its language broadly, so as to effect its purpose. Accordingly, . . . we have held that certain communications from lenders to debtors should be analyzed from the perspective of the "least sophisticated debtor.").

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                31

   2. *Mortgage Servicers that Cloak Themselves in MERS' Name should be as
      Construed as Debt Collectors*

   One of the puzzling, and arguably suspicious, ironies behind the MERS'
business model is the combination of its remarkable breadth in market share with
translucent depth in market participation. Because MERS itself is a relatively
small company, it does not have the resources to use its own employees to bring
the hundreds of thousands of foreclosures in which it is a named party.[165] For
MERS itself to participate in all of these foreclosures, the company would need
loafers (as opposed to boots) on the ground in virtually every county courthouse in
the nation. That would entail a large human resources operation, regional middle
management, scores of leases on local office spaces, secretarial support, and many
more costly expenses and managerial headaches.
   MERS has solved this problem with characteristically novel and arguably
flawed legal mumbo jumbo. MERS, and the mortgage servicers and foreclosure
attorneys it works with, simply tell the court or anyone else that asks that the
servicer's employee or the foreclosure attorney is an employee of MERS, even
though MERS does not pay the individual a salary or any other compensation.[166]
Indeed, MERS has adopted a company policy of naming thousands of individual
employees of *other* companies and law firms "certifying officers" of MERS.[167]
Employees of lenders, loan servicers, or foreclosure attorneys do not become

---

[165] MERS' web page lists the contact information for only five attorneys and two
paralegals. MERS Departments,
http://www.mersinc.org/about/departments.aspx?id=2 (viewed Sept. 5, 2009).
[166] Mortgage Electronic Registration System, Inc., MERS Law Seminar for USFN
Conference, 15 (April 21, 2002) (document on file with author) ("Question : *Who
should be named as a certifying officer?* [Answer:] Anyone that signs 'documents
for the Lender currently should be named as a certifying officer. This way, the
Lender's procedures will not need to be changed and the same people will continue
to execute the documents.").
[167] Question and Answer document produced by MERS for a training conference
explains:
     Question: *What is a Certifying Officer?*
     A certifying officer is an employee of the Lender who is appointed a
     MERS officer by a MERS Corporate Resolution. The Resolution
     allows the certifying officer to execute documents as a MERS officer.
     Question: *Does the title that the employee holds as an employee of the
     Lender correspond to the title that the employee holds as a MERS
     Certifying Officer?*
     No. All MERS Certifying Officers are appointed assistant secretaries
     and vice presidents of Mortgage Electronic Registration Systems, Inc.
     That means that if an employee is a Senior Vice President of the
     Lender, that employee is not a Senior Vice President of MERS. The
     employee is an assistant secretary and vice president of MERS.
Mortgage Electronic Registration System, Inc., MERS Law Seminar for USFN
Conference, 15 (April 21, 2002) (document on file with author).

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*              32

officers of MERS through an actual, individually considered action on the part of the MERS' board of directors.[168] Rather, the employees of other companies and firms simply fill in a "Corporate Resolution Request Form" on MERS' web page.[169] The webpage, which includes fields for the employee's name, address, and the date, then automatically regurgitates a boilerplate document listing the names just entered on the electronic form.[170] The company even provides telephone customer support service by a paralegal for those who have trouble getting their corporate resolutions off of the web page.[171]

Courts and homeowners often actually believe servicer employees and foreclosure attorneys are employees of MERS because MERS makes an effort to give this relationship the appearance of a traditional employment. For example, "certifying officers" are given a job title.[172] In states where courts have not demanded greater authority "certifying officers" describe themselves as an "assistant secretary of MERS."[173] For more chary states, a MERS letter to servicers and foreclosure specialists explains further: "However, in a few states it has been brought to our attention that it is required that the signatory hold the office of vice president or above." No problem, explains the letter: "Therefore it is acceptable to use the title of vice president in Maryland, Mississippi, Nebraska, Oklahoma, Kansas, North Carolina, South Carolina and Pennsylvania."[174] For good measure the web page "corporate resolution request form" allows servicers and foreclosure specialists to order as many MERS corporate seals as they would like—for a convenient, reasonable fee of $25.00 each.[175] Perhaps, for a company that pretends to "own" half of the nation's mortgages, pretending to have hundreds of "vice presidents" all over the country is not much of a stretch.

However, for adjudicators hoping to faithfully implement the federal Fair Debt Collection Practices Act, the substance, rather than the form, of employment relationships of those that collect debts is meaningful. The FDCPA demands that courts look past the nominal labels debt collectors give themselves and determine who is actually engaging in what type of economic activity. For example, debt collectors that pretend to send letters from an attorney, where an attorney has not

---

[168] Mortgage Electronic Registration System, Inc., MERS Law Seminar for USFN Conference, 15 (April 21, 2002) (document on file with author) ("*Question: How do we update our officer list?* [Answer:] Go to the MERS web site www.mersinc.org, and under MERS ProductPMERS Online>Foms, click on the Corporate Resolution Request Form and follow the instructions.").
[169] MERS, Corporate Resolution Request Form, www.mersinc.org/MersProducts/forms/crrf/crrf.aspx (last viewed: April 6, 2009).
[170] *Id. See also* Mortgage Electronic Registration System, Inc., MERS Law Seminar for USFN Conference, 15-16 (April 21, 2002) (document on file with author) (providing a sample certifying officer resolution).
[171] *Id.*
[172] Mortgage Electronic Registration System, Inc., MERS Law Seminar for USFN Conference, 14-15 (April 21, 2002).
[173] MERS, Corporate Resolution Request Form, www.mersinc.org/MersProducts/forms/crrf/crrf.aspx (last viewed: April 6, 2009).
[174] *Id.*
[175] *Id.*

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    33

actually reviewed the file in question, commit an actionable deception under the statute.[176] Similarly, third party debt collectors cannot obtain an exemption from the statute simply by pretending to be the original creditor.[177] And, importantly, creditors that pretend to be debt collectors are explicitly regarded as such under the statute.[178]

If the courts ratify MERS' claim to have hundreds or even thousands of "vice presidents" around the country (without paying a single cent in compensation to any of them) ejecting people from their homes, what is to prevent any credit card lender, hospital, or land lord from adopting "corporate resolutions" naming their third party debt collectors vice presidents of their own companies? Presumably, under MERS' rationale, the FDCPA could be circumvented simply by including a "corporate resolution" purporting give the debt collector a job title along with any assignment of a debt for collection.

Furthermore, courts have an obligation to take a step back for a moment to look at these relationships from the perspective of a confused, frightened homeowner teetering on the brink of foreclosure and possibly even homelessness.[179] How is a homeowner to understand with whom they can negotiate a settlement, or from whom to obtain additional information, or how to distinguish a legitimate employee of a legitimate company from the thousands of mortgage related con artists and charlatans currently swirling around American families?[180] The Consumer Credit Protection Act in general, and the Fair Debt Collection Practices title of that Act in particular, took the position that even misleading (as opposed to false) representations had no place in the debt collection industry because of the great potential for consumer abuse and the threat to the American economy from undermining our collective faith in financial markets and institutions.[181] To effectuate this policy of transparency and honesty,

---

[176] Clomon v. Jackson, 988 F.2d 1314 (2d. Cir. 1993).

[177] 15 U.S.C. § 1692e(11).

[178] 15 U.S.C. § 1692a(6) ("The term 'debt collector' . . . includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts, such term includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.").

[179] Clommon, 988 F.2d at 1318 ("The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd. This standard is consistent with the norms that courts have traditionally applied in consumer-protection law.").

[180] John Leland, *Swindlers Find Growing Market in Foreclosures*, N.Y. TIMES, January 15, 2009, at A1; Vivian S. Toy, *Penetrating the Maze of Mortgage Relief*, N.Y. TIMES, June 14, 2009, at RE1; Riva Richmond, *Online Scammers Target the Jobless*, N.Y. TIMES, August 6, 2009, at B6.

[181] 15 U.S.C. § 1692(a), (c) ("There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of privacy. ... Means other

2008]       *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*       34

misrepresentations and misleading statements are evaluated from the perspective of the "least sophisticated consumer" standard.[182] Unsophisticated consumers that receive communications from a MERS "vice president" or "assistant secretary" are likely to believe that this individual serves a different role in the foreclosure process than he or she actually does. Having foreclosure communications conducted in MERS' name may lead consumers to believe that the servicer has turned the case over to a quasi-official entity that lacks the authority to negotiate loan modifications, short sales, or settlements. The effect could be to pacify the consumer at the point they are most likely to resist through actively litigating (often in a *pro se* capacity) their all too often legitimate counter claims and defenses. Indeed, this is precisely the sort of deception targeted by the federal statute promoting "fair" debt collection.

### D.  *Loans Recorded in MERS' Name May Lack Priority against Subsequent Purchasers for Value and Bankruptcy Trustees*

Perhaps the single most troubling legal question that remains unanswered with respect to MERS' legal foundation is whether recording assignments or mortgages in MERS' name is sufficient protect lienors against subsequent purchasers, including especially a bankruptcy trustee. A primary objective of rules requiring recording mortgages in county recording systems is to provide a rough form of notice to subsequent purchasers of pre-existing ownership claims. To create an incentive to promptly and accurately record mortgages, state recording statutes often depart from the customary "first in time, first in right" priority rule when a mortgagee fails to properly record.[183] Under state law, if a mortgagee fails to properly record its mortgage, and then someone subsequently buys or lends against the home, the subsequent purchaser can often take priority over the first.[184] In jurisdictions stylized as "notice" states, a subsequent purchaser for value takes priority over an earlier mortgagee if the purchaser had no actual or constructive notice at the time of the conveyance.[185] A purchaser is generally thought to have constructive notice if the original mortgagee successfully recorded her mortgage with the appropriate county recording office.[186] In some states, a purchaser also has "inquiry notice" if there are facts, such as possession, that would alert the purchaser of the prior interest.[187] In "race-notice" states, the subsequent purchaser takes free of the prior mortgage only if she took without actual or constructive notice and successfully records before the prior mortgagee.[188] In all fifty states, if

---

than misrepresentation or other abusive debt collection practices are available for the effective collection of debts.")

[182] Clomon v. Jackson, 988 F.2d 1314 (2d. Cir. 1993); Gammon v. GC Services Ltd. Partnership, 27 F.3d 1254 (7th Cir. 1996).

[183] POWELL ON REAL PROPERTY § 82.01[3].

[184] *Id.* at § 82.02[1][a].

[185] *Id.*

[186] *Id.* at § 82.02[1][d][ii].

[187] *Id.* at § 82.02[1][d][iii].

[188] *Id.* at § 82.02[1][a].

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    35

the original debtor files for bankruptcy, a chapter 7 trustee can avoid the mortgage
loan if under state law a hypothetical bona fide purchaser would have had
priority.[189] In such cases, the result is that mortgage lenders are treated as
unsecured creditors and are likely to receive only pennies on the dollar, rather than
the full fair market value of the home at the time of the bankruptcy petition.[190]

Indeed, state recording statutes and the federal bankruptcy code, place severe
financial penalties on mortgage lenders that make even minor clerical errors in
recording their home mortgage liens. Taking only few examples from the many
possible is sufficiently illustrative. Courts have invalidated recorded mortgages
because a notary acknowledgment form, although signed by a mortgagor and a
witness, did not clearly indicate who was physically present before the notary at
the time of signing—even when there was no actual dispute over the identity of the
individuals in question.[191] Merely forgetting to affix a notary's seal can lead to
avoidance.[192] The lack of a second witness signature rendered a mortgage
avoidable by a bankruptcy trustee, even though the mortgage was physically
registered with the town clerk and fully searchable in the title records.[193] There are
many cases where incorrect property descriptions rendered mortgages
avoidable.[194] Even omission of the amount t of a mortgage debt has led to
invalidation of a mortgage record.[195] In all of these cases, the result of the minor
variation from the norm contemplated by the state legislature was the avoidance of

---

[189] 11 USC 544(a)(3); *In re Seaway Exp. Corp.*, 912 F.2d 1125, 1128 (9th Cir.
1990) ("[A] bona fide purchaser prevails over a prior unrecorded conveyance.").
[190] David Lloyd & Ariane Holtschlag, *Chapter 13 Strip-Off of Junior Mortgages:
Not Whether, But How Under Current Law*, 28 AM. BANKR. INST. J. 12, 12 (2009).
[191] *In re Stubbs*, 330 B.R. 717, 726-30 (N.D. Ind. 2005). *See also* In re
Cocanougher, 378 B.R. 518 (Ky 2007) (omission of debtors' names on
acknowledgement rendered mortgage avoidable).
[192] In re Marsh, 12 S.W.3d 449 (Tenn. 2000) (notary public's accidental failure to
affix his seal on acknowledgement of deed of trust rendered instrument null and
void as to subsequent bona fide purchaser).
[193] *In re Ryan*, 851 F.2d 502, 505 (1st Cir. 1988) ("Although "recorded" in the
sense it was physically placed in the records of the town clerk, the original
mortgage deed was not an "effectual" or valid recording under Vermont law
because it was signed by only one witness. It was as if never recorded.") (citations
omitted). *See also* In re Cornelius, 2009 WL 2179128 (Bank. Ohio 2009) (Chapter
7 trustee had priority over mortgagee because of improperly acknowledged
mortgage).
[194] Poncelet v. English, 795 P.2d 436 (Mont. 1990); O'Neill v. Lola Realty Corp.,
264 A.D. 60 (N.Y. 1942); Norton v. Fuller, 251 P. 29 (Utah 1926).
[195] Bullock v. Battenhousen, 108 Ill. 28, 1883 WL 10352, *5 (Ill. 1883) ("The
spirit of our recording system requires that the record of a mortgage should
disclose, with as much certainty as the nature of the case will admit, the real state
of the incumbrance. If a mortgage is given to secure an ascertained debt, the
amount of such debt should be stated. By omitting to so state the debt the widest
door is opened for fraud of every description, and to prevent the same the law
declares such a mortgage fraudulent and void as to creditors and subsequent
purchasers.").

the mortgagor's lien—in effect reducing a home mortgage loan to a debt no different than an unsecured credit card.

While the results in these cases are easily criticized as harshly formalistic and unbridled from the parties' original contractual intentions, courts defend with stern sermons on the importance of maintaining transparent records of ownership interests in land. A federal bankruptcy judge's recent defense of these cases is worth quoting at length:

> Lest one think that the . . . Courts have exalted form over substance, it is critical to note several concepts. . . . [W]we are dealing with interests in land—not a security interest in an inventory of plumbing fixtures, in chinchillas, in canned corn, or in a lawn and garden tractor. Land. Land is certainly the asset which people deem to be their most important "possession": There is no other "thing" more important historically in our culture than an interest in land, whether that interest be in a condominium, in a house, or in farm. Land. The transferring of interests in land has been entrusted to a system of records that allows people to be certain that this single most important asset in their lives is *indeed* going to be theirs, and that the encumbrances recorded with respect to this asset are in fact accurate and valid. It is therefore absolutely imperative that transactions in land be guaranteed to vest title in the people who invested in those transactions, and that the investors know definitively the interests in the land in which they invest which may affect their interests in this singularly important asset. The record of land transactions in the Recorder's Office provides this critical assurance. Perhaps the most critical aspect of this "chain" of assurance is to guarantee as much as possible on the face of an instrument that a person purported to have signed a document which affects interests in land actually did sign that document.[196]

Financiers' decisions to record their mortgages and mortgage assignments in MERS' name, rather than their own, must be judged within this contextual tradition.

Historically, virtually no state recording statutes have explicitly authorized mortgagees or mortgage assignees to vicariously record using the name of an agent or nominee. Nevertheless, in its landmark legal opinion that does not cite cases or statutes, Moody's Investor Service asserted that "[t]he recording system has been set up to provide notice of security interests, but not necessarily the identity of secured parties."[197] This would be a more persuasive argument if virtually every recording act ever adopted did not, in fact, require record keeping for both the name of mortgagors and mortgagees—thus the use of grantor-grantee indexes in the vast majority of states.[198] Indeed, the very first American recording statute, adopted by Massachusetts Bay Colony in 1640, required recording of the names of

---

[196] *Stubbs*, 330 B.R. at 730.
[197] Moodys, *supra* note X, at 3.
[198] 14 POWELL ON REAL PROPERTY §82.03[2][b].

the parties—including both "the names of the grauntor and grauntee."[199] Under its most plain and simple reading, that statute does not contemplate nor allow obscuring actual ownership through naming only a "mortgagee of record in nominee capacity." Indeed there are many cases, and compelling secondary authority, suggesting that errors in or omission of the name of a mortgagee invalidate either the recording or even the mortgage agreement itself, rendering the mortgage avoidable.[200] The policy of requiring the recordation of the actual mortgagee's name sounds in the longstanding title recordation act goal of "prevent[ing] secret conspiracies between mortgagors and mortgagees as to the fact and amount of indebtedness to the prejudice of subsequent purchasers and creditors, by compelling them to at once make known the real claim."[201] If the identity of mortgagees were unimportant, legislatures could easily have drafted recording statutes, and record keeping systems, to merely require disclosure of the existence of a lien, with no reference to who owns it. Moreover, rather than using a grantor-grantee index, real property records could have been designed to only use tract indexes. But, by and large, legislatures did not do this. And as much as MERS and the mortgage lending industry may wish it were otherwise, recording acts specify that the name of the mortgagee or assignee must be included and that records and indexes be drawn up from the names of both parties.[202] Surely MERS executives knew this and that fact more than any other explains why the company would so frequently engage in the contortioned linguistic gymnastics of claiming

---

[199] 14 POWELL ON REAL PROPERTY §82.01[1][b] (*quoting* 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 306 (N. Shurtleff ed. 1853)).

[200] Disque v. Wright, 49 Iowa 538, 1878 WL 623 (Iowa 1878) ("It has been frequently held that slight omissions in the acknowledgment of a deed destroy the effect of the record as constructive notice. *A fortiori*, it seems to us, should so important and vital an omission as that of the name of the grantee have that effect."); Chauncey v. Arnold, 24 N.Y. 330 (N.Y. 1862) ("No mortgagee or obligee was named in [a mortgage], and no right to maintain an action thereon, or to enforce the same, was given therein to the plaintiff or any other person. It was, *per se*, of no more legal force than a simple piece of blank paper."); Richey v. Sinclair, 67 Ill. App. 580 (Ill. App. 1896) (mortgage that did not name mortgagee, though it described note secured thereby as payable "to the order of" named person, was void for failure to name mortgagee); Allen v. Allen, 51 N.W. 473, 474 (1892) (omission of name of grantee invalidated conveyance because "A legal title to real property cannot be established by parol.") *See also* 2 PATTON AND PALOMAR ON LAND TITLES § 338 (3d ed. 2009) ("It is axiomatic that a deed will be inoperative as a conveyance unless it designates someone to whom the title passes. A grantee is as necessary to the validity of a grant as that there should be a grantor or a property granted."); 59 CJS MORTGAGES § 306 ("Notice may be deemed not present in cases of insufficient attestation or where the instrument itself is so defective as to be void as a matter of law, as where it wholly omits the name of the mortgagee.") (citations omitted).

[201] Bullock, 108 Ill. 28, at *5.

[202] 14 POWELL ON REAL PROPERTY §82.03[2][b].

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    38

that it is simultaneously both an agent and a principal with respect to the mortgages it "owns."

## IV. ANALYZING MERS' ROLE IN THE RESIDENTIAL MORTGAGE MARKET

Looking beyond the problematic legal doctrine associated with MERS, an analysis of the role the company plays holds at least three important insights: (1) the MERS system was one additional contributing factor in the genesis of the mortgage foreclosure crisis; (2) the company's private, for profit, database and tax evasion services are causing atrophy in the nation's public real property information infrastructure; and (3), the financial industry's sponsorship and embrace of MERS in the absence of legislation or meaningful judicial precedent reflects a troubling anti-democratic shift in housing policy.

### A. MERS and the Subprime Mortgage Lending Foreclosure Crisis

While there is plenty of blame to go around, the MERS recording and foreclosure system was yet one additional contributing cause of the American mortgage foreclosure crisis. MERS facilitates predatory structured finance by decreasing the exit costs of originators. As investment banks, hedge funds, institutional investors, and the credit rating agencies weighed the risks of dumping billions upon billions of dollars into mortgage securities drawn out of the balance sheets of thinly capitalized, bankruptcy-prone mortgage lenders, MERS provided an important additional inducement. In previous research I have argued that in the run-up to the foreclosure crisis mortgage origination companies were used as disposable liability filters.[203] When thinly capitalized originators churned out more and more securitized loans, claims against those lenders accumulated, while their assets did not.[204] Once the projected costs of disgruntled investor recourse demands and borrower predatory lending lawsuits exceeded the projected costs of bankruptcy and reformation under a new corporate guise, originator management would predictably discard their corporate identity.[205] MERS made this easier by offering a *super-generic placeholder* that transcended the aborted life of lenders. MERS reassured investors that even when an originator goes bankrupt, county property records would remain unaffected and foreclosure could proceed apace. By serving as the true mortgagee's proxy in recording and foreclosure, MERS abetted a fly-by-night, pump-and-dump, no-accountability model of structured mortgage finance.

Moreover, the use of MERS' corporate identity facilitates separation of foreclosure actions and litigation of predatory lending and servicing claims. When MERS (or more accurately servicers or foreclosure specialists acting in MERS' name) brings foreclosure actions, it justifies this entitlement based on a claim of legal ownership of mortgage liens. But, when borrowers attempt to assert counter claims challenging the legality of mortgage brokers, lenders, trusts, or servicers,

---

[203] Peterson, Predatory Structured Finance, *supra* note X, at 2275.
[204] *Id.*
[205] *Id.*

MERS hides behind its claim of nominee status. One former mortgage lender has estimated that in the mid-2000s approximately 70 percent of brokered loan applications submitted to mortgage lenders involved some form of broker encouraged fraud.[206] Similarly, Professor Porter's study of mortgage loans in Chapter 13 bankruptcy found that residential mortgage creditors did not supply a promissory note in 41.1% of cases involving a home mortgage.[207] Because promissory notes are not recorded, nor where MERS is involved, is the actual identity of the note holder revealed, consumers and their counsel can verify neither the identity of the parties involved, nor even the amount of the debt in question. In an ordinary foreclosure, using MERS' name erects a tactical barrier to judicial resolution of these types of problems. MERS confuses and pacifies borrowers (and sometimes courts) at precisely the crucial moment: on the eve of foreclosure. Once a family looses their home, their leverage and appetite for litigation dissipate. The separation of predatory lending litigation from foreclosure litigation facilitated by bringing foreclosure in MERS' name decreases the costs of foreclosure and dulls the deterrent force of consumer protection law. MERS represents the mortgage finance industry's best effort to create a single, national foreclosure plaintiff that always has foreclosure standing, but never has foreclosure accountability.

Obviously MERS is not responsible for the failed monetary and regulatory policy of the Federal Reserve Board.[208] The President and Congress could have intervened in the troubling trends toward unrealistic mortgage loans.[209] Mortgage brokers and lenders systematically strove for volume and commissions, rather than sustainable home ownership.[210] Federal banking regulators obstructed the efforts of state legislators and attorneys general to bring the market to heel.[211] The credit rating agencies rashly gave their seal of approval to the risky, complex packaged and repackaged mortgage loans securities.[212] While MERS may have reassured investors of the viability of churned residential mortgage backed securities, it had little to do with the over-leveraging of hedge funds, bond insurers, or the government sponsored housing enterprises.[213] The recognition of MERS' role in

---

[206] RICHARD BITNER, CONFESSIONS OF A SUBPRIME LENDER: AN INSIDER'S TALE OF GREED, FRAUD, AND IGNORANCE 45 (2008).

[207] Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 TEX. L. REV. 121, 147(2008).

[208] Paul Krugman, *How Did Economists Get it So Wrong?*, N.Y. TIMES, Sept. 6, 2009, MM36.

[209] Jo Becker, Sheryl Gay Stolberg, & Stephen Labaton, *White House Philosophy Stoked Mortgage Bonfire*, N.Y. TIMES, December 21, 2008, at A1.

[210] Bitner, *supra* note X, at 181-82.

[211] Christopher L. Peterson, *Federalism and Predatory Lending: Unmasking the Deregulatory Agenda*, 78 TEMPLE L. REV. 1, 96-97 (2005); Christopher L. Peterson, *Preemption, Agency Cost Theory, and Predatory Lending by Banking Agents: Are Federal Regulators Biting Off More than they Can Chew?*, 56 AM. U. L. REV. 515, 549-551 (2007).

[212] Steven L. Schwarcz, *Understanding the Subprime Financial Crisis*, 60 S.C. L REV. 549, 550-52 (2009).

[213] Frederick Tung, *The Great Bailout of 2008-09*, 25 EMORY BANKR. DEV. J. 333, 336 (2009); Binyamin Appelbaum, Carol D. Leonning & David S. Hilzenrath,

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*          40

facilitating the foreclosure crisis is not to ignore nor excuse these other causal factors. Nevertheless, it is a mistake to list the contribute factors associated with the crisis and omit MERS.

### B. MERS and Atrophy of the Land Title Information Infrastructure

Over time, the widespread recording of loans and loan assignments in MERS' name will assist fraudsters and cause decay in the accuracy of public real property records. Suppose, for example, in a transaction where MERS is recorded as the original mortgagee, a mortgage broker or originator convinces a homeowner to sign a renewal note and mortgage after the original note and mortgage have been assigned. (This is imminently plausible when many homeowners sign anything put in front of them.[214]) Then, further suppose the broker or originator attempts to sell the subsequent renewal note and mortgage to a bona fide purchaser for value. If the prospective purchaser wanted to rely on public records, it would search with the county and discover the original mortgage listed in MERS' name. If the originator acted quickly so that the date of the original loan was proximate in time to the subsequent loan, then the purchaser would naturally assume that the loan recorded in MERS' name was the self-same loan they planned to purchase. Because the original mortgage is recorded in the name of MERS, and because there is no public record of the assignment of the original note, the subsequent bona fide purchaser would have no publically available way to discover the fraud—and the entire transaction could be completed without recording a single fraudulent document. In the ironic and inevitable litigation both purchasers would claim that in MERS' original recording MERS was acting as *their* agent, leaving the court to award priority where both lenders have a essentially the same "claim" based on the same recording. Two or more mortgages against the same property could easily end up in different (or even *the same*) pool of mortgages that are securitized for investors. Recording real property ownership interests in the name of an agent, rather than the actual owner, opens the door to unscrupulous agents using the same record to fool multiple principals. And our long standing case law and statutes will have little advice on how to equitably resolve competing claims of priority since this body of authority assumes that purchasers will record their own, rather than their agent's name. Envy not the judges and law clerks assigned to write these forthcoming opinions.

Similarly, MERS may also spawn fraud, confusion, and litigation by facilitating fraudulent mortgage loan releases. One reason recording statutes require that the actual mortgagee's or mortgage assignee's name be kept in the

---

*How Washington Failed to Rein in Fannie, Freddie*, WASH. POST., Sept. 14, 2008, Bus. Sec.
[214] JAMES M. LACKO & JANIS K. PAPPALARDO, FED. TRADE COMM'N, IMPROVING CONSUMER MORTGAGE DISCLOSURES: AN EMPIRICAL ASSESSMENT OF CURRENT AND PROTOTYPE DISCLOSURE FORMS 26-29 (2007), http:// www.ftc.gov/os/2007/06/P025505MortgageDisclosureReport.pdf; Todd J. Zywicki & Joseph D. Adamson, *The Law and Economics of Subprime Lending*, 80 U. COLO. L. REV. 1, 72-73(2009).

records is to help ensure that liens can only be released by the party entitled to do so. For example, recording statutes attempt to prevent unscrupulous land owners from recording a false mortgage satisfaction and then obtaining another loan under false pretenses. Any of MERS' thousands of unmonitored, unpaid, and unsupervised vice presidents and assistant secretaries can file fraudulent satisfactions that are indistinguishable from authentic records. Homeowners that happen to be a MERS vice president (or have a coconspirator that is or posses as a MERS vice president) could record mortgage satisfactions, then sell the home or obtain a new loan and all-the-while the public real property records would not reveal the previous unpaid debt.

In the wake of the subprime crisis, this decline in the value of the public records is already occurring.[215] For example, in loans where MERS is listed as the mortgagee, virtually any company can show up, claim to own the note, and proceed to foreclose on a family that is in arrears. Because MERS has so many "certifying officers" a court cannot easily verify whether the individual acting in MERS' name is actually representing the real party in interest given that the public records do not reveal who that party is. One can imagine an original mortgagee, either through error or fraud, foreclosing on a defaulting family despite having assigned the loan into a structured finance deal. In a MERS as original mortgagee transaction, the assignment would not be recorded, and the only name on the public records would be MERS'. Neither the courts nor a purchaser at a judicial or non-judicial foreclosure sale could use the public records to discover that someone other than the company or individual bringing foreclosure action actually owns the proceeds of the sale.

Moreover, in recent years, many courts have been indulgent in dispensing with normal the requirement that a foreclosure plaintiff produce the original promissory note. Not wanting investors to suffer forfeiture because of a record keeping problem, many courts have instead accepted affidavits claiming that original note was lost or even a copy of the pooling and servicing agreement naming the servicer.[216] Conversely, because in structured finance deals, originators,

---

[215] Creola Johnson, *Fight Blight: Cities Sue to Hold Lenders Responsible for the Rise in Foreclosures and Abandoned Properties,* 2008 UTAH L. REV. 1169, 1185.
[216] Porter, *supra* note X, at 172-74; Raymond H. Brescia, *Beyond Balls and Strikes: Towards a Problem Solving Ethic in Foreclosure Proceedings,* CASE W.R. L. REV. 305, 345 (2009); Chris Markus, Ron Taylor, & Blak Bogt, *From Main Street to Wall Street: Mortgage Loan Securitization and New Challenges Facing Foreclosure Plaintiffs in Kentucky,* 36 N. KY. L. REV. 395, 406 (2009). A few courts have begun insisting on more accurate documentation form foreclosure plaintiffs. , In re Foreclosure Cases, Nos. 1:07CV2282 (N.D. Ohio Oct. 31, 2007) (dismissing consolidated foreclosure cases for failure to produce evidence demonstrating ownership or assignment of promissory notes); Bank of New York v. Williams, 979 So. 2d 347 (Fla. Dist. Ct. App. 2008) (affirming dismissal of the foreclosure complaint for failure to show ownership interest in mortgage and note); HSBC Bank USA, Nat'l Ass'n v. Perboo, No. 38167/07, 2008 WL 2714686 (N.Y. Sup. Ct. July 11, 2008) (denying foreclosure plaintiff's application for default Judgment); Wells Fargo Bank, Nat'l Ass'n v. Reyes, No. 5516/08, 2008 WL

2008]        *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    42

securitizers, and trustees have been notoriously lax in keeping track of promissory notes, it is possible that an employee of an original lender or a broker (either of whom could credibly claim to represent MERS) could conceivably still retain possession of the actual original promissory note, despite having received funds from the assignment of the loan.[217] A court could easily order a foreclosure, sell the home, give the funds to someone not entitled to them, and the actual owner would never be the wiser. The clever thief would make payments on behalf of the defaulting borrower during the pendency of the foreclosure (the unwitting family would certainly not complain) to keep the actual loan assignee from investigating.[218] Because so many finance professional have lost their jobs, and some were not especially reliable in the best of times, one should think that the risk of such schemes is now acute.[219] Moreover, given the empirical and anecdotal evidence of shoddy record keeping in this industry, it is entirely possible that an originator or servicer could unintentionally foreclose on a loan that it does not actually own.[220] The ubiquitous use of the MERS label in our public real property records along with our new casual flexibility in notions of corporate identity facilitates this sort of fraud and mistake.

When half of the nation's mortgages are all recorded under the name of one company that does not publish its own records, the ability of the public (including both consumers and lenders) to use public records to evaluate who owns real property interests will inevitably decline. In county recording officers around the country, real property records increasingly repeated MERS' name over and over again. In an often repeated Irish fable a boy marks a leprechaun's gold with red handkerchief tied around a tree.[221] He returns only to find that the leprechaun has tied red handkerchiefs tied around every tree in the forest. Recording mortgages in MERS' name leaves a message signaling the existence of a lien. But it does not reveal who owns the lien or who has the right to release it. If present trends and the MERS agenda continue apace, we should expect that eventually virtually every home in the country will, at one point or another, have a MERS recording against it. Viewed alone, county real property records will become a forest where each tree has its own handkerchief. To discover a more accurate picture of the title status of

---

2466257 (N.Y. Sup. Ct. June 19, 2008) (dismissing complaint for plaintiff's failure to establish ownership of mortgage).

[217] Johnson v. Melnikoff, Slip op., 20 Misc.3d 1142, 2008 WL 4182397, *1 (N.Y. Supp Sept. 11, 2008)

[218] An especially clever strategist would continue to make the payments for a year or more while concealing the proceeds and running the same scheme several times over.

[219] *See, e.g.,* Cary Spivak, *Criminal Past No Barrier to Mortgage Field: Ex-Cons Who Got Loan-Originating Licenses Commit Scores of Frauds that Cost Customers Millions,* MILWAUKEE J. SENT., March 14, 2009, A1.

[220] *Cf* Nosek v. Ameriquest Mortgage Company, 386 B.R. 374, 379 (2008) (attorneys sanctioned for defending Ameriquest in an eight day trial while never advising the Court that Ameriquest was neither the note holder nor the mortgagee).

[221] AMY T. PETERSON & DAVID J. DUNWORTH, MYTHOLOGY IN OUR MIDST: A GUIDE TO CULTURAL REFERENCES 93 (2004).

2008]          *MORTGAGE ELECTRONIC REGISTRATION SYSTEM*                    43

a home, the public will be forced to turn to MERS, Inc. This will makes the public records derivative of and subordinate to the MERS system.[222]

Moreover, this decline in the usefulness of public records is exacerbated financially because MERS is usurping the recording fees that once funded maintenance, innovation, and vigilance in public record keeping systems. Proponents of MERS often cite figures on how much money the mortgage finance industry "saves" by recording under MERS' name rather than real parties in interest. In some sense, this notion of savings is a misnomer. One could just as easily characterize the commercial pattern as crippling budget cuts in public information infrastructure designed to create transparency in ownership of real property. By allowing the mortgage lending industry to circumvent their traditional obligation to maintain fraud resistant public records, in the long run, the courts will facilitate commercial uncertainty, inefficient litigation, and disappointed expectations.

Recording mortgages in the name of MERS and subsequent refusal to record assignments is not a technological innovation. On the contrary, it is an example of atrophy in the mortgage market's legal infrastructure. Companies that specialize in shipping goods need highways, bridges, and ports—physical infrastructure completely indispensible to commerce. But despite the importance of creating and maintaining such infrastructure, collective action problems make the hard work of facilitating infrastructure impossible for individual market actors. These companies and the consumers they serve need the firm hand of government to organize the leadership and extract the resources necessary to facilitate infrastructure for the benefit of all. Commerce in shared human obligation—loans—is not so terribly different. Profit-seeking individual companies are not well suited to maintaining a platform of transparent information systems easily accessible to our communities. MERS and its proponents are no doubt sincere in their belief that their private, undemocratic information system is a boon to business. However, this belief is premised on a short term view of maximizing profit at the expense of maintaining a public information system. It is certainly true that county recording systems are technologically outdated. However, the solution to outdated infrastructure is to modernize that infrastructure, not abandon it. If MERS is allowed to continue to plot its own course as the national residential property ownership oracle and foreclosure plaintiff, the burden of reconstructing chains of real property ownership in cases of fraudulent or erroneous conveyance will increasingly shift from county recorders to litigation.[223] The national system of public land title record keeping will become derivative and its usefulness will decay.

---

[222] MERSCorp, Inc. v. Romaine, 861 N.E.2d 81, 88 (N.Y. 2006) (Kaye, J. dissenting in part) ("[T]he MERS system will render the public record useless by masking beneficial ownership of mortgages and eliminating records of assignments altogether. Not only will this information deficit detract from the amount of public data accessible for research and monitoring of industry trends, but it may also function, perhaps unintentionally, to insulate a noteholder from liability, mask lender error and hide predatory lending practices.")

[223] It is likely that this litigation will often be *pro se* or will be handled by consumer attorneys that are not paid enough to assemble and wade through the factually complex private land title evidence. Cases where courts maledict pro se

### C. Title Recording Law and Democratic Governance

A fair critique of MERS must include recognition of the dated, expensive, and cumbersome nature of county real property records and state recording statutes. Unlike the relatively homogenous personal property lien recording systems governed by Article 9 of the Uniform Commercial Code, the National Conference of Commissioners on Uniform State Laws and the American Law Institute have not been able to prevail on state legislatures to standardize real property mortgage and recording laws. Moreover, unlike personal property lien records, which are usually maintained by a Secretary of State, real property records are generally maintained by each county. This further diversifies record keeping standards and operating procedures. It is only fair to say that, even with the use of title insurer plant copies, recording and searching in county property records is time consuming, expensive, and often not especially reliable.[224] In contrast, MERS gives each loan a unique identifier, is accessible through the internet, and is organized n one nationwide system.[225]

Still, the consumer protection critique of MERS is not just about what MERS does wrong, but also what the process of creating MERS prevented. By taking upon itself the reformation of the county recording systems created by state law, MERS and the mortgage finance industry circumvented the state and national debate that normally precedes significant legislative change. The MERS system, while digital and nationwide in scope, is not equally available to all. It has given a single corporation the opportunity to grant special "vice president" status to its favored side in foreclosure disputes. It has been manipulated into a device to make foreclosure easier and more anonymous for financiers. The financial industry could have channeled its dissatisfaction with county property records into a campaign for legal reform. This would have necessitated a debate where consumers, county officials, researchers, poverty advocates, and anyone else could have participated. Fifteen years ago, if the finance industry put its formidable legislative muscle behind a public reformation of county recording systems, perhaps today we would have a national system maintained by a federal regulator, or a statewide systems supported by a new Article of the Uniform Commercial Code. Instead financiers chose to act alone, creating an entirely new system that competes financially with public records, undermines the accuracy of public records, and was never authorized by the elected leaders that guide a republican system of law.

In a moment of refreshing candor, not long ago a MERS senior vice president concluded an extolling public relations piece with the explanation that "MERS is

---

foreclosure defendants and underpaid consumer counsel are illustrative of the MERS led trend toward erosion of clear, public mortgage records. *See, e.g.,* Lumzy v. Mortgage Electronic Registration Systems, Inc., Slip op., 2008 WL 3992671 (S.D. Miss. Aug. 21, 2008) (dismissing Fair Debt Collection Practices Act suit against MERS because "her conclusory and convoluted allegations do not pass muster.") .

[224] 14 POWELL ON REAL PROPERTY § 82.03[2].

[225] Arnold, *supra* note X, at 35.

owned and operated by and for the mortgage industry."[226] It is ironic and perhaps not coincidental that the syntactical form of the sentence bears such close resemblance to President Lincoln's Gettysburg address. One will no doubt recall that Americans have generally aspired to "government of the people, by the people, for the people," rather than of, by, and for the mortgage bankers.[227] MERS' attempt to "capture every mortgage loan in the country"[228] is an effort to supplant the public land title recording systems' lien records, many of which predate the Constitution itself, with a purely private system. Perhaps MERS, Inc. is correct that doing so is more efficient; is more modern; and, maybe they are right that it is even better for the American people at the margin. But, this effort is without question a surrender of the messy compromises inherent in representative democracy to the seductively easy lure of mercantile oligarchy. Bankers just complain so much less when courts, regulators, and legislators let them do whatever they want. Still, perhaps those of us with romantic attachments to our Republic and the rule of law will be excused for supposing that if the mortgage bankers wanted a newer, more efficient, national land title recording system, they should have asked Congress or the legislatures first.

## VI.   CONCLUSION

This Article has explored the legal and public policy foundations of the Mortgage Electronic Registration System. MERS maintains a central national database tracking mortgage servicing rights for loans registered on its system. In addition to its database, MERS has taken on two related but distinct roles in the American home mortgage market. First, mortgage finance companies use MERS' name as a proxy in county land title records in order to avoid paying taxes to local governments for recording assignments during the life of a loan. Second, where local courts have allowed it, MERS creates something of a foreclosure doppelganger by allowing the actual parties in interest to bring residential foreclosures under MERS' corporate identity instead of their own. Recording loans in the name MERS, rather than the actual parities in interest, has generally not been explicitly authorized under the state title recording acts that trace their lineage back to the earliest years of the American republic. By adopting such a radical shift in how mortgages are recorded and foreclosed without legislative change, the mortgage finance companies have rebuilt their industry on a legal foundation of sand. MERS' claim to own legal title to a mortgage loan's security interest, divorced from the promissory note and entitlement to receive loan payments, is in direct tension with precedent that has been well settled for over a hundred years. MERS' role in prosecuting home mortgage foreclosures should bring it within the scope of the federal Fair Debt Collection Act—a statute that MERS has generally made little attempt to comply with. And it is unclear whether recording a mortgage or mortgage assignment in the name of someone other than that actual mortgagee and assignee should be sufficient to protect those actual

---

[226] Arnold, *supra* note X, at 36.
[227] GARRY WILLS, LINCOLN AT GETTYSBURG: THE WORDS THAT REMADE AMERICA 145-47 (1992).
[228] MERS Registers 20 Million Loans, *supra* note X, at 1.

parties in interest from subsequent purchasers. Indeed there is a compelling argument that loans where MERS is recorded as the original mortgagee should be avoidable by bankruptcy trustees in many states.

The shift away from recording loans in the name of actual mortgagees and assignees represents an important policy change that erodes not only the tax base of local governments, but also the usefulness of the public land title information infrastructure. MERS did not, by itself, cause the mortgage finance crisis and its ensuing aftermath. However, it was an important cog in the machine that churned out the millions of unsuitable, poorly underwritten, and incompletely documented mortgages that were destined for foreclosure. In the aftermath of the mortgage finance crisis that has crippled the American economy, necessitated massive taxpayer bailouts of financial institutions, and left millions of American families ejected from their homes, the judiciary has an obligation to aggressively reexamine our financiers' cut corners, false assumptions, and jaundiced legal theory.

# EXHIBIT 7

Westlaw.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

Supreme Court of Kansas.
**LANDMARK NATIONAL BANK**, Plaintiff/Appellee,
v.
**Boyd A. KESLER** Appellee/Cross-appellant
Millennia Mortgage Corporation, Defendant,
(Mortgage Electronic Registration Systems, Inc.
and Sovereign Bank), Appellants/Cross-appellees,
and
Dennis Bristow and Tony Woydziak, Intervenors/
Appellees.
No. 98,489.

Aug. 28, 2009.

**Background:** Purported purchaser of second mortgage and company designated in second mortgage as its "nominee" filed motion to set aside first mortgagee's default judgment in foreclosure action, asserting that company was necessary party to action. The District Court, Ford County, E. Leigh Hood, J., refused to set aside default judgment. Movants appealed. The Court of Appeals, 40 Kan.App.2d 325, 192 P.3d 177, affirmed. Movants filed petition for review.

**Holdings:** The Supreme Court, Rosen, J., held that:
(1) in a matter of first impression, trial court did not abuse its discretion in denying company's motion to set aside default judgment or its motion to intervene as a contingently necessary party, and
(2) trial court's refusal to allow company to intervene did not violate its due process rights.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ☞957(1)**

30 Appeal and Error
    30XVI Review
        30XVI(H) Discretion of Lower Court

30k957 Opening Default
    30k957(1) k. In general. Most Cited
Cases
Denial of a motion to set aside a default judgment is subject to review under a standard of abuse of discretion.

**[2] Appeal and Error 30 ☞949**

30 Appeal and Error
    30XVI Review
        30XVI(H) Discretion of Lower Court
            30k949 k. Allowance of remedy and matters of procedure in general. Most Cited Cases
A district court decision that denies a motion to join a party as a necessary party is subject to an abuse of discretion standard of review. West's K.S.A. 60-219(a).

**[3] Parties 287 ☞53**

287 Parties
    287IV New Parties and Change of Parties
        287k49 Bringing in New Parties
            287k53 k. Application and proceedings thereon. Most Cited Cases
Whether the evidence demonstrates that the statutory requirements for joinder of a necessary party have been met is a mixed question of fact and law. West's K.S.A. 60-219(a).

**[4] Appeal and Error 30 ☞842(9)**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k838 Questions Considered
                30k842 Review Dependent on Whether Questions Are of Law or of Fact
                    30k842(9) k. Mixed questions of law and fact. Most Cited Cases

**Appeal and Error 30 ☞893(1)**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
            30k893 Cases Triable in Appellate
Court
            30k893(1) k. In general. Most Cited
Cases

**Appeal and Error 30 ⌬⇒1010.1(4)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and
Findings
         30XVI(I)3 Findings of Court
            30k1010 Sufficiency of Evidence in
Support
         30k1010.1 In General
            30k1010.1(4) k. Competent or
credible evidence. Most Cited Cases

**Appeal and Error 30 ⌬⇒1010.1(6)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and
Findings
         30XVI(I)3 Findings of Court
            30k1010 Sufficiency of Evidence in
Support
         30k1010.1 In General
            30k1010.1(6) k. Substantial
evidence. Most Cited Cases
When reviewing a mixed question of fact and law,
an appellate court reviews the district court's factual
findings for substantial competent evidence and re-
views de novo the district court's legal conclusions.

**[5] Parties 287 ⌬⇒44**

287 Parties
   287IV New Parties and Change of Parties
      287k37 Intervention
         287k44 k. Application and proceedings
thereon. Most Cited Cases

Intervention by a party as a matter of right is sub-
ject to the same mixed determination of law and
fact as is joinder of a necessary party. West's
K.S.A. 60-219(a), 60-224(a).

**[6] Parties 287 ⌬⇒38**

287 Parties
   287IV New Parties and Change of Parties
      287k37 Intervention
         287k38 k. In general. Most Cited Cases
Permissive intervention by a party lies within the
discretion of the district court. West's K.S.A.
60-224(b).

**[7] Appeal and Error 30 ⌬⇒946**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k944 Power to Review
            30k946 k. Abuse of discretion. Most
Cited Cases
For appellate purposes, judicial discretion is abused
when no reasonable person would take the view ad-
opted by the trial court.

**[8] Appeal and Error 30 ⌬⇒946**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k944 Power to Review
            30k946 k. Abuse of discretion. Most
Cited Cases
Review for abuse of discretion includes review to
determine whether erroneous legal conclusions
guided the exercise of discretion.

**[9] Appeal and Error 30 ⌬⇒842(1)**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in
General
         30k838 Questions Considered
            30k842 Review Dependent on Whether

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
**(Cite as: 289 Kan. 528, 216 P.3d 158)**

Questions Are of Law or of Fact
          30k842(1) k. In general. Most Cited
Cases
Supreme Court exercises unlimited review over
lower court's interpretation of statutory mandates.

**[10] Judgment 228 ☞148**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
         228k148 k. Persons entitled to relief.
Most Cited Cases

**Mortgages 266 ☞436**

266 Mortgages
   266X Foreclosure by Action
      266X(E) Parties and Process
         266k436 k. Intervention. Most Cited
Cases
Trial court did not abuse its discretion in denying
motion of company named as "nominee" of lender
in second mortgage to vacate default judgment ob-
tained by first mortgagee in foreclosure action or
company's motion to intervene as a contingently ne-
cessary party in foreclosure action; second mort-
gage stated that company functioned "solely as
nominee" for lender and lender's successors and as-
signs, relationship company had to purported pur-
chaser of second mortgage was more akin to that of
a straw man than to a party possessing all the rights
given a buyer, company did not lend money to
mortgagor or to any other entity involved in case,
and company's counsel explicitly declined to
demonstrate a tangible interest in second mortgage.
West's K.S.A. 60-219(a), 60-255(b).

**[11] Judgment 228 ☞154**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
         228k154 k. Parties on application. Most
Cited Cases
Statute permitting default judgment to be set aside

for good cause shown does not require that the
movant be a party to the action. West's K.S.A.
60-255(b).

**[12] Judgment 228 ☞163**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
         228k163 k. Hearing and determination.
Most Cited Cases
It is appropriate for a trial court to consider evid-
ence beyond the bare pleadings to determine wheth-
er it should set aside a default judgment. West's
K.S.A. 60-255(b).

**[13] Judgment 228 ☞145(1)**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
         228k145 Meritorious Cause of Action or
Defense
         228k145(1) k. In general. Most Cited
Cases

**Judgment 228 ☞162(2)**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
        228k162 Evidence
         228k162(2) k. Presumptions and bur-
den of proof. Most Cited Cases
In a motion to set aside a default judgment, a trial
court should consider a variety of factors to determ-
ine whether the defendant or would-be defendant
had a meritorious defense, and the burden of estab-
lishing a meritorious defense rests with the moving
party. West's K.S.A. 60-255(b).

**[14] Judgment 228 ☞145(2)**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
        228k145 Meritorious Cause of Action or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

Defense
    228k145(2) k. Necessity for showing meritorious cause of action or defense. Most Cited Cases
Relief under statute permitting default judgment to be set aside for good cause shown is appropriate only upon a showing that if relief is granted the outcome of the suit may be different than if the entry of default or the default judgment is allowed to stand; the showing should underscore the potential injustice of allowing the case to be disposed of by default, and in most cases the court will require the party in default to demonstrate a meritorious defense to the action as a prerequisite to vacating the default entry or judgment. West's K.S.A. 60-255(b).

**[15] Judgment 228 🔗145(2)**

228 Judgment
    228IV By Default
        228IV(B) Opening or Setting Aside Default
            228k145 Meritorious Cause of Action or Defense
                228k145(2) k. Necessity for showing meritorious cause of action or defense. Most Cited Cases

**Parties 287 🔗51(.5)**

287 Parties
    287IV New Parties and Change of Parties
        287k49 Bringing in New Parties
            287k51 Necessity and Grounds
                287k51(.5) k. In general. Most Cited Cases
The law relating to a contingently necessary party closely resembles the law relating to vacating default judgment, in that both require the party asserting the interest to demonstrate a meritorious defense or an interest that may be impaired. West's K.S.A. 60-219(a), 60-255(b).

**[16] Mortgages 266 🔗23**

266 Mortgages
    266I Requisites and Validity

        266I(A) Nature and Essentials of Conveyances as Security
            266k22 Parties
                266k23 k. In general. Most Cited Cases
The law generally understands that a mortgagee is not distinct from a lender; a "mortgagee" is a party to whom property is mortgaged, which is to say, a mortgage creditor or lender, and a mortgagee and a lender have intertwined rights that defy a clear separation of interests.

**[17] Evidence 157 🔗246**

157 Evidence
    157VII Admissions
        157VII(D) By Agents or Other Representatives
            157k246 k. Attorneys. Most Cited Cases
Parties are bound by the formal admissions of their counsel in an action.

**[18] Constitutional Law 92 🔗4417**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)19 Tort or Financial Liabilities
                92k4415 Liens, Mortgages, and Security Interests
                    92k4417 k. Enforcement; proceedings. Most Cited Cases

**Mortgages 266 🔗436**

266 Mortgages
    266X Foreclosure by Action
        266X(E) Parties and Process
            266k436 k. Intervention. Most Cited Cases
Trial court's refusal to allow company, which was second mortgagee's "nominee," to intervene in foreclosure action in which first mortgagee had obtained default judgment, did not violate company's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

Page 5

due process rights; company had no direct property interests at stake, in that it lent no money and received no payments from borrower, and it suffered no direct, ascertainable monetary loss as result of litigation. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § 18.

**[19] Appeal and Error 30 ☞949**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k949 k. Allowance of remedy and matters of procedure in general. Most Cited Cases

**Parties 287 ☞51(2)**

287 Parties
   287IV New Parties and Change of Parties
      287k49 Bringing in New Parties
         287k51 Necessity and Grounds
            287k51(2) k. Discretion of court. Most Cited Cases
Although joinder of a party is evaluated under an abuse of discretion standard, if a constitutional right is involved the trial judge's exercise of discretion is limited.

**[20] Constitutional Law 92 ☞3879**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3878 Notice and Hearing
            92k3879 k. In general. Most Cited Cases
Due process provides any interested party with the elementary and fundamental right to notice of the pendency of an action and the opportunity to present its objections in any proceeding that is to be accorded finality. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § 18.

**[21] Constitutional Law 92 ☞3869**

92 Constitutional Law

92XXVII Due Process
      92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3868 Rights, Interests, Benefits, or Privileges Involved in General
            92k3869 k. In general. Most Cited Cases
In the absence of a protected property or liberty interest, there can be no due process violation. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § 18.

**[22] Constitutional Law 92 ☞3869**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3868 Rights, Interests, Benefits, or Privileges Involved in General
            92k3869 k. In general. Most Cited Cases
The Due Process Clause does not protect entitlements where the identity of the alleged entitlement is vague. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § 18.

**[23] Constitutional Law 92 ☞3874(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3868 Rights, Interests, Benefits, or Privileges Involved in General
         92k3874 Property Rights and Interests
            92k3874(1) k. In general. Most Cited Cases
To be protected by Due Process Clause, a protected property right must have some ascertainable monetary value. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill of Rights, § 18.

**[24] Constitutional Law 92 ☞3869**

92 Constitutional Law

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

92XXVII Due Process
    92XXVII(B) Protections Provided and
Deprivations Prohibited in General
        92k3868 Rights, Interests, Benefits, or
Privileges Involved in General
            92k3869 k. In general. Most Cited
Cases
Indirect monetary benefits do not establish protec-
tion under the Due Process Clause. U.S.C.A.
Const.Amend. 14; K.S.A. Const.Bill of Rights, § 18

[25] Constitutional Law 92 ⊂⇒3874(1)

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and
Deprivations Prohibited in General
        92k3868 Rights, Interests, Benefits, or
Privileges Involved in General
            92k3874 Property Rights and Interests
                92k3874(1) k. In general. Most
Cited Cases
An entitlement to a procedure does not constitute a
protected property interest for purposes of due pro-
cess. U.S.C.A. Const.Amend. 14; K.S.A. Const.Bill
of Rights, § 18.

**160 *528 *Syllabus by the Court*

1. Denial of a motion to set aside default judgment
is subject to review under a standard of abuse of
discretion. A district court decision that denies a
motion to join a party as a necessary party under
K.S.A. 60-219(a) is also subject to an abuse of dis-
cretion standard of review.

2. Whether the evidence demonstrates that the stat-
utory requirements for joinder have been met is a
mixed question of fact and law. When reviewing a
mixed question of fact and law, an appellate court
reviews the district court's factual findings for sub-
stantial competent evidence and reviews de novo
the district court's legal conclusions.

3. Intervention as a matter of right is subject to the

same mixed determination of law and fact as is
joinder. Permissive intervention lies within the dis-
cretion of the district court.

4. Judicial discretion is abused when no reasonable
person would take the view adopted by the trial
court. Review for abuse of discretion includes re-
view to determine whether erroneous legal conclu-
sions guided the exercise of discretion.

5. K.S.A. 60-255(b) does not require that the party
moving for relief from default judgment be a party
to the action.

6. It is appropriate for a trial court to consider evid-
ence beyond the bare pleadings to determine wheth-
er it should set aside a default judgment. In a mo-
tion to set aside default, a trial court should con-
sider a variety of factors to determine whether the
defendant or would-*529 be defendant had a merit-
orious defense, and the burden of establishing a
meritorious defense rests with the moving party.

7. Relief under K.S.A. 60-255(b) is appropriate
only upon a showing that if relief is granted the out-
come of the suit may be different than if the entry
of default or the default judgment is allowed to
stand; the showing should underscore the potential
injustice of allowing the case to be disposed of by
default. In most cases the court will require the
party in default to demonstrate a meritorious de-
fense to the action as a prerequisite to vacating the
default entry or judgment. The nature and extent of
the showing that will be necessary lie within the tri-
al court's discretion.

8. The law relating to a contingently necessary
party closely resembles the law relating to vacating
default judgment, in that both require the party as-
serting the interest to demonstrate a meritorious de-
fense or an interest that may be impaired.

9. The word "nominee" is subject to more than one
interpretation. The legal significance of the word
depends on the context in which it is used. The
word encompasses a range of meanings from a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

straw man or limited agent to a representative en-joying **161 the same legal rights as the party that acts as the nominator.

10. The law generally understands that a mortgagee is not distinct from a lender: a mortgagee is a party to whom property is mortgaged, which is to say, a mortgage creditor or lender. A mortgagee and a lender have intertwined rights that defy a clear sep-aration of interests.

11. Parties are bound by the formal admissions of their counsel in an action.

12. The Due Process Clause does not protect enti-tlements where the identity of the alleged entitle-ment is vague. A protected property right must have some ascertainable monetary value. An entitlement to a procedure does not constitute a protected prop-erty interest.
Tyson C. Langhofer and Court T. Kennedy, of Stin-son Morrison Hecker, L.L.P., of Wichita, for appel-lants/cross-appellees.

Ted E. Knopp, of Ted E. Knopp, Chartered, of Wichita, for appellee Boyd A. Kesler.

David A. Schatz, of Husch Blackwell Sanders L.L.P., of Kansas City, Missouri, for amicus curiae American Land Title Association.

The opinion of the court was delivered by ROSEN, J.:

*530 Mortgage Electronic Registration Systems, Inc. (MERS) and Sovereign Bank seek review of an opinion by our Court of Appeals holding that a non-lender is not a contingently necessary party in a mortgage foreclosure action and that due process does not require that a nonlender be allowed to in-tervene in a mortgage foreclosure action.

The facts underlying this appeal are not in dispute. On March 19, 2004, Boyd Kesler secured a loan of $50,000 from Landmark National Bank (Landmark) with a mortgage registered in Ford County, Kansas.

On March 15, 2005, he secured an additional loan of $93,100 from Millennia Mortgage Corp. (Millennia) through a second mortgage registered in Ford County. Both mortgages were secured by the same real property located in Ford County.

The second mortgage lies at the core of this appeal. That mortgage document stated that the mortgage was made between Kesler-the "Mortgagor" and "Borrower"-and MERS, which was acting "solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns." The document then identified Millennia as the "Lender." At some subsequent time, the mortgage may have been as-signed to Sovereign and Sovereign may have taken physical possession of the note, but that assignment was not registered in Ford County.

On April 13, 2006, Kesler filed for bankruptcy in the United States Bankruptcy Court for the District of Kansas, Wichita Division. He named Sovereign as a creditor; although he claimed the secured prop-erty as exempt, he filed an intention to surrender the property. The bankruptcy court discharged his personal liability on November 16, 2006. The re-cord contains little documentation or evidence ex-plaining the interplay of the bankruptcy and the foreclosure*531 action, except to suggest that the bankruptcy action may have given Sovereign con-structive notice of a possible default on payments.

On July 27, 2006, Landmark filed a petition to fore-close on its mortgage, serving and naming as de-fendants Kesler and Millennia. It did not serve no-tice of the litigation on MERS or Sovereign. In the absence of answers from either defendant, the trial court entered default judgment against Kesler and Millennia on September 6, 2006. The trial court then filed an order of sale on September 29, 2006. Notice of the sale was initially published in the Dodge City Daily Globe on October 4, 2006. On October 26, 2006, Dennis Bristow and Tony Woy-dziak purchased the secured property at a sheriff's sale for $87,000, and on November 14, 2006, Land-mark filed a motion to confirm sale of the secured property.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

Also on November 14, 2006, Sovereign filed an an-swer to the foreclosure petition, asserting an in-terest in the real property as the successor in in-terest to Millennia's second mortgage. A week later, on November 21, 2006, Sovereign filed a motion to set aside **162 or vacate the default judgment and an objection to confirmation of sale. The motion as-serted that MERS was a K.S.A. 60-219(a) contin-gently necessary party and, because Landmark failed to name MERS as a defendant, Sovereign did not receive notice of the proceedings. The motion asked the court to vacate the default judgment un-der K.S.A. 60-260(b). The motion further asked the court to set aside the surplus from the sale, holding it to later to be paid to Sovereign if the court elec-ted not to grant the motion to vacate.

On November 27, 2006, Kesler filed a motion seek-ing distribution of surplus funds from the sheriff's sale, and on January 3, 2007, Kesler filed a motion joining Landmark's earlier motion to confirm the sheriff's sale. The trial court conducted a hearing on the various motions on January 8, 2007, at which counsel for Landmark, Kesler, Sovereign, and Bris-tow appeared and presented their cases. The trial court deferred judgment pending review of the pleadings.

On January 16, 2007, MERS filed a motion joining Sovereign's motion to vacate the journal entry of default judgment and objecting *532 to confirma-tion of the sheriff's sale, followed on January 18, 2007, by a motion to intervene under K.S.A. 60-224 . MERS proffered an answer and a cross-claim to the original foreclosure petition.

On that same date, the trial court filed an order finding that MERS was not a real party in interest and Landmark was not required to name it as a party to the foreclosure action. The court found that MERS served only as an agent or representative for Millennia. The court also found that Sovereign's failure to register its interest with the Ford County Register of Deeds precluded it from asserting rights to the mortgage after judgment had been entered. The court denied the motions to set aside judgment

and to intervene and granted the motions to confirm the sale and to distribute the surplus.

On February 1, 2007, MERS and Sovereign filed motions to reconsider. The trial court conducted a hearing on those motions, at which counsel for Kesler, Sovereign, and MERS appeared and argued. The trial court subsequently entered an order deny-ing the motions to reconsider. MERS and Sovereign filed timely notices of appeal.

Prior to the appellants submitting their briefs, the purchasers Bristow and Woydziak filed a motion with the Court of Appeals seeking leave to inter-vene in the appeal. The Court of Appeals granted the motion. Bristow and Woydziak then filed a mo-tion to compel the office of the Clerk of the Appel-late Courts to docket their cross-appeal, which the Court of Appeals denied. The Court of Appeals af-firmed the district court in *Landmark National Bank v. Kesler*, 40 Kan.App.2d 325, 192 P.3d 177 (2008). This court granted the appellants' petition for review.

*I. Did The District Court Abuse Its Discretion In Denying MERS's Motion To Set Aside Default Judgment And Motion To Intervene As A Contin-gently Necessary Party?*

*A. Standard of Review*

[1][2][3][4] Denial of a motion to set aside a de-fault judgment is subject to review under a standard of abuse of discretion. See *Canaan v. Bartee*, 272 Kan. 720, Syl. ¶ 9, 35 P.3d 841 (2001). A district court *533 decision that denies a motion to join a party as a necessary party under K.S.A. 60-219(a) is also subject to an abuse of discretion standard of review. *State ex rel. Graeber v. Marion County Landfill, Inc.*, 276 Kan. 328, 352, 76 P.3d 1000 (2003). Whether the evidence demonstrates that the statutory requirements for joinder have been met is a mixed question of fact and law. When reviewing a mixed question of fact and law, an appellate court reviews the district court's factual findings for sub-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

stantial competent evidence and reviews de novo the district court's legal conclusions. *State v. Fisher*, 283 Kan. 272, 286, 154 P.3d 455 (2007).

[5][6] Intervention as a matter of right is subject to the same mixed determination of law and fact as is joinder. K.S.A. 60-224(a). Permissive intervention lies within the discretion of the district court. K.S.A. 60-224(b); see *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 382 n. 1, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987) (Brennan, J., concurring) (discussing the different standards **163 applied to Federal Rule of Civil Procedure 24[a] and [b] ).

[7][8] Judicial discretion is abused when no reasonable person would take the view adopted by the trial court. *Harsch v. Miller*, 288 Kan. 280, 293, 200 P.3d 467 (2009). Review for abuse of discretion includes review to determine whether erroneous legal conclusions guided the exercise of discretion. *State v. Skolaut*, 286 Kan. 219, Syl. ¶ 3, 182 P.3d 1231 (2008).

[9] To the extent that this appeal requires interpretation of statutory mandates, this court exercises unlimited review. See *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1031, 181 P.3d 549 (2008).

*B. Analysis*

While this is a matter of first impression in Kansas, other jurisdictions have issued opinions on similar and related issues, and, while we do not consider those opinions binding in the current litigation, we find them to be useful guideposts in our analysis of the issues before us.

[10] At the heart of this issue is whether the district court abused its discretion in refusing to set aside the default judgment and in refusing to join MERS as a contingently necessary party.

[11] *534 The statutory provision for setting aside a default judgment is K.S.A. 60-255(b), which refers

to K.S.A. 60-260(b), relating to relief from judgment, in a manner similar to the correlation between the corresponding federal rules, Fed. R. Civ. Proc. 55(c) and 60(b). K.S.A. 60-260(b) allows relief from a judgment based on mistake, inadvertence, surprise, or excusable neglect; newly discovered evidence that could not have been timely discovered with due diligence; fraud or misrepresentation; a void judgment; a judgment that has been satisfied, released, discharged, or is no longer equitable; or any other reason justifying relief from the operation of the judgment. K.S.A. 60-260(b) requires that the motion be made by a party or by a representative who is in privity with a party, thus precluding a nonparty of standing to file such a motion. K.S.A. 60-255(b) does not, however, require that the movant be a party to the action. See 11 Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d § 2865 (1995).

[12][13] It is appropriate-and probably necessary-for a trial court to consider evidence beyond the bare pleadings to determine whether it should set aside a default judgment. In a motion to set aside default, a trial court should consider a variety of factors to determine whether the defendant (or would-be defendant) had a meritorious defense, and the burden of establishing a meritorious defense rests with the moving party. See *Canaan v. Bartee*, 272 Kan. 720, 731, 35 P.3d 841 (2001).

[14] This conclusion is consistent with the construction of the parallel federal rules:

"Generally, a federal court will grant a motion under Rule 55(c) only after some showing is made that if relief is granted the outcome of the suit may be different than if the entry of default or the default judgment is allowed to stand; the showing should underscore the potential injustice of allowing the case to be disposed of by default. In most cases, therefore, *the court will require the party in default to demonstrate a meritorious defense to the action as a prerequisite to vacating the default entry or judgment.* ...

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

"A majority of the courts ... have insisted upon a presentation of some factual basis for the supposedly meritorious defense....

"The demonstration of a meritorious defense is not expressly called for by the federal rules and, therefore, *the nature and extent of the showing that will be necessary is a matter that lies within the court's discretion.* ... *The underlying *535 concern is to determine whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default.*" (Emphasis added.) 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 2697 (1998).

We accordingly find that it was incumbent on the trial court, when ruling on the motion to set aside default judgment, to consider **164 whether MERS would have had a meritorious defense if it had been named as a defendant and whether there was some reasonable possibility MERS would have enjoyed a different outcome from the trial if its participation had precluded default judgment.

In determining whether MERS was a contingently necessary party that was entitled to relief from judgment, the trial court was required to consider the factors of K.S.A. 60-219(a) in addition to those of K.S.A. 60-260(b).

K.S.A. 60-219(a) defines which parties are to be joined in an action as necessary for just adjudication:

"A person is contingently necessary if (1) complete relief cannot be accorded in his absence among those already parties, or (2) he claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action in his absence may (i) as a practical matter substantially impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent oblig-

ations by reason of his claimed interest."

[15] The law relating to a contingently necessary party closely resembles the law relating to vacating a default judgment, in that both require the party asserting the interest to demonstrate a meritorious defense or an interest that may be impaired. In order to prevail on appeal, MERS must demonstrate that the trial court abused its discretion when it found, based on the testimony, evidence, and pleadings before the court at the time when it considered the motion to set aside default judgment, that MERS lacked a meritorious defense to the foreclosure proceeding or had an interest that could be impaired. We will accordingly examine the nature of the interest in the mortgage that MERS has demonstrated.

Sovereign is a financial institution that putatively purchased the Kesler mortgage from Millennia but did not register the transaction *536 in Ford County. The relationship of MERS to the transaction is not subject to an easy description. One court has described MERS as follows:

"MERS is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans. Through the MERS System, MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS. MERS is listed as the grantee in the official records maintained at county register of deeds offices. The lenders retain the promissory notes, as well as the servicing rights to the mortgages. The lenders can then sell these interests to investors without having to record the transaction in the public record. MERS is compensated for its services through fees charged to participating MERS members." *Mortgage Elec. Reg. Sys., Inc. v. Nebraska Depart. of Banking*, 270 Neb. 529, 530, 704 N.W.2d 784 (2005).

The second mortgage designated the relationships of Kesler, MERS, and Millennia and established payment and notice obligations. That document

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

purported to define the role played by MERS in the transaction and the contractual rights of the parties.

The document began by identifying the parties:

"THIS MORTGAGE is made this 15th day of March 2005, between the Mortgagor, BOYD A. KESLER, (herein 'Borrower'), and the Mortgagee, Mortgage Electronic Registration Systems, Inc. ('MERS'), (solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns). MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. MILLENNIA MORTGAGE CORP., A CALIFORNIA CORPORATION is organized and existing under the laws of CALIFORNIA and has an address of 23046 AVENIDA DE LA CARLOTA # 100, LAGUNA HILLS, CALIFORNIA 92653 (herein 'Lender')."

The third paragraph of the first page of the mortgage document conveyed a security interest in real estate:

**165 "TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the County of FORD, State of Kansas."

*537 The first paragraph of the second page of the mortgage document contains the following language that apparently both limits and expands MERS's rights:

"Borrower understands and agrees that MERS

holds only legal title to the interests granted by Borrower in this Mortgage; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any and all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or cancelling this Mortgage."

Paragraph 7 of the mortgage document provides the lender with the right to protect the security:

"If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest."

Paragraph 9 of the mortgage document provides the lender with rights in the event of a condemnation:

"Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this mortgage."

Paragraph 12 of the mortgage document addresses notice:

"Notice. Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

Lender as provided herein, and (b) *any notice to Lender* shall be given by certified mail *to Lender's address stated herein* or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein." (Emphasis added.)

The signature page of the mortgage document contains language relating to notice in the event of default:

*538 "*Borrower and Lender request the holder of any mortgage,* deed of trust or other encumbrance with a lien which has priority over this Mortgage *to give Notice to Lender, at Lender's address* set forth on page one of this Mortgage, *of any default* under the superior encumbrance and of any sale or other foreclosure action." (Emphasis added.)

The mortgage instrument states that MERS functions "solely as nominee" for the lender and lender's successors and assigns. The word "nominee" is defined nowhere in the mortgage document, and the functional relationship between MERS and the lender is likewise not defined. In the absence of a contractual definition, the parties leave the definition to judicial interpretation.

What meaning is this court to attach to MERS's designation as nominee for Millennia? The parties appear to have defined the word in much the same way that the blind men of Indian legend described an elephant**166 -their description depended on which part they were touching at any given time. Counsel for Sovereign stated to the trial court that MERS holds the mortgage "in street name, if you will, and our client the bank and other banks transfer these mortgages and rely on MERS to provide them with notice of foreclosures and what not." He later stated that the nominee "is the mortgagee and is holding that mortgage for somebody else." At another time he declared on the record that the nomin-

ee "is more like a trustee or more like a corporation, a trustee that has multiple beneficiaries. Now a nominee's relationship is not a trust but if you have multiple beneficiaries you don't serve one of the beneficiaries you serve the trustee of the trust. You serve the agent of the corporation."

Counsel for the auction property purchasers stated that a nominee is "one designated to act for another as his representative in a rather limited sense." He later deemed a nominee to be "like a power of attorney."

Black's Law Dictionary defines a nominee as "[a] person designated to act in place of another, usu. in a very limited way" and as "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others." Black's Law Dictionary 1076 (8th ed.2004). This definition suggests that a nominee possesses few or no legally enforceable rights beyond those of a principal whom the nominee serves.

*539 In its opinion below, the Court of Appeals cited *Thompson v. Meyers,* 211 Kan. 26, 30, 505 P.2d 680 (1973), which provides the only discussion in Kansas of the legal significance of a nominee:

"In common parlance the word 'nominee' has more than one meaning. Much depends on the frame of reference in which it is used. In Webster's Third New International Dictionary, unabridged, one of the definitions given is 'a person named as the recipient in an annuity or grant.' We view a 'nominee', as the term was used by the parties here, not simply in the sense of a straw man or limited agent ..., but in the larger sense of a person designated by them to purchase the real estate, who would possess all the rights given a buyer....."

The legal status of a nominee, then, depends on the context of the relationship of the nominee to its

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

principal. Various courts have interpreted the relationship of MERS and the lender as an agency relationship. See *In re Sheridan*, 2009 WL 631355, at *4 (Bankr.D.Idaho March 12, 2009) (MERS "acts not on its own account. Its capacity is representative."); *Mortgage Elec. Registration System, Inc. v. Southwest*, 2009 Ark. 152, ----, --- S.W.3d ----, 2009 WL 723182 (March 19, 2009) ("MERS, by the terms of the deed of trust, and its own stated purposes, was the lender's agent"); *LaSalle Bank Nat. Ass'n v. Lamy*, 12 Misc.3d 1191, 824 N.Y.S.2d 769, 2006 WL 2251721, at *2 (Sup.2006) (unpublished opinion) ("A nominee of the owner of a note and mortgage may not effectively assign the note and mortgage to another for want of an ownership interest in said note and mortgage by the nominee.")

[16] The relationship that MERS has to Sovereign is more akin to that of a straw man than to a party possessing all the rights given a buyer. A mortgagee and a lender have intertwined rights that defy a clear separation of interests, especially when such a purported separation relies on ambiguous contractual language. The law generally understands that a mortgagee is not distinct from a lender: a mortgagee is "[o]ne to whom property is mortgaged: the mortgage creditor, or lender." Black's Law Dictionary 1034 (8th ed.2004). By statute, assignment of the mortgage carries with it the assignment of the debt. K.S.A. 58-2323. Although MERS asserts that, under some situations, the mortgage document purports to give it the same rights as the lender, the document consistently refers only to rights of the lender, including rights to receive notice *540 of litigation, to collect payments, and to enforce the debt obligation. The document consistently limits MERS to acting "solely" as the nominee of the lender.

Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying **167 with some independent entity, the mortgage may become unenforceable.

"The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note. [Citation omitted.] Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. [Citation omitted.] The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust." *Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 623 (Mo.App.2009).

The Missouri court found that, because MERS was not the original holder of the promissory note and because the record contained no evidence that the original holder of the note authorized MERS to transfer the note, the language of the assignment purporting to transfer the promissory note was ineffective. "MERS never held the promissory note, thus its assignment of the deed of trust to Ocwen separate from the note had no force." 284 S.W.3d at 624; see also *In re Wilhelm*, 407 B.R. 392 (Bankr.D.Idaho 2009) (standard mortgage note language does not expressly or implicitly authorize MERS to transfer the note); *In re Vargas*, 396 B.R. 511, 517 (Bankr.C.D.Cal.2008) ("[I]f FHM has transferred the note, MERS is no longer an authorized agent of the holder unless it has a separate agency contract with the new undisclosed principal. MERS presents no evidence as to who owns the note, or of any authorization to act on behalf of the present owner."); *Saxon Mortgage Services, Inc. v. Hillery*, 2008 WL 5170180 (N.D.Cal.2008) (unpublished opinion) ("[F]or there to be a valid assignment, there must be more than just assignment of the deed alone; the note must also be assigned.... MERS purportedly assigned both the deed of trust and the promissory note.... However, there is no evidence of record that establishes that MERS either held the *541 promissory note or was given the authority ... to assign the note.").

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

What stake in the outcome of an independent action for foreclosure could MERS have? It did not lend the money to Kesler or to anyone else involved in this case. Neither Kesler nor anyone else involved in the case was required by statute or contract to pay money to MERS on the mortgage. See *Sheridan*, 2009 WL 631355, at *4 ("MERS is not an economic 'beneficiary' under the Deed of Trust. It is owed and will collect no money from Debtors under the Note, nor will it realize the value of the Property through foreclosure of the Deed of Trust in the event the Note is not paid."). If MERS is only the mortgagee, without ownership of the mortgage instrument, it does not have an enforceable right. See *Vargas*, 396 B.R. at 517 ("[w]hile the note is 'essential,' the mortgage is only 'an incident' to the note" [quoting *Carpenter v. Longan*, 16 Wall. 271, 83 U.S. 271, 275, 21 L.Ed. 313 (1872) ] ).

When it found that MERS did not have an interest in the property that was impaired by the default judgment, the trial court properly considered four factors: (1) that the written pleadings and oral arguments by MERS and Sovereign identified MERS as acting only as a digital mortgage tracking service; (2) that counsel for MERS insisted that no evidence of a financial or property interest was necessary and its argument rested solely on its identity as the mortgagee on the mortgage document, when counsel was directly challenged to produce evidence of a financial or property interest; (3) that evidence showed that Sovereign was on notice that Landmark had leave of the bankruptcy court to proceed with foreclosure and that MERS did not attempt to intervene in the action until after its alleged principal, Sovereign, had already had its motion to intervene and to set aside judgment denied; and (4) that the case law submitted by the parties weighed more in favor of denying the motion. These factors were properly before the trial court and were consistent with the evidence and supported the court's legal reasoning.

[17] Counsel for MERS explicitly declined to

demonstrate to the trial court a tangible interest in the mortgage. Parties **168 are bound by the formal admissions of their counsel in an action. *542 *Dick v. Drainage District No. 2*, 187 Kan. 520, 525, 358 P.2d 744 (1961). Counsel for MERS made no attempt to show any injury to MERS resulting from the lack of service; in fact, counsel insisted that it did not have to show a financial or property interest.

MERS argued in another forum that it is *not* authorized to engage in the practices that would make it a party to either the enforcement of mortgages or the transfer of mortgages. In *Mortgage Elec. Reg. Sys. v. Nebraska Dept. of Banking*, 270 Neb. 529, 704 N.W.2d 784 (2005), MERS challenged an administrative finding that it was a mortgage banker subject to license and registration requirements.

The Nebraska Supreme Court found in favor of MERS, noting that "MERS has no independent right to collect on any debt because MERS itself has not extended credit, and none of the mortgage debtors owe MERS any money." 270 Neb. at 535, 704 N.W.2d 784. The Nebraska court reached this conclusion based on the submissions by counsel for MERS that

"MERS does not take applications, underwrite loans, make decisions on whether to extend credit, collect mortgage payments, hold escrows for taxes and insurance, or provide any loan servicing functions whatsoever. MERS merely tracks the ownership of the lien and is paid for its services through membership fees charged to its members. MERS does not receive compensation from consumers." 270 Neb. at 534, 704 N.W.2d 784.

Even if MERS was technically entitled to notice and service in the initial foreclosure action-an issue that we do not decide at this time-we are not compelled to conclude that the trial court abused its discretion in denying the motions to vacate default judgment and require joinder of MERS and Sovereign. The record lacks evidence supporting a claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

that MERS suffered prejudice and would have had a meritorious defense had it been joined as a defendant to the foreclosure action. We find that the trial court did not abuse its discretion and did not commit reversible error in ruling on the postdefault motions.

We note that various arguments were presented suggesting that economic policy provides independent grounds for reversing the trial court. MERS and the *amicus curiae* American Land Title Association argue that MERS provides a cost-efficient method of *543 tracking mortgage transactions without the complications of county-by-county registration and title searches. The *amicus* suggests the statutory recording system is grounded in seventeenth-century property law that is entirely unsuited to twentieth-century financial transactions. While this may be true, the MERS system introduces its own problems and complications.

One such problem is that having a single front man, or nominee, for various financial institutions makes it difficult for mortgagors and other institutions to determine the identity of the current note holder.

"[I]t is not uncommon for notes and mortgages to be assigned, often more than once. When the role of a servicing agent acting on behalf of a mortgagee is thrown into the mix, it is no wonder that it is often difficult for unsophisticated borrowers to be certain of the identity of their lenders and mortgagees." *In re Schwartz*, 366 B.R. 265, 266 (Bankr.D.Mass.2007).

"[T]he practices of the various MERS members, including both [the original lender] and [the mortgage purchaser], in obscuring from the public the actual ownership of a mortgage, thereby creating the opportunity for substantial abuses and prejudice to mortgagors ..., should not be permitted to insulate [the mortgage purchaser] from the consequences of its actions in accepting a mortgage from [the original lender] that was already the subject of litigation in which [the original lender] erroneously represented that it had

authority to act as mortgagee." *Johnson v. Melnikoff*, 20 Misc.3d 1142, 873 N.Y.S.2d 234, 2008 WL 4182397, at *4 (Sup.1008).

The *amicus* argues that "[a] critical function performed by MERS as the mortgagee is the receipt of service of all legal process related to the property." The *amicus* makes this argument despite the mortgage clause **169 that specifically calls for notice to be given to the *lender*, not the putative mortgagee. In attempting to circumvent the statutory registration requirement for notice, MERS creates a system in which the public has no notice of who holds the obligation on a mortgage.

The Arkansas Supreme Court has noted:

"The only recorded document provides notice that [the original lender] is the lender and, therefore, MERS's principal. MERS asserts [the original lender] is not its principal. Yet no other lender recorded its interest as an assignee of [the original lender]. Permitting an agent such as MERS purports to be to step in and act without a recorded lender directing its action would wreak havoc on notice in this state." *Southwest Homes v. Carmen Price*, --- Ark. at ----. --- S.W.3d at -
---.

*544 In any event, the legislature has established a registration requirement for parties that desire service of notice of litigation involving real property interests. It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 348, 789 P.2d 541 (1990)
.

*II. Did The Trial Court's Refusal To Join MERS As A Party Violate MERS's Right To Due Process?*

[18] MERS contends that the Fourteenth Amendment and § 18 of the Kansas Constitution Bill of Rights guarantees of due process were violated when the foreclosure action was consummated without MERS receiving notice of the proceeding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

216 P.3d 158
289 Kan. 528, 216 P.3d 158
(Cite as: 289 Kan. 528, 216 P.3d 158)

and without MERS having the opportunity to intervene in the action.

[19] Although joinder is evaluated under an abuse of discretion standard, if a constitutional right is involved the trial judge's exercise of discretion is limited. Discretion must be exercised not in opposition to, but in accordance with, established principles of law. It is not an arbitrary power. *In re Adoption of B.G.J.*, 281 Kan. 552, 563, 133 P.3d 1 (2006).

The Fourteenth Amendment to the United States Constitution provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law."

Section 18 of the Kansas Constitution Bill of Rights provides: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

[20][21] Due process provides any interested party with the elementary and fundamental right to notice of the pendency of an action and the opportunity to present its objections in any proceeding that is to be accorded finality. *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1275, 136 P.3d 457 (2006) (citing *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 94 L.Ed. 865, 70 S.Ct. 652 [1950] ). In the absence of a protected property or liberty interest, there can be no due process violation. *545 State ex rel. Tomasic v. Unified Gov't of Wyandotte County/Kansas City*, 265 Kan. 779, 809, 962 P.2d 543 (1998).

[22][23][24][25] The Due Process Clause does not protect entitlements where the identity of the alleged entitlement is vague. *Castle Rock v. Gonzales*, 545 U.S. 748, 763, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005). A protected property right must have some ascertainable monetary value. 545 U.S. at 766, 125 S.Ct. 2796. Indirect monetary benefits do not establish protection under the Four-

teenth Amendment. 545 U.S. at 767, 125 S.Ct. 2796. An entitlement to a procedure does not constitute a protected property interest. 545 U.S. at 764, 125 S.Ct. 2796.

MERS's contention that it was deprived of due process in violation of constitutional protections runs aground in the shallows of its property interest. As noted in the discussion of the first issue above, MERS did not demonstrate, in fact, did not attempt to demonstrate, that it possessed any tangible interest in the mortgage beyond a nominal designation as the mortgagor. It lent no money and received no payments from the borrower. It suffered no direct, ascertainable monetary **170 loss as a consequence of the litigation. Having suffered no injury, it does not qualify for protection under the Due Process Clause of either the United States or the Kansas Constitutions.

Furthermore, MERS received the full opportunity to present arguments and evidence to the trial court. Only after Sovereign clearly had notice of the litigation, had filed a motion to intervene, and had participated in a hearing on the motion did MERS-Sovereign's nominee-elect to file for joinder. Despite its late decision to enter an appearance in the case, the trial court allowed MERS the opportunity to present arguments and evidence. It cannot be said that MERS was prejudicially denied notice and the opportunity to be heard.

We find that the district court did not abuse its discretion in denying the motions to vacate and for joinder and in holding that MERS was not denied due process. We accordingly affirm the district court and the Court of Appeals.

Kan.,2009.
Landmark Nat. Bank v. Kesler
289 Kan. 528, 216 P.3d 158

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 8

Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619 (Mo. App. 2009)

**284 S.W.3d 619**
Robert BELLISTRI, Respondent,
v.
**OCWEN LOAN SERVICING, LLC, Appellant.**
No. ED 91369.
Missouri Court of Appeals, Eastern District, Division Five.
March 3, 2009.
Motion for Rehearing and/or Transfer to Supreme Court Denied April 6, 2009.
Application for Transfer Denied June 30, 2009.
[284 S.W.3d 621]

Blake Hill, Jeffrey Weisman, Co-Counsel, St. Louis, MO, for appellant.

Phillip Gebhardt, Desoto, MO, for respondent.

NANNETTE A. BAKER, Chief Judge.

**Introduction**

The appellant, Ocwen Loan Servicing, L.L.C.1, (Ocwen) appeals from a judgment of the Circuit Court of Jefferson County quieting title to real estate commonly known as 1210 Airglades, Arnold, Missouri, 63010 (the property) in favor of Robert Bellistri. Both parties filed motions for summary judgment, and the circuit court held that Ocwen lacked standing to contest Bellistri's deed. For the following reasons, we affirm.

**Facts**

On March 5, 2002, Glen Crouther purchased the property and executed a promissory note and a deed of trust. BNC Mortgage Inc. (BNC) was the lender and payee of the promissory note. In the deed of trust, Millsap, Singer & Dunn, P.C. was the trustee. The deed of trust, however, did not name BNC as the beneficiary, but instead names Mortgage Electronic Registration System (MERS), solely as BNC's nominee. The promissory note does not make any reference to MERS. The note and the deed of trust both require payments to be made to the lender, not MERS.

During 2002, 2003 and 2004, Crouther failed to pay taxes. At the second offering delinquent tax sale, Bellistri, the respondent, purchased the property and was issued a certificate of purchase on August 22, 2005. On May 12, 2006, Bellistri sent BNC a notice of redemption as required under the Jones Munger Act, Section 140.405 RSMo. (2006).

On September 19, 2006, the collector of revenue of Jefferson County, Missouri issued Bellistri a collector's deed. After the issuance of the collector's deed, MERS, as nominee for BNC, assigned the deed of trust to Ocwen on April 4, 2007. The assignment of the deed of trust also contained language that this assignment also transferred any and all notes described in the deed of trust.

Bellistri filed the instant action seeking to quiet title and eject Crouther from the property. Initially, Bellistri named Crouther as a defendant and published notice for all other unknown persons with an interest in the property. Later, Bellistri filed a motion to add Ocwen as a necessary, if not indispensable party. The circuit court granted his motion. Ocwen and Bellistri filed cross motions for summary judgment. The circuit court denied Ocwen's motion and granted summary judgment in favor of Bellistri. Ocwen now appeals.

**Standard of Review**

Whether a motion for summary judgment should be granted is a question of law and our review is essentially de
[284 S.W.3d 622]
novo. ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper where the movant establishes the absence of any genuine issue of material fact and a legal right to judgment. Id. at 378. We will review the record in the light most favorable to the party against whom judgment has been entered. Facts set forth by affidavit or otherwise in support are taken as true unless contradicted by the non-moving party's response. Id. at 376. We will affirm the trial court's judgment if it is sustainable on any theory. Citibrook II, L.L.C. v. Morgan's Foods of Missouri, Inc., 239 S.W.3d 631 (Mo.App. E.D.2007).

**Points on Appeal**

On appeal, Ocwen argues that the trial court erred in entering summary judgment in favor of Bellistri because (1) Bellistri lost his interest in the property by failing to send MERS any notice pursuant to section 140.405; (2) the notice Bellistri sent to BNC misrepresented the redemption period and was therefore insufficient; (3) summary judgment should have been entered in its favor because Bellistri failed to comply with section 140.405; and (4) Ocwen had standing in this quiet title action because it was the named grantee on the assignment of the deed of trust.

**Discussion**

We will address the issue of standing first, as it is a jurisdictional matter antecedent to the right to relief. Farmer v. Kinder, 89 S.W.3d 447, 451 (Mo. banc 2002). Standing refers to a party's right to seek relief. Id. It "requires that a party seeking relief have

a legally cognizable interest in the subject matter and that he has a threatened or actual injury." Eastern Missouri Laborers Dist. Council v. St. Louis County, 781 S.W.2d 43, 46 (Mo. banc 1989). Standing requires the party to be sufficiently affected so as to ensure a justiciable controversy. Shannon v. Hines, 21 S.W.3d 839, 841 (Mo.App. E.D.1999). Therefore, a party "must have some actual, justiciable interest." Id. They must have a recognizable stake. Wahl v. Braun, 980 S.W.2d 322 (Mo.App. E.D.1998). Lack of standing cannot be waived and may be considered by the court sua sponte. Brock v. City of St. Louis, 724 S.W.2d 721 (Mo.App. E.D.1987). If a party seeking relief lacks standing, the trial court does not have jurisdiction to grant the requested relief. Shannon, 21 S.W.3d at 842.

The Jones Munger Act, RSMo section 140.330, provides that one who acquires a collector's deed may bring an action to quiet title, naming as defendants "all parties who have, or claim to have, or appear of record in the county where such land or lot is situated, to have an interest in, or lien upon such lands or lots." Section 140.330. Here, Ocwen appears of record to have an interest in the property because it is the named grantee on the assignment of the deed of trust.

While this section allows broad joinder of defendants, a named defendant will not prevail unless the defendant has at least some interest in the property. Scott v. Unknown Heirs of Solomon Garrison, 361 Mo. 643, 235 S.W.2d 372, 374 (1951). In Scott, the plaintiff claimed title by virtue of a tax deed. The plaintiff brought an action to quiet her title, and the defendant claimed he was the owner of the property. The defendant, however, failed to produce a recorded title. The defendant also never had possession and paid no taxes on the property. He claimed he lost the deed, but had assumed a contract to purchase the property. The trial court found that the defendant had no right, title or interest in the property. On appeal, the defendant

[284 S.W.3d 623]

argued that the tax deed was void because the tax sale was so grossly inadequate as to amount to fraud. While the court agreed that the amount paid was so grossly inadequate as to be constructive fraud, they found that the defendant "did not have such an interest or claim of right to the property in question to challenge the sufficiency of the plaintiff's deed." Id.

Essentially, the Scott court found that the defendant lacked standing to invalidate the tax deed. The defendant lacked a legally cognizable interest in the property, and therefore he could not challenge the issuance of a collector's deed.

The same is true in the instant case. While Ocwen is the recorded grantee on the assignment of the deed of trust, it has no legally cognizable interest. Lacking such an interest, Ocwen is not entitled to the relief it seeks, namely, to dismiss Bellistri's petition and declare that the plaintiff has lost all interest in the real estate. Essentially, Ocwen is asking the court to quiet title in Crouther's name.

To seek this relief from the court, Ocwen must at least have an "interest" in the property. Scott, 235 S.W.2d at 374; Thurmon v. Ludy, 914 S.W.2d 32, 34 (Mo. App. E.D.1995) On the assignment of the deed of trust, Ocwen is listed as the grantee, as servicer for Deutsche Bank National Trust Company, as Trustee for the registered holders of the CDC Mortgage Capital trust, 2002-HE1, Mortgage Pass-Through Certificates, Series 2002-HE1 (Deutsche Bank). We must turn to the law of mortgages to understand Ocwen's interest.

Generally, a mortgage loan consists of a promissory note and security instrument, usually a mortgage or a deed of trust, which secures payment on the note by giving the lender the ability to foreclose on the property. Typically, the same person holds both the note and the deed of trust. In the event that the note and the deed of trust are split, the note, as a practical matter becomes unsecured. Restatement (Third) of Property (Mortgages) § 5.4. Comment. The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note. Id. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. Id. The mortgage loan became ineffectual when the note holder did not also hold the deed of trust.

When the holder of the promissory note assigns or transfers the note, the deed of trust is also transferred. George v. Surkamp, 336 Mo. 1, 76 S.W.2d 368, 371 (1934). An assignment of the deed of trust separate from the note has no "force." Id. Effectively, the note and the deed of trust are inseparable, and when the promissory note is transferred, it vests in the transferee "all the interest, rights, powers and security conferred by the deed of trust upon the beneficiary therein and the payee in the notes." St. Louis Mut. Life Ins. Co. v. Walter, 329 Mo. 715, 46 S.W.2d 166, 170 (1931).

When it assigned the deed of trust, MERS attempted to transfer to Ocwen the deed of trust "together with any and all notes and obligations therein described or referred to, the debt respectively secured thereby and all sums of money due and to become due." The record reflects that BNC was the

holder of the promissory note. There is no evidence in the record or the pleadings that MERS held the promissory note or that BNC

[284 S.W.3d 624]

gave MERS the authority to transfer the promissory note. MERS could not transfer the promissory note; therefore the language in the assignment of the deed of trust purporting to transfer the promissory note is ineffective. Black v. Adrian, 80 S.W.3d 909, 914-15 (Mo.App. S.D.2002) ("[A]ssignee of a deed of trust or a promissory note is vested with all interests, rights and powers possessed by the assignor in the mortgaged property"). MERS never held the promissory note, thus its assignment of the deed of trust to Ocwen separate from the note had no force. See George, 76 S.W.2d at 371. St. Louis Mut. Life Ins. Co., 46 S.W.2d at 170.

As Ocwen holds neither the promissory note, nor the deed of trust, Ocwen lacks a legally cognizable interest and lacks standing to seek relief from the trial court. See Scott, 235 S.W.2d at 374. The trial court was without jurisdiction to grant Ocwen its requested relief, and did not err in granting summary judgment in Bellistri's favor.

Conclusion

Ocwen lacked a legally cognizable interest in the property, and therefore, it has no standing to seek relief. We hereby affirm the judgment of the circuit court of Jefferson County.

GLENN A. NORTON, J., and KENNETH M. ROMINES, J., concur.

------

Notes:

1. Ocwen Loan Servicing, L.L.C. refers to Ocwen Loan Servicing, L.L.C., servicer for Deutsche Bank National Trust Company, as Trustee for the registered holders of the CDC Mortgage Capital trust 2002-HE1, as successor in interest to MERS, Inc.

------

# EXHIBIT 9

# The Salt Lake Tribune

http://www.sltrib.com

## Foreclosures: Salt Lake hardest hit in mortgage crisis

By Lesley Mitchell
The Salt Lake Tribune

Salt Lake Tribune
Updated:04/29/2010 07:52:17 AM MDT

# The Salt Lake Tribune

http://www.sltrib.com

When it comes to foreclosures, Salt Lake City is the worst of the worst.

The metro area had the largest percentage increase in foreclosure filings the past year among more than 50 communities hardest hit by the nation's foreclosure crisis, a new report shows.

Owners of 5,155 local properties received a foreclosure-related notice in the first quarter, 101 percent higher than the same period in 2009, according to RealtyTrac, a company that tracks foreclosures nationally. In the U.S., foreclosure filings rose only 16 percent. Many of the other metro areas with high levels of distressed properties actually saw their foreclosure rates fall from the super-high levels of last year.

As for the rate of foreclosures-related filings, one in every 77 of all housing units in the Salt Lake area, or 1.3 percent, received a notice in the first three months of the year, RealtyTrac said. That's the 35th-highest rate of filings among all 206 metro areas in the RealtyTrac report, up from No. 62 in the first quarter 2009 and No. 107 in the first quarter 2008.

Provo-Orem was No. 34, while Ogden-Clearfield was No. 53.

RealtyTrac said Salt Lake's growing foreclosure-filings rate demonstrates how the problem has spread in a big way from cities in California, Arizona and Nevada into other once-booming areas. Utah, which in the mid-2000s had one of the most robust economies and lowest foreclosure rates now has the fifth-highest rate of foreclosure filings of all states, behind only Nevada, Arizona, Florida and California.

"Early on, when we started seeing foreclosure problems it was a limited number of states and metro areas," said Darin Blomquist of RealtyTrac. "The foreclosure problem has spread."

Defaults and foreclosures in Utah first started to creep up in 2008, after the real estate market and state's overall economy began to take a turn for the worse. As home sales and prices have fallen over the past two years, more and more homeowners are "underwater," meaning they owe more than their homes are worth. Many of those in this situation are unable to sell their homes for enough money to cover their mortgages after they encounter financial trouble and can't keep up with their payments.

That's why Mark Knold, chief economist for the Utah Department of Workforce Services, isn't surprised that Utah's foreclosure rate is significantly higher than the national average. Nationally, only one in every 138 households have received a foreclosure filing, or 0.72 percent, compared with Utah's much higher one-in-77 rate.

"We were late in to the housing bubble, we'll be the last to get out," he said. Knold believes Utah's foreclosure problem will be at its worst this year and should begin to improve in 2011.

In some cases, homeowners can sell their homes via a short sale if lenders agree to accept less than they are owed. Some lenders also are willing to modify mortgages, which can lower a borrower's monthly mortgage payment. But either method of avoiding foreclosure can be difficult and time-consuming to complete, and not all borrowers qualify for help.

The RealtyTrac report covers a wide range of foreclosure-related filings, from default notices -- in which homeowners are simply behind on their payments but not yet in danger of losing their properties -- to notices that the bank is taking possession of the property.

lesley@sltrib.com

Metro areas with highest foreclosure rates

1 » Las Vegas-Paradise, Nev.

2 » Modesto, Calif.

3 » Cape Coral-Fort Myers, Fla.

4 » Riverside-San Bernardino-Ontario, Calif.

5 » Stockton, Calif.

34 » Provo-Orem

35 » Salt Lake City

53 » Ogden-Clearfield

Source: RealtyTrac

Close Window   Send To Printer

# EXHIBIT 10

# Loan registry raises legal questions

Foreclosures » Courts, legal scholars question company's role.

By Tony Semerad

The Salt Lake Tribune

Updated: 04/25/2010 09:16:28 AM MDT

A small real estate data-management company is the focus of a widening legal controversy that could affect millions of U.S. foreclosures, including thousands filed against distressed homeowners in Utah.

The nation's largest lenders created Mortgage Electronic Registration Systems (MERS), of Reston, Va., in 1994 as a loan registry designed to save millions of dollars on paperwork and recording fees. By registering mortgages with the private computer-tracking system and, in effect, putting loans under MERS' name, lenders could avoid having to file public documents each time a mortgage was bought and sold.

The arrangement served its purpose well as markets went up. By MERS's own estimates, it saved mortgage lenders more than $1 billion during a decade, and the efficiencies it brought to mortgage trading played a key role in the growth of mortgage-backed securities and the housing boom.

But with the economic downturn and crush of foreclosures, MERS is now showing up on tens of thousands of foreclosure notices sent to delinquent homeowners, including nearly 3,000 sent in Utah since July 2008, most of them in Salt Lake County.

Here and nationally, the company's legal status as a party in these actions is increasingly being challenged.

"This is one of the buried, yet-to-emerge bombs in the whole mortgage crisis," said Christopher Peterson, a University of Utah law professor and author of the first scholarly analysis of MERS and its legal underpinnings, to be published this spring in the *University of Cincinnati Law Review* . "This has the potential to fundamentally affect the trajectory of our recovery."

--

**'A tax evasion broker'** » MERS officials vigorously disagree, but Peterson contends the MERS system has violated a deep-seated principle of American law -- transparency in land-ownership transactions -- by effectively removing much of that information from the public record. In so doing, Peterson says, MERS also has served as "a tax evasion broker," denying counties millions of dollars in recording fees -- revenue that might otherwise have funded essential public services.

And now, by allowing actual lenders to pursue foreclosures under MERS' name instead of their own, Peterson says the company is acting as a "foreclosure doppelganger."

"Throughout history, executioners have always worn masks," the U. professor writes in his article, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*. "In the American mortgage lending industry, MERS has become the veiled man wielding the home foreclosure ax."

--

**'Lucky ones ...are ...with MERS'** » A MERS official played down the controversy, saying that without MERS, the current real estate meltdown would be much worse. Its process makes mortgage data more accurate and reliable, while reducing errors and keeping costs low, spokeswoman Karmela Lejarde said.

Lenders initiate foreclosures under the name of MERS, which functions as an industry utility, she said. Parties to a MERS action have full access to the ownership trail through the MERS registry, Lejarde said.

"We're all for systematic tracking and transparency," she said. "It's the lucky ones whose loans are registered with MERS and are able to track down what happened."

As more and more homeowners and their lawyers fight foreclosure, courts are having to weigh in, and in some cases, their interpretations conflict. Given the numbers at stake -- the MERS registry holds an estimated 60 million U.S. mortgages -- many in the industry have a sense of foreboding.

"This could be the scam from hell," Salt Lake County Recorder Gary Ott said.

Legal issues aside, MERS has complicated and even thwarted efforts by some homeowners in foreclosure as they seek to contact and negotiate with whomever legitimately holds their loan.

``They don't know who their investor is and the lender won't always tell them,'' said Kristin Johnson, chairwoman of the Housing Education Coalition of Utah and a foreclosure-prevention counselor. ``If you don't know who their investor is, how do you get resolution for the homeowner?"

Peterson and others warn the system may also be derailing efforts to track down and prosecute shady lending practices.

Representatives of the Utah lending community say use of the loan registry has been standard operating procedure, endorsed of government backed agencies such as Fannie Mae and Freddie Mac, which were instrumental in MERS' creation.

And all of the participants in the mortgage boom -- home buyers, lenders, loan servicers and real-estate companies -- benefited from savings that MERS generated, according to Julia Borst, president of the Utah Mortgage Lenders Association, a trade group for lenders.

In terms of using technology to modernize the processing of mortgages, ``it all makes sense for this to have been set up," said Cleon Butterfield, chief financial officer for the Utah Housing Corporation, a state-backed lending agency.

Yet, virtually everyone agrees the company's role has been radically transformed by the mortgage collapse.

``MERS was intended to be a repository of all these records, but it turned into something else," said Rick Sharga, senior vice president for RealtyTrac, which tracks foreclosures nationwide. "They became the foreclosing party of record and it's hard to argue logically that a registry should be a foreclosing party of record."

--

**'Patch-up job'** » Amid the current explosion in foreclosure actions across the country, courts in Nevada, Florida, Minnesota and elsewhere have upheld MERS standing as a foreclosing party. MERS also points to a 2009 federal case in Utah that affirmed its authority to exercise certain legal powers accorded to the lender, including the right to foreclose.

But several MERS foreclosures have bogged down when parties could not produce the original loan or ``blue-ink'' documents on judicial demand. In September, the Kansas Supreme Court ruling took a dim view of the idea of a ``nominee'' of the lender filing foreclosures -- a position that some observers see as hostile to the MERS approach.

*The New York Times* quoted University of Missouri law professor Patrick Randolph as saying, ``The entire structure of MERS as recorded nominee could collapse in Kansas, and that could lead to a patch-up job where they would have to run around and re-record the mortgages."

Homeowners in Delaware, meanwhile, have filed a class-action lawsuit against MERS, over what they claim are fraudulent fees charged by lenders seeking to foreclose under the MERS name.

Lejarde, the MERS spokeswoman, said the company's practices have not been significantly affected by the cases.

--

**It's a bloody mess** » In Utah, where foreclosure rates are dramatically outpacing the national average, cases already are bubbling up in state and federal courts that raise issues regarding MERS' role.

``There is a flaw in the system that was set up by the stakeholders," said Salt Lake City attorney Walter Keane, who is pushing several such cases. ``Anyone could use these arguments."

Some predict severe economic consequences if MERS' role in foreclosures is undercut. Lenders will have no choice but to tighten credit if their ability to foreclose on delinquent loans is hampered, said Borst, of the Utah Mortgage Lenders Association.

With bank bailouts, federal regulators are hammering on foreclosing banks to be consistent from state to state, she said. Combine that with a coming foreclosure surge and state courts taking divergent positions on who has the right to foreclose, Borst said, "and it's a bloody mess. There's no other way to put it."

*tsemerad@sltrib.com*